# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **YUKSEL CELIKGOGUS** <br> **Kabakozmah** <br> **Yeni Adapazari Cad. Nr. 88** <br> **Karasu/Sakarya** <br> **Turkey;** <br><br> **IBRAHIM SEN** <br> **Altintepe Mah.** <br> **Holilulloh Sok. Nr. 18** <br> **Van/Merkez** <br> **Turkey** <br><br> Plaintiffs, <br><br> v. <br><br> **DONALD RUMSFELD** <br> **Department of Defense** <br> **1000 Defense Pentagon** <br> **Washington D.C. 20301-1000;** <br><br> **AIR FORCE GEN. RICHARD MYERS** <br> **Former Chairman, Joint Chiefs of Staff** <br> **9999 Joint Chiefs of Staff Pentagon** <br> **Washington, D.C. 20318;** <br><br> **ARMY MAJ. GEN. GEOFFREY MILLER** <br> **Former Commander, Joint Task Force** <br> **Guantánamo Bay Naval Base, Cuba,** <br> **c/o United States Army** <br> **Army Pentagon** <br> **Washington, D.C. 20310-0200;** <br><br> **ARMY GEN. JAMES T. HILL** <br> **Former Commander, United States Southern** <br> **Command** <br> **c/o United States Army** <br> **Army Pentagon** <br> **Washington, D.C. 20310-0200;** <br><br> **ARMY MAJ. GEN. MICHAEL E. DUNLAVEY** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>         Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Former Commander, Joint Task Force    )
Guantánamo Bay Naval Base, Cuba,      )
c/o United States Army                )
Army Pentagon                         )
Washington, D.C. 20310-0200;          )
                                      )
ARMY BRIG. GEN. JAY HOOD              )
Commander, Joint Task Force, GTMO     )
Guantánamo Bay Naval Base, Cuba,      )
c/o United States Army                )
Army Pentagon                         )
Washington, D.C. 20310-0200;          )
                                      )
MARINE MAJ. GEN. MICHAEL LEHNERT      )
Commander Joint Task Force-160        )
Guantánamo Bay Naval Base, Cuba       )
c/o United States Marines             )
Marine Pentagon                       )
Washington, D.C.;                     )
                                      )
ARMY BRIG. GEN. NELSON J. CANNON      )
Commander, Camp Delta                 )
Guantánamo Bay Naval Base, Cuba,      )
c/o United States Army                )
Army Pentagon                         )
Washington, D.C. 20310-0200;          )
                                      )
ARMY COL. TERRY CARRICO               )
Commander Camp X-Ray, Camp Delta      )
Guantánamo Bay Naval Base, Cuba,      )
c/o United States Army                )
Army Pentagon                         )
Washington, D.C. 20310-0200;          )
                                      )
ARMY LT. COL. WILLIAM CLINE           )
Commander, Camp Delta                 )
Guantánamo Bay Naval Base, Cuba,      )
c/o United States Army                )
Army Pentagon                         )
Washington, D.C. 20310-0200;          )
                                      )
and                                   )
                                      )
JOHN DOES 1-100, individuals involved in the  )
abuses of Plaintiffs at Kandahar and  )

**Guantánamo**                                    )
                                                   )
**All in their individual capacities;**            )
                                                   )
               **Defendants.**                     )
                                                   )
_____)

## COMPLAINT

### INTRODUCTION

1.     Plaintiffs Yuksel Celikgogus and Ibrahim Sen, Turkish citizens, were physically and psychologically abused, subjected to coercive interrogations, denied the ability to practice freely their religion and abused them for the practice thereof, and detained without charge and without any reasonable (let alone probable) cause for nearly two years at U.S. military bases in Kandahar, Afghanistan, and Guantánamo Bay.  Though they have never had any affiliation with any terrorist group, and in fact only learned of Al Qaeda from their United States interrogators, Mr. Celikgogus and Mr. Sen were repeatedly pressured to admit to being Al Qaeda fighters.

2.     After fleeing Afghanistan in 2001 in the fog of war, Mr. Celikgogus and Mr. Sen were first transferred to Pakistani police, and then to Pakistani military, and finally to U.S. soldiers.  From their earliest interactions with U.S. soldiers and interrogators, Mr. Celikgogus and Mr. Sen were subjected to physical, psychological, sexual and religious abuse authorized directly or indirectly by the senior officials in the Department of Defense and carried out by U.S. soldiers and civilians.

3.     Plaintiffs were released without charge on November 22, 2003 and continue to suffer the physical and psychological effects of their detention and torture and the stigma of their having been detained in Guantánamo.

3

4.     Plaintiffs bring this action against Donald Rumsfeld, Gen. Richard Myers, Maj. Gen. Geoffrey Miller, Gen. James Hill, Maj. Gen. Michael Dunlavey, Brig. Gen. Jay Hood, Brig. Gen. Michael Lehnert, Col. Nelson Cannon, Col. Terry Carrico, and Lt. Col. William Cline, who directly and/or indirectly authorized the abusive and illegal practices in Guantánamo and U.S. detention facilities overseas; and against the Doe soldiers, interrogators and guards who participated directly and/or aided and abetted in Plaintiffs' abduction, detention, interrogation, torture, and/or abusive treatment.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331; 28 U.S.C. § 1343; 28 U.S.C. §1350; 42 U.S.C. § 1988(a); and directly under the United States Constitution.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(3) and 28 U.S.C. § 1391(b)(2).

## PARTIES

7.     Plaintiff Yuksel Celikgogus is a Turkish citizen.  He was born on October 1, 1967.  Plaintiff Celikgogus and his wife have three children aged fifteen, eleven, and nine.  He was detained in U.S. custody from in or around November 2001 to November 22, 2003 in Kandahar, Afghanistan and Guantánamo Bay.

8.     Plaintiff Ibrahim Sen is a Turkish citizen.  He was born on October 1, 1980.  He has eleven brothers and sisters.  He was detained in U.S. custody from in or around November 2001 to November 22, 2003 in Kandahar, Afghanistan and Guantánamo Bay.

9. Defendant Donald Rumsfeld was the United States Secretary of Defense throughout the period during which the events herein described occurred. He is a citizen of Illinois and a resident of the District of Columbia. Defendant Rumsfeld is responsible for maintaining the custody and control of the Guantánamo detainees and with ensuring that their treatment was in accordance with law. Defendant Rumsfeld ordered, authorized, condoned and/or created methods and procedures for the illegal prolonged arbitrary detention, torture, and mistreatment of Plaintiffs as alleged herein. Defendant Rumsfeld is sued in his individual capacity.

10. Defendant Myers is a General in the United States Air Force and was at times relevant hereto Chairman of the Joint Chiefs of Staff. He is a citizen and resident of Virginia. As the senior uniformed military officer in the chain of command, Defendant Myers was responsible for the custody and control of those detained at Guantánamo. He was responsible for ensuring that their treatment was in accordance with domestic and international law. Defendant Myers knew of torture and other mistreatment of detainees at Guantánamo and did not act to prevent it from occurring. Furthermore, he authorized, mandated, directed, and/or aided and abetted in the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. Defendant Myers was in regular contact with Defendant Rumsfeld and participated in and/or implemented decisions which led to injuries suffered by Plaintiffs. Defendant Myers is sued in his individual capacity.

11. Defendant Miller is a Major General in the United States Army and was at times relevant hereto Commander of Joint Task Force-GTMO. He is a citizen and resident of Texas. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees and was responsible for ensuring that their treatment was in accordance with law. On information and

belief, Defendant Miller was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command and participated in and/or implemented decisions leading to the injuries suffered by Plaintiffs. Furthermore, he authorized, mandated and/or directed the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. On information and belief, Defendant Miller implemented and condoned numerous methods of torture and other mistreatment as hereinafter described. On information and belief, Defendant Miller was subsequently transferred to Abu Ghraib where he implemented and/or facilitated torture and other mistreatment which led to international condemnation. Defendant Miller is sued in his individual capacity.

12.    Defendant Hill is a General in the United States Army and was at times relevant hereto Commander of the United States Southern Command. He is a citizen and resident of Texas. On information and belief, Defendant Hill was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command and participated in and/or implemented decisions leading to injuries suffered by Plaintiffs. On information and belief, General Hill requested and recommended approval for several abusive interrogation techniques. Furthermore, he authorized, mandated, directed, and/or aided and abetted in the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. Defendant Hill is sued in his individual capacity.

13.    Defendant Dunlavey is a Major General in the United States Army and was at times relevant hereto commander of Joint Task Forces 160/170, successors to Joint Task Force-GTMO. He is a citizen and resident of Pennsylvania. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees and for their legal treatment. On

information and belief, Defendant Dunlavey was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command and participated in and/or implemented decisions which led to injuries suffered by Plaintiffs. On information and belief, Major General Dunlavey implemented and condoned the cruel, inhuman or degrading acts and conditions alleged hereafter. Furthermore, he authorized, mandated, directed, and/or aided and abetted in the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. Defendant Dunlavey is sued in his individual capacity.

14.    Defendant Hood is a Brigadier General in the United States Army and is the Commander of Joint Task Force-GTMO, which at all relevant times operated the detention facilities at Guantánamo. He is a citizen of South Carolina. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees and for ensuring that their treatment was in accordance with law. On information and belief, Defendant Hood was in regular contact with the Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Furthermore, he authorized, mandated and directed the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. Defendant Hood is sued in his individual capacity.

15.    Defendant Lehnert is a Major General in the United States Marine Corps and was at times relevant hereto Commander of the Joint Task Force responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantánamo. He is a citizen and resident of Florida. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees and for ensuring that their treatment was in accordance with law. On information and belief,

Defendant Lehnert was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions which led to injuries suffered by Plaintiffs. Furthermore, he authorized, mandated, directed, and/or aided and abetted in the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. Defendant Lehnert is sued in his individual capacity.

16.    Defendant Cannon is a Brigadier General in the United States Army and the Commander of Camp Delta at Guantánamo. He is a citizen and resident of Michigan. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees and for their legal treatment. On information and belief, Defendant Cannon was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command and participated in and/or implemented decisions which led to injuries suffered by Plaintiffs. Furthermore, he authorized, mandated, directed, and/or aided and abetted in the aforesaid acts of torture and mistreatment carried out by those below him in the chain of command, including some or all of the Doe defendants herein. Defendant Cannon is sued in his individual capacity.

17.    Defendant Carrico is a Colonel in the United States Army and was at times relevant hereto Commander of Camp X-Ray and Camp Delta at Guantánamo. He is a citizen and resident of Texas. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees and for ensuring that their treatment was in accordance with law. On information and belief, Defendant Carrico was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command and participated in and/or implemented decisions which led to injuries suffered by Plaintiffs. Furthermore, he authorized, mandated, directed, and/or aided and abetted in the aforesaid acts of torture and mistreatment carried out by those

below him in the chain of command, including some or all of the Doe defendants herein. Defendant Carrico is sued in his individual capacity.

18.    Plaintiffs do not know the true names and capacities of defendants sued herein as Does 1-100 and therefore sue these defendants by fictitious names. Does 1-100 were the military and civilian personnel who participated in the torture and other mistreatment of Plaintiffs as hereinafter alleged.

## LEGAL FRAMEWORK

19.    Plaintiffs' detention and mistreatment were in plain violation of the United States treaty and customary international law obligations, the U.S. Constitution, and U.S. statutory obligations.

20.    Plaintiffs' treaty and customary international law claims arise under the Geneva Conventions, the Vienna Convention on Consular Relations, and the Alien Tort Statute, 28 U.S.C. § 1350, which permits aliens to bring suit in United States courts for violations of the law of nations or a treaty of the United States. The Alien Tort Statute recognizes as federal common law international norms that have general acceptance among civilized nations. Arbitrary prolonged detention; torture; and cruel, inhuman or degrading treatment are definite and accepted international norms codified in numerous international law instruments. They are therefore actionable under the Alien Tort Statute.

21.    Plaintiffs' constitutional law claims arise under the First, Fourth, and Fifth Amendments. The actions of Defendants are actionable under Bivens v. Six Unknown Named Federal Agents, 450 U.S. 388 (1971).

22.    Plaintiffs' statutory claims arise out of the Religious Freedom Restoration Act, due to Defendants' substantial burdening of Plaintiffs' religious exercise; and the U.S. Civil Rights Acts, enacted pursuant to the great Civil War Amendments, the Thirteenth and Fourteenth.  The Civil Rights Acts protect against actions and conspiracies by public officials and others designed to deprive equal protection of the laws and equal privileges and immunities from any person or class of persons and/or to injure persons.  These are actionable under 42 U.S.C. §§ 1985 (3), 1988 (a).

## FACTUAL ALLEGATIONS

Plaintiffs' Abduction in Pakistan

23.    Having faced economic difficulties at home, Mr. Celikgogus and Mr. Sen had each left Turkey in early 2001 to see if they would find better economic prospects elsewhere. Mr. Celikgogus and Mr. Sen had been independently residing in Kabul, Afghanistan for a short period when the United States began to bomb Afghanistan in September 2001.  They had not known each other in Kabul and only met after their capture in Pakistan.

24.    As the war began, and Mr. Celikgogus and Mr. Sen attempted to return to Turkey for their safety, each found transportation in private vehicles to the Pakistani border.

25.    After crossing the Pakistani border with crowds of people fleeing Afghanistan, Mr. Celikgogus and Mr. Sen were initially welcomed by Pakistani villagers.  Soon after their entry into Pakistan, however, they were surrendered by villagers to Pakistani police.  Mr. Celikgogus initially spent a week in Pakistani jail before being transferred to the military prison. Mr. Sen was transferred from the police to the military prison after one night.

26.    Mr. Celikgogus and Mr. Sen were detained together for part of the time that they were held in the Pakistani military prison.  During this time, they were interviewed several times by Pakistani military officers, but they were only asked basic questions about their identities and the purpose of their travel to Afghanistan.

27.    After approximately one month in the military prison, U.S. officials interrogated Mr. Celikgogus and Mr. Sen.  Their interrogators told them that they must confess to being Al Qaeda fighters even though Mr. Celikgogus and Mr. Sen knew nothing of al Qaeda until they first learned of it during this interrogation in Pakistan.

Plaintiffs' Detention in U.S. Custody in Afghanistan

28.    The U.S. soldiers who interrogated Mr. Celikgogus and Mr. Sen in the Pakistani military prison later transported them by plane to a U.S.-run airbase in Kandahar, Afghanistan.  During their imprisonment in Kandahar, Plaintiffs were in the exclusive physical custody and control of the United States military officials, acting under the direction and control of certain of the defendants.

29.    Mr. Celikgogus and Mr. Sen were placed on the airplane in Pakistan hooded, shackled, and with sacks covering their heads.  As soon as the plane took off, U.S. soldiers, acting under the direction and control of certain of the defendants, began to beat and abuse Mr. Celikgogus, Mr. Sen, and the other bound and hooded detainees.

30.    After the plane arrived in Kandahar, U.S. soldiers, acting under the direction and control of certain of the defendants, forced the men to lay motionless on the cold ground.  While lying on the ground, Mr. Celikgogus and Mr. Sen were beaten and kicked in the genitals and elsewhere on their bodies, repeatedly, by those guarding them.

31.     Mr. Celikgogus and Mr. Sen were then taken to a tent, where soldiers, acting under the direction and control of certain of the defendants, forcibly removed all their clothing and photographed them.     They were held naked, freezing, and in painful positions for interrogations in which they were told again that they were Al Qaeda fighters.     Because the defendants provided no interpreters who spoke Turkish, Mr. Celikgogus and Mr. Sen were unable to communicate with their interrogators.     After the interrogations, U.S. soldiers threw Mr. Celikgogus and Mr. Sen to the ground.

32.     Throughout their time in Kandahar, Mr. Celikgogus and Mr. Sen were deprived of food, water and sleep by U.S. soldiers, acting under the direction and control of certain of the defendants, who systematically woke them at regular intervals during the nights.

33.     U.S. soldiers, acting under the direction and control of certain of the defendants, interfered with Mr. Celikgogus and Mr. Sen's ability to practice their religion.     Islam requires believers to wash their body before prayer, yet defendants Does did not provide sufficient water for cleansing.     Further, when Mr. Celikgogus and Mr. Sen attempted to pray, U.S. soldiers beat them or threatened them with guns in order to disperse the men.     They were thus forced by the defendants to pray in secret, sitting or lying down without provoking the attention of their guards.     This resulted in the plaintiffs being forced to compromise their religious beliefs.

34.     Mr. Celikgogus and Mr. Sen were subjected to repeated coercive interrogations in their final days in Kandahar.     As in Pakistan, Mr. Celikgogus and Mr. Sen were pressured to confess to membership in Al Qaeda.     Mr. Celikgogus and Mr. Sen were threatened and subjected to physical abuse when they protested their innocence and refused to confess to being members of a group to which they did not belong.

35.    Despite their requests to communicate with family or representatives of the Turkish government, Mr. Celikgogus and Mr. Sen were never permitted to communicate with anyone other than their guards, interrogators, or fellow detainees.

36.    In or around January 2002, U.S. soldiers brought five Turkish prisoners together, stripped them of all clothes, and took photographs of them. The men were told to put on red overalls and were hooded, chained, and shackled again. They were forced to wear black goggles, earmuffs, thermal gloves, and a facemask.

37.    Mr. Celikgogus and Mr. Sen were forced onto a large cargo plane, and flown to Guantánamo. On the plane, they were chained to the floor with no backrests, immobile in uncomfortable positions for the entire flight and without access to toilet facilities.


Plaintiffs' Transfer to Guantánamo Bay

38.    Upon arrival in Guantánamo, U.S. soldiers unloaded Mr. Celikgogus, Mr. Sen, and other detainees. Despite their inability to see, hear, speak, or move because of restraints, soldiers acting under the direction and control of certain of the defendants beat and abused the plaintiffs repeatedly.

39.    Soldiers, acting under the direction and control of certain of the defendants, processed the plaintiffs, forcing them to undergo further public nudity. After processing, U.S. soldiers, acting under the direction and control of certain of the defendants, brought Mr. Celikgogus and Mr. Sen to Camp X-Ray, the initial makeshift prison camp for detainees. Mr. Celikgogus, Mr. Sen, and others were placed in wire cages of approximately two square meters. Conditions were cruel, inhuman, and degrading. Their cells were little more than animal cages.

40.    The cells were entirely exposed to the elements—the extreme heat of Guantánamo Bay during the day and the cold during the night.

41.    The plaintiffs were deprived of sleep during their confinement in Camp X-Ray because of strong and continuous lighting and disruptive noise. They were ordered and were forced to sit in their cells in total silence and isolation for extended periods of time.

42.    Plaintiffs were forcibly given unspecified pills and injections at regular intervals. The guards would neither let them resist the medication nor respond to their inquiries as to its substance. There was no way to escape this forced medical treatment.

43.    Disciplinary violations subjected detainees to extreme cruelty. For example, for allegedly having a small piece of wood in his cell, Mr. Sen was beaten by multiple guards and forcibly restrained in a painful position for a prolonged period of time. Plaintiffs were severely beaten on several occasions for similar infractions.

44.    Having been deprived of all remnants of a normal human life, plaintiffs were left with only their religion, prayer and religious study. They read the Koran and prayed. However, U.S. soldiers, acting under the direction and control of certain of the defendants, consistently placed substantial burdens on their ability to practice their religion and pray to their God. On numerous occasions, their efforts to pray were banned or interrupted. U.S. soldiers, acting under the direction and control of certain of the defendants, desecrated Plaintiffs' Korans. Other detainees were also prevented from making the call to prayer, with guards either silencing the person who was issuing the prayer call or playing loud music to drown out the call. The defendants thereby established an environment in which the exercise of religion by the plaintiffs was fraught with fear and humiliation.

45.    During interrogations, interrogators prohibited Mr. Celikgogus and Mr. Sen from praying despite their explicit requests to pray. This was part of a continuing pattern of disrespect and contempt for their religious beliefs, planned and implemented by the defendants pursuant to a conspiracy and alleged and set forth herein.

## Plaintiffs' Interrogation at Camp X-Ray

46.    Mr. Celikgogus and Mr. Sen were extensively interrogated at Camp X-Ray. During interrogations, they were shackled and chained to the floor and repeatedly urged by their interrogators to sign a document admitting that they were Al Qaeda fighters.

47.    During interrogations at Camp X-Ray, Mr. Celikgogus and Mr. Sen were threatened and verbally abused. During Mr. Sen's first interrogation in Guantánamo, his interrogator, one of the Doe defendants herein and acting under the direction and control of certain of the defendants, told him that if he did not "tell the truth" that he was an Al Qaeda fighter, the armed soldier in the interrogation room would shoot him in the head. Later in the same interrogation, the interrogator threatened to bring Mr. Sen's elder and younger brothers to be imprisoned alongside Mr. Sen in Guantánamo.

## Plaintiffs' Transfer to Camp Delta

48.    After more than three months in Camp X-Ray, Plaintiffs were transferred to Camp Delta where they were detained in neighboring cells. They were transferred to Camp Delta in restraints and with a sack on their heads.

49.     At Camp Delta, Plaintiffs were detained in iron cages that were subdivided from a larger metal container.  There was little to no privacy and the cages provided little shelter from the heat during the day or the cold at night.

50.     During the night, guards, Doe defendants herein and acting under the direction and control of certain of the defendants, sometimes entered Plaintiffs' cells and removed their bedcovers and mat and forced them to sleep on the iron bed frame.

51.     Numerous times when Mr. Celikgogus, Mr. Sen, or others resisted any of the abuses of the guards, U.S. soldiers, Doe defendants herein and acting under the direction and control of certain of the defendants, sprayed Plaintiffs with a chemical.  The chemical spray burned their eyes and bodies and made it difficult to breathe.  The agony was prolonged because guards turned off the water in the cells.  At other times, guards assaulted detainees with an industrial strength hose for an extended period of time.  The strength of the hose knocked detainees to the wall and soaked the contents of their cells.  Detainees were subjected to these punishments regardless of whether or not they were responsible for the alleged disciplinary violations or resistance.

52.     In Camp Delta, as in Camp X-Ray, guards desecrated Plaintiffs' Korans and defamed their religion.  Soldiers, Doe defendants herein and acting under the direction and control of certain of the defendants, disrupted the call to prayer by making sounds, imitating the call, screaming, hitting the bars of the cells, and playing loud music both in the interrogation rooms and in the cells.

Plaintiffs' Interrogations and Torture in Camp Delta

53.    Mr. Celikgogus and Mr. Sen were subjected to numerous coercive interrogations in Camp Delta, all engineered by defendants herein, to force them to sign a statement confessing to their membership in Al Qaeda and their involvement in terrorist activities.

54.    Mr. Celikgogus and Mr. Sen were, at different times, forced into painful positions for extended periods of time.    Interrogations sometimes lasted many hours or several days. While in the interrogation rooms, they were subjected to extreme temperature conditions.    The guards, Doe defendants herein and acting under the direction and control of certain of the defendants, blasted air conditioning to uncomfortably low temperatures and, at some points when Mr. Celikgogus or Mr. Sen were suffering from the cold, guards would enter the interrogation rooms for the sole purpose of pouring buckets of cold water on them.    Other times, the temperature was raised to such a high degree that Mr. Sen would scream.    Despite constant video monitoring, no one relieved Mr. Sen of his agony.    The extremes of heat and cold were deliberately utilized to intimidate, discomfort and break down prisoners.

55.    Detainees called the interrogation rooms in Camp Delta "rooms that make men crazy."

Plaintiffs' Transfer to Camp 4

56.    Mr. Celikgogus and Mr. Sen were transferred from Camp Delta to Camp 4 in or around October 2003, Mr. Celikgogus approximately ten days prior to Mr. Sen.

57.    In their final interrogations at Guantánamo, Mr. Celikgogus and Mr. Sen were forced to undergo lie detector tests and told that their release was dependent on the results of the tests.

58.    After defendant Does told Plaintiffs that they would be released conditional on their signing an "Agreement" that they were members of Al Qaeda, Mr. Celikgogus and Mr. Sen signed these false confessions because they believed that they would return to Turkey if they signed and would be forced to remain in Guantánamo indefinitely if they did not.

Plaintiffs' Transfer to Turkish Custody

59.    Mr. Celikgogus and Mr. Sen were released from custody in Guantánamo and flown to Turkey in November 2003 after approximately two years in United States custody in Kandahar and Guantánamo.  On November 22, 2003, U.S. officials transferred Mr. Celikgogus and Mr. Sen to the Turkish police at the Incirlik U.S. military base in Adana, Turkey.

60.    The Turkish police interrogated Mr. Celikgogus and Mr. Sen for two days and then released them.  Mr. Celikgogus returned to his family, but Mr. Sen was required to undergo a year of compulsory military service.

Defendants' Development and Implementation of a Plan of Prolonged Arbitrary Detention, Torture and Abuse of Detainees

61.    Defendants were aware that Plaintiffs were tortured and abused at Kandahar and Guantánamo.  Defendants took no steps to prevent the infliction of torture and other mistreatment to which Plaintiffs were subjected.  Instead, Defendants authorized, mandated implemented and/or encouraged the infliction of torture and other mistreatment against Plaintiffs. The techniques practiced on Plaintiffs and others – including beatings, short-shackling, sleep deprivation, injections of unknown substances, subjection to extreme cold or heat, hooding, stress positions, isolation, forced shaving, forced nakedness, intimidation with vicious dogs and

threats – were known to and authorized by Defendant Rumsfeld and others in the military chain of command.

62.    Defendants were aware that prolonged arbitrary detention violates customary international law.  Defendants knowingly authorized and carried out the prolonged arbitrary detention of Plaintiffs and others.

63.    Defendants authorized and implemented coercive interrogation techniques and the abusive treatment of detainees in Kandahar and Guantánamo Bay where Defendants knew or reasonably should have known that these techniques and treatment violated clearly established domestic and international law.

64.    Decisions and acts by Defendants ordering, facilitating, committing, and acquiescing in the commission of the alleged acts reached from the highest levels of the United States Government and down the military chain of command.  On information and belief, approval for all alleged acts emanated under color of law from orders, approvals, and omissions occurring in the Pentagon, numerous government agencies headquartered in the District of Columbia, and the offices of Defendant Rumsfeld.

65.    Defendant Rumsfeld has approved numerous illegal interrogation methods to which Plaintiffs were subjected.  On or around December 2, 2002, Defendant Rumsfeld signed a then-classified memorandum approving prolonged forced "stress positions" up to four hours, forced nudity, intimidation with dogs, prolonged interrogations up to twenty hours, sensory deprivation, forced grooming, isolation, and "mild, non-injurious physical contact."

66.    In April 2003, after a "Working Group Report," Defendant Rumsfeld issued a new set of recommended techniques, requiring his explicit approval for four techniques that violated the Geneva Conventions and/or customary international law, including the use of

intimidation, removal of religious items, threats and isolation. The April 2003 report, however, officially withdrew approval for unlawful actions that had been ongoing for months, including hooding, forced nakedness, shaving, stress positions, use of dogs, and "mild, non-injurious physical contact." Nevertheless, these illegal practices continued to be employed in Guantánamo, with the knowledge and approval of defendant Rumsfeld and other defendants.

67.    Co-Defendants Myers, Miller, Hill, Dunlavey, Hood, Lehnert, Cannon, Carrico, and Cline, at their respective levels in the military chain of command with some responsibility for the practices at Guantánamo, authorized and implemented the coercive interrogation and abusive treatment that took place at Guantánamo at all times relevant.

68.    Co-Defendant Does implemented the coercive interrogation practices and abusive treatment at Kandahar, Afghanistan and Guantánamo.

69.    Defendants knew or should have known that the practices that they authorized and implemented violated clearly established law.

## INJURIES

70.    As a proximate of the wrongful acts of the defendants, as set forth above and herein, plaintiff Mr. Celikgogus was caused the following injuries, among others:

    A. Physical injuries, permanent and severe, including to his nuerological system;

    B. Emotional and psychological injuries, permanent and severe;

    C. Loss of earnings and earning capacity;

    D. Loss of interfamilial relations;

    E. Medical expenses, past and future;

      F. Humiliation, embarrassment, degradation and public mortification, disgrace and shame.

71.    As a proximate of the wrongful acts of the defendants, as set forth above and herein, plaintiff Mr. Sen was caused the following injuries, among others:

      A. Physical injuries, permanent and severe, including to his eyes;

      B. Emotional and psychological injuries, permanent and severe;

      C. Loss of earnings and earning capacity;

      D. Loss of interfamilial relations;

      E. Medical expenses, past and future;

      F. Humiliation, embarrassment, degradation and public mortification, disgrace and shame.

## CAUSES OF ACTION

### Count I
### Alien Tort Statute
### Prolonged Arbitrary Detention

72.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

73.    The acts described herein constitute prolonged arbitrary detention of Plaintiffs in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

74.     Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers, have directed, ordered, confirmed, ratified, and/or conspired in bringing about the prolonged arbitrary detention of Plaintiffs.

75.     As a result of Defendants' unlawful conduct, Plaintiffs were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, and are entitled to monetary damages and other relief to be determined at trial.

## Count II
## Alien Tort Statute
## Torture

76.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

77.     The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing Plaintiffs or intimidating them.  Instead, they were perpetrated to coerce, punish, and intimidate Plaintiffs.   Torture is not permitted as a legitimate government function under any circumstances.

78.     These acts included *inter alia* repeated severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; forced nudity; lack of basic hygiene; intentional exposure to extremes of heat and cold, and to the elements; continuous isolation for a period of months; forced injections; sexual humiliation; intimidation with unmuzzled dogs; and death threats.

79.     The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international

law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

80.    Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired together in bringing about the torture of Plaintiffs.

81.    Plaintiffs suffered severe immediate physical and psychological abuse as a result of the acts alleged herein.  Plaintiffs continue to suffer profound physical and psychological trauma from the acts alleged herein.

82.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count III
### Alien Tort Statute
### Cruel, Inhuman or Degrading Treatment or Punishment

83.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

84.    The acts described herein had the intent and the effect of grossly humiliating and debasing Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and moral resistance.

85.    These acts included *inter alia* repeated severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; forced nudity; lack of basic hygiene; intentional exposure to extremes of heat and cold, and to the elements; continuous isolation for a period of months; forced injections; sexual humiliation; intimidation with unmuzzled dogs; and death threats.

86.     The acts described herein constitute cruel, inhuman or degrading treatment or punishment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment or punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

87.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired together in bringing about the cruel, inhuman or degrading treatment or punishment of Plaintiffs.

88.     Plaintiffs suffered severe immediate physical and psychological abuse as a result of the acts alleged herein.  Plaintiffs continue to suffer profound physical and psychological trauma from the acts alleged herein.

89.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## Count IV
## Alien Tort Statute
### Geneva Conventions and War Crimes

90.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

91.     As detailed herein, Plaintiffs were held arbitrarily, tortured and otherwise mistreated during their detention in violation of specific protections of the Third and Fourth Geneva Conventions, including but not limited to Article 3 common to all four Geneva Conventions.  Common Article 3 prohibits, among other things, "outrages upon personal dignity, in particular, humiliating and degrading treatment."

92.     Violations of the Geneva Conventions are direct treaty violations as well as violations of customary international law.

93.     Defendants are liable for such conduct directly and insofar as they directed, ordered, confirmed, ratified and/or conspired together to commit violations of the Geneva Conventions.

94.     As a result of Defendants' violations of the Geneva Conventions, Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**Count V**
**Alien Tort Statute**
**Vienna Convention on Consular Relations**

95.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

96.     Plaintiffs were not notified by arresting authorities of their right to communicate with consular officials as required by the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, Art. 36.

97.     When Plaintiff Sen requested to speak with officials from his consulate, Defendants further violated his Vienna Convention rights by failing to respond to his requests without delay and notify the consular posts of his detention.  Vienna Convention, Art. 36(1).

98.     Violations of the right to consular access are direct treaty violations, as specified above, and are also violations of customary international law.

99.     As result of Defendants' unlawful conduct, Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## Count VI
## U.S. Constitution
## First Amendment:  Freedom of Religion

100.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

101.     Defendants have adopted, promulgated, and/or implemented policies and practices intended to deny Plaintiffs the ability to practice and observe their religion.  These policies and practices have included, among other things, the visitation of verbal and physical abuse upon Plaintiffs, and the deliberate denial of all means by which they could maintain their religious practices, including their daily prayer requirements.

102.     By such mistreatment, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated Plaintiffs' right to free exercise of religion guaranteed to them under the First Amendment to the United States Constitution.

103.     Plaintiffs and class members have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

104.     As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

## Count VII
## U.S. Constitution
## Fourth Amendment:  Seizure

105.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

106.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

107.    In detaining Plaintiffs without charging them with any crime and without affording them a hearing before a judicial officer to determine whether there was probable cause to justify their continued detention, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly seized Plaintiffs in violation of the Fourth Amendment to the United States Constitution.

108.    Plaintiffs have no effective means of enforcing their Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

109.    As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

**Count VIII**
**U.S. Constitution**
**Fifth Amendment:  Due Process**

110.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

111.    Defendants' actions alleged herein against Plaintiffs violated the Fifth Amendment of the United States Constitution through depriving Plaintiffs of their liberty and subjecting them to behavior which "shocks the conscience."

112.    The arbitrary and baseless detention of Plaintiffs for more than two years constitutes a deprivation of their liberty without due process, in direct violation of their Fifth Amendment rights.

113.    The cruel, inhuman, and degrading conditions of Plaintiffs' incarceration violated their substantive rights to due process.

114.    Defendants' refusal to permit Plaintiffs to consult with counsel, and to have access to tribunals to challenge the fact and conditions of their confinement, constitute violations of Plaintiffs' procedural rights to due process.

115.    Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

116.    Plaintiffs suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment. Plaintiffs also suffer present and future economic damage.

117.    The actions of Defendants are actionable under <u>Bivens v. Six Unknown Named Federal Agents</u>, 450 U.S. 388 (1971).

118.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## Count IX
## <u>Religious Freedom Restoration Act</u>
### Religious Interference

119.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

120.    Defendants' actions alleged herein inhibited and constrained religiously motivated conduct central to Plaintiffs' religious beliefs.

121.    Defendants' actions imposed a substantial burden on Plaintiff's abilities to exercise and express their religious beliefs.

122.    Defendants regularly and systematically engaged in practices specifically aimed at disrupting Plaintiffs' religious practices. These acts included forced nudity; desecration of the Koran; prohibitions and intrusions on prayer and the call to prayer; sexual humiliation; and

confining Plaintiff under conditions where it was impossible or infeasible for them to exercise their religious rights.

123.    Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

124.    Plaintiffs suffered damages as a direct and proximate result of Defendants' violations of the Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb *et seq*.

125.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**Count X**
**Federal Civil Rights Act**
**42 U.S.C. § 1985 (3)**

126.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

127.    At all times herein the Defendants conspired to injure the plaintiffs, to deny them the equal protection of the laws, and to deprive them of rights secured by the laws, treaties, Constitution, and applicable common law of the United States.  This conspiracy was motivated by a class-based invidious animus and antagonism to the race and religion of the plaintiffs.

128.    As a proximate result of the aforementioned, the defendants and their agents undertook and implemented the adverse actions against the plaintiffs, as described and set forth herein.

129.    As a further proximate result, the plaintiffs were caused the injuries, set forth above.

**Count XI**
**Federal Civil Rights Act**
**42 U.S.C. § 1988 (a)**

130.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

131.    As a result of the actions described herein and above, the defendants have committed the following violations of the plaintiffs' civil rights which would otherwise be identified as unlawful common law wrongs. These wrongs, otherwise available at common law, include:

        A.  False arrest;

        B.  False imprisonment;

        C.  Assault and battery;

        D.  Gross negligence;

        E.  Intentional infliction of emotional harm; and

        F.  Defamation

132.    As a proximate result, the plaintiffs were caused the injuries set forth above.

## REQUEST FOR RELIEF

Wherefore Plaintiffs each demand judgment against Defendants jointly and severally, including:

1.    Declaring that Defendants' actions, practices, customs, and policies, and those of all persons acting on their behalf and/or their agents and/or employees, alleged herein, were illegal and violate the constitutional rights of Plaintiffs and class members as to each applicable count;

2.  Declaring that each individual Plaintiff's detention was unjustified, unconstitutional, and unlawful;

3.  Awarding compensatory and punitive damages in an amount that is fair, just and reasonable, including reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper; and

4.  Ordering such further relief as the Court considers just and proper.

A jury trial is demanded on all issues.

Dated: November 21, 2006

William Goodman
Michael Ratner
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Ph:  (212) 614-6439
Fax: (212) 614-6499

*Attorneys for Plaintiff*

**VERIFICATION**

Counsel for Plaintiffs declare under penalty of perjury that the foregoing is true and correct to the

best of our knowledge, information, and belief.

Dated:        November 21, 2006

_____

William Goodman
Michael Ratner
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Ph:  (212) 614-6439
Fax: (212) 614-6499

*Attorneys for Plaintiff*

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioners certify, pursuant to L. Cv. R. 83.2(g), that they are representing

Petitioners without compensation.

Dated: November 21, 2006

William Goodman
Michael Ratner
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Ph: (212) 614-6439
Fax: (212) 614-6499

*Attorneys for Plaintiff*

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

YUKSEL CELIKGOGUS, IBRAHIM SEN

**DEFENDANTS**

DONALD RUMSFELD, Secretary of Defense, GEN. RICHARD MYERS, MAJ. GEN. GEOFFREY MILLER, GEN. JAMES T. HILL, MAJ. GEN. MICHAEL E. DUNLAVEY, BRIG. GEN. JAY HOOD, BRIG. GEN. MICHAEL LEHNERT, COL. NELSON J. CANNON, COL. TERRY CARRICO, LT. COL. WILLIAM CLINE, DOES 1-100

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     TURKEY
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT     UNITED STATES
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

WILLIAM GOODMAN
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

ATTORNEYS (IF KNOWN)

JAMES BARTOLOTTO
Trial Attorney
U.S. Department of Justice
Civil Division, Torts Branch
Constitutional & Specialized Tort litigation
P.O. Box 7146
Washington, D.C. 20044
(202) 616-4174

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

● 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ○ A. *Antitrust*

☐ 410 Antitrust

### ○ B. *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

### ○ D. *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. *General Civil (Other)*     OR     ○ F. *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Alien Tort Statute, 28 U.S.C. §1350; 28 U.S.C. §1331, §1343

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** _____    Check YES only if demanded in complaint    **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 11/21/06    SIGNATURE OF ATTORNEY OF RECORD    *Bill Goodman / JWH*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.