UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**YUKSEL CELIKGOGUS**  )
**Kabakozmah**  )
**Yeni Adapazari Cad. Nr. 88**  )
**Karasu/Sakarya**  )
**Turkey;**  )
 )
**IBRAHIM SEN**  )
**Altintepe Mah.**  )
**Holilulloh Sok. Nr. 18**  )
**Van/Merkez**  )
**Turkey;**  )
 )
**NURI MERT**  )          Civil Action No. 06-CV-1996 (HHK)
**Sarıkız Cad. Kaan Apt.**  )
**Pırlanta İnşaat Daire Nr. 8**  )
**Akçay/Balıkesir**  )
**Turkey;**  )
 )
**ZAKIRJAN HASAM**  )
**United Nations High Commissioner for Refugees** )
**Center for Refugees**  )
**Babrru**  )
**Albania;**  )
 )
**ABU MUHAMMAD**  )
**United Nations High Commissioner for Refugees** )
**Center for Refugees**  )
**Babrru**  )
**Albania;**  )
 )
           Plaintiffs,  )
 )
**v.**  )
 )
**DONALD RUMSFELD**  )
**Fmr. Secretary of Defense**  )
**Department of Defense**  )
**1000 Defense Pentagon**  )
**Washington D.C. 20301-1000;**  )
 )
**GEN. RICHARD MYERS**  )
**Fmr. Chairman, Joint Chiefs of Staff**  )

**9999 Joint Chiefs of Staff Pentagon**                              )
**Washington, D.C. 20318;**                                         )
                                                                    )
**GEN. JAMES T. HILL**                                              )
**Fmr. Commander, United States Southern**                          )
**Command**                                                         )
**c/o United States Army**                                          )
**Army Pentagon**                                                   )
**Washington, D.C. 20310-0200;**                                    )
                                                                    )
**GEN. BANTZ CRADDOCK**                                             )
**Fmr. Commander, United States Southern**                          )
**Command**                                                         )
**c/o United States Army**                                          )
**Army Pentagon**                                                   )
**Washington, D.C. 20310-0200;**                                    )
                                                                    )
**MAJ. GEN. MICHAEL LEHNERT**                                       )
**Fmr. Commander Joint Task Force-160**                             )
**Guantánamo Bay Naval Base, Cuba**                                 )
**c/o United States Marines**                                       )
**Marine Pentagon**                                                 )
**Washington, D.C.;**                                               )
                                                                    )
**MAJ. GEN. MICHAEL E. DUNLAVEY**                                   )
**Fmr. Commander, Joint Task Force-GTMO**                           )
**Fmr. Commander, Joint Task Force-170**                            )
**Guantánamo Bay Naval Base, Cuba**                                 )
**c/o United States Army**                                          )
**Army Pentagon**                                                   )
**Washington, D.C. 20310-0200;**                                    )
                                                                    )
**MAJ. GEN. GEOFFREY MILLER**                                       )
**Fmr. Commander, Joint Task Force-GTMO**                           )
**Guantánamo Bay Naval Base, Cuba,**                                )
**c/o United States Army**                                          )
**Army Pentagon**                                                   )
**Washington, D.C. 20310-0200;**                                    )
                                                                    )
**BRIG. GEN. JAY HOOD**                                             )
**Fmr. Commander, Joint Task Force, GTMO**                          )
**Guantánamo Bay Naval Base, Cuba**                                 )
**c/o United States Army**                                          )
**Army Pentagon**                                                   )
**Washington, D.C. 20310-0200;**                                    )
                                                                    )

**REAR ADM. HARRY B. HARRIS, JR.**           )
**Commander, Joint Task Force-GTMO**         )
**Guantánamo Bay Naval Base, Cuba**          )
**c/o United States Navy**                   )
**Navy Pentagon**                            )
**Washington, DC 20350-2000;**               )
                                             )
**COL. TERRY CARRICO**                       )
**Fmr. Commander, Camp X-Ray**               )
**Guantánamo Bay Naval Base, Cuba,**         )
**c/o United States Army**                   )
**Army Pentagon**                            )
**Washington, D.C. 20310-0200;**             )
                                             )
**COL. ADOLPH MCQUEEN**                      )
**Fmr. Commander, Joint Detention Operations**  )
**Group (JDOG)**                             )
**Guantánamo Bay Naval Base, Cuba**          )
**c/o United States Army**                   )
**Army Pentagon**                            )
**Washington, D.C. 20310-0200;**             )
                                             )
**BRIG. GEN. NELSON J. CANNON**              )
**Fmr. Commander, Joint Detention Operations**  )
**Group (JDOG)**                             )
**Guantánamo Bay Naval Base, Cuba,**         )
**c/o United States Army**                   )
**Army Pentagon**                            )
**Washington, D.C. 20310-0200;**             )
                                             )
**COL. MIKE BUMGARNER**                      )
**Fmr. Commander, Joint Detention Operations**  )
**Group (JDOG)**                             )
**Guantánamo Bay Naval Base, Cuba**          )
**c/o United States Army**                   )
**Army Pentagon**                            )
**Washington, D.C. 20310-0200;**             )
                                             )
**COL. DENNIS WADE**                         )
**Commander, Joint Detention Operations  Group** )
**Guantánamo Bay Naval Base, Cuba**          )
**c/o United States Army**                   )
**Army Pentagon**                            )
**Washington, D.C. 20310-0200;**             )
                                             )
**ESTEBAN RODRIGUEZ**                        )

| | |
|---|---|
| Director, Joint Intelligence Group | ) |
| Guantánamo Bay Naval Base, Cuba | ) |
| c/o Department of Defense | ) |
| Defense Pentagon | ) |
| Washington, D.C. 20301-1000; | ) |
| | ) |
| and | ) |
| | ) |
| JOHN DOES 1-100, individuals involved in the | ) |
| abuses of Plaintiffs at Kandahar, Bagram and | ) |
| Guantánamo; | ) |
| | ) |
| All in their individual capacities; | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

Plaintiffs Yuksel Celikgogus, Ibrahim Sen, Nuri Mert, Zakirjan Hasam and Abu Muhammad

(collectively "Plaintiffs") respectfully submit this Amended Complaint.  This amended

complaint supercedes the prior pleading of Plaintiffs Celikgogus and Sen in its entirety:

## PRELIMINARY STATEMENT

1.    Plaintiffs Yuksel Celikgogus, Ibrahim Sen, Nuri Mert, Zakirjan Hasam and Abu

Muhammad were detained without charge and without any reasonable cause for from two to over

four years at U.S. military bases in Afghanistan and Guantánamo Bay.  They were denied due

process, the ability to practice freely their religion and access to consular officials, and were

subjected to coercive interrogations and acts of physical and mental abuse, including a

confluence of acts amounting to torture.  Though they have never had any affiliation with or

materially supported any terrorist group, Mr. Celikgogus, Mr. Sen, Mr. Mert, Mr. Hasam and

Mr. Muhammad were pressured to admit to being terrorist fighters.

2.     As foreigners in Afghanistan or Pakistan in 2001 or 2002, in the fog of war and with the U.S. offering generous bounties for the capture of alleged terrorists, Mr. Celikgogus, Mr. Sen, Mr. Mert, Mr. Hasam and Mr. Muhammad were wrongfully arrested or captured by Pakistani or Afghan officials and shortly thereafter transferred to U.S. custody.  From their earliest interactions with U.S. soldiers and interrogators, Mr. Celikgogus, Mr. Sen, Mr. Mert, Mr. Hasam and Mr. Muhammad were subjected to physical, mental and religious abuse carried out by U.S. soldiers and/or civilians who were under the command authority of officials in the Department of Defense.

3.     Plaintiffs were released without charge and continue to suffer the physical and mental effects of their detention, abuse and torture, and the stigma of their having been detained in Guantánamo.

4.     Mr. Celikgogus and Mr. Sen were released from Guantánamo to Turkey in November 2003.  Mr. Mert was released to Turkey in April 2004.  Although the U.S. government detained them for between twenty-four and twenty-seven months, the U.S. government never classified Mr. Celikgogus, Mr. Sen or Mr. Mert as enemy combatants through Combatant Status Review Tribunals or any other procedure, and never filed any charges against them.

5.     Mr. Hasam was transferred from Afghanis to the custody of the United States in or around April 2002.  Mr. Muhammad was captured by Pakistani officials, accompanied by U.S. officials, in May 2002.  Both were transferred to Guantánamo.  Mr. Hasam and Mr. Muhammad were classified as *non*-enemy combatants by the U.S. military in 2004; yet they continued to be detained for two years subsequent to this classification.  When finally released

from Guantánamo in November 2006, Mr. Hasam and Mr. Muhammad were transferred to poverty-stricken Albania, where they now live isolated and unemployed in a refugee center.

6.     Plaintiffs bring this action for declaratory relief, and for compensatory and punitive damages against Defendants Donald Rumsfeld, Gen. Richard Myers, Gen. James T. Hill, Gen. Bantz Craddock, Maj. Gen. Michael Lehnert, Maj. Gen. Michael Dunlavey, Maj. Gen. Geoffrey Miller, Brig. Gen. Jay Hood, Rear Adm. Harry B. Harris, Jr., Col. Terry Carrico, Col. Adolph McQueen, Brig. Gen. Nelson Cannon, Col. Mike Bumgarner, Col. Dennis Wade and Esteban Rodriguez for their responsibility for the torts committed against Plaintiffs in violation of international and domestic law.  Defendants exercised command responsibility over, conspired with, aided and abetted subordinates, or persons acting in concert with the U.S. officials, and/or directly or indirectly participated in the commission of the abusive and illegal practices alleged herein, including prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, denial of consular access, violation of religious rights, and denial of due process in Guantánamo and U.S. detention facilities overseas.  Plaintiffs additionally institute this action against soldiers, interrogators and guards, Does 1-100, who exercised command responsibility over, conspired with, aided or abetted subordinates and/or directly or indirectly participated in Plaintiffs' abduction, detention, interrogation, torture, and/or abusive treatment. Accordingly, Defendants are liable under domestic and international law for Plaintiffs' injuries, pain and suffering.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331; 28

U.S.C. § 1343; 28 U.S.C. §1350; 42 U.S.C. § 1985(3); and directly under the United States

Constitution.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(3) and 28 U.S.C. § 1391(b)(2).

## PARTIES

**Plaintiffs**

9.      Plaintiff Yuksel Celikgogus is a 39 year old Turkish citizen.  Mr. Celikgogus and

his wife have three children aged fifteen, twelve and nine years old.  Mr. Celikgogus brings this

action, in his individual capacity, for the prolonged, arbitrary detention, torture, cruel, inhuman

or degrading treatment, violation of religious rights and denial of due process he suffered at the

hands of U.S. officials and those with command authority over these officials, or persons acting

in coordination with or under the control of U.S. government officials, in or around November

2001 until November 22, 2003 in Kandahar, Afghanistan and Guantánamo Bay.  Mr. Celikgogus

was released to Turkey on November 22, 2003.

10.     Plaintiff Ibrahim Sen is a 26 year old Turkish citizen.  He is one of twelve

children.  Mr. Sen brings this action, in his individual capacity, for the prolonged, arbitrary

detention, torture, cruel, inhuman or degrading treatment, violations of religious rights, and

denial of consular access and due process he suffered at the hands of U.S. officials and those

with command authority over those officials, or persons acting in coordination with or under the

control of U.S. government officials, in or around November 2001 until November 22, 2003 in

7

Kandahar, Afghanistan and Guantánamo Bay. Mr. Sen was released to Turkey on November 22, 2003.

11.     Plaintiff Nuri Mert is a 35 year old Turkish citizen. He has four children aged fifteen, thirteen, eleven and nine years old. Mr. Mert brings this action, in his individual capacity, for the prolonged, arbitrary detention, torture, cruel, inhuman or degrading treatment, violation of religious rights, and denial of consular access and due process he suffered at the hands of U.S. officials and those with command authority over those officials, or persons acting in coordination with or under the control of U.S. government officials, in or around January 2002 until April 1, 2004 in Kandahar, Afghanistan and Guantánamo Bay. Mr. Mert was released to Turkey on April 1, 2004.

12.     Plaintiff Zakirjan Hasam is an Uzbek refugee. He fled religious persecution in Uzbekistan in January 2001. Mr. Hasam was captured by Afghanis and subsequently transferred to U.S. custody in or around April 2002. Mr. Hasam brings this action, in his individual capacity, for the prolonged, arbitrary detention, torture, cruel, inhuman or degrading treatment, violation of religious rights, and denial of due process he suffered at the hands of U.S. officials and those in command authority over those officials, or persons acting in coordination with or under the control of the U.S. government, from in or around April 2002 until November 16, 2006. On November 16, 2006, the U.S. government transferred Mr. Hasam to Tirana, Albania where he now lives in a refugee center. Mr. Hasam seeks to proceed under the pseudonym that he has used since his capture because he fears reprisals against himself or his family.

13.     Plaintiff Abu Muhammad is a 43 year old Algerian who was granted refugee status by the United Nations High Commissioner for Refugees ("UNHCR") in Pakistan in 1998 because he would be at risk of persecution if he returned to his home country. Prior to his

capture, he had been living in Pakistan with his pregnant wife and their five children. His six

children now are aged thirteen, twelve, eleven, nine, six and five years old. Mr. Muhammad

brings this action, in his individual capacity, for the prolonged, arbitrary detention, torture, cruel,

inhuman or degrading treatment, violation of religious rights, and denial of due process he

suffered at the hands of U.S. officials and those with command authority over these officials, or

persons acting in coordination with or under the control of U.S. government officials, from May

26, 2002 until November 16, 2006. On November 16, 2006, the U.S. government transferred

Mr. Muhammad to Tirana, Albania where he now lives in a refugee center. He has not seen his

wife or children in over four and a half years. Mr. Muhammad seeks to proceed under the

pseudonym which he has utilized in litigation since his detention at Guantánamo because he

fears reprisals against himself or his family.

**Defendants**

14.     Defendant Donald Rumsfeld is a U.S. citizen residing in Illinois. Defendant

Rumsfeld was the United States Secretary of Defense from January 20, 2001 until December 18,

2006, including the entire period during which the events herein described occurred. At all

relevant times, Defendant Rumsfeld possessed and exercised command and control over the

United States military and the U.S. detention facilities in Afghanistan and Guantánamo Bay.

Defendant Rumsfeld is sued in his individual capacity for ordering, authorizing, condoning,

creating methods and procedures for, exercising command responsibility over, conspiring with,

aiding or abetting subordinates and/or directly or indirectly participating in the abuses of

Plaintiffs as hereinafter alleged.

15.     Defendant Air Force Gen. Richard Myers is a U.S. citizen residing in Virginia. From October 1, 2001 until October 1, 2005, Defendant Myers was Chairman of the Joint Chiefs of Staff.  As the senior uniformed military officer in the chain of command during the relevant times November 2001 until October 1, 2005, Defendant Myers possessed and exercised command and control over the U.S. military and the U.S. detention facilities at Guantánamo Bay and in Afghanistan.  Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

16.     Defendant Marine Gen. Peter Pace is a U.S. citizen and resident of New Jersey. Defendant Myers has served as the Chairman of the Joint Chiefs of Staff since September 30, 2005.  As the senior uniformed military officer in the chain of command during the relevant times September 30, 2005 until November 16, 2006, Defendant Myers possessed and exercised command and control over the U.S. military and the U.S. detention facilities at Guantánamo Bay and in Afghanistan.  Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

17.     Defendant Army Gen. James T. Hill is a U.S. citizen and resident of Florida. From August 18, 2002 until November 9, 2004, Defendant Hill was Commander of the United States Southern Command ("SouthCom").  During his tenure, Defendant Hill possessed and exercised command and control over subordinates at the Guantánamo Bay detention facility. Defendant Hill is sued in his individual capacity for ordering, authorizing, condoning, creating

methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

18.    Defendant Army Gen. Bantz Craddock is a U.S. citizen and resident of West Virginia.  From November 9, 2004 until October 18, 2006, Defendant Craddock was Commander of the United States Southern Command ("SouthCom").  During his tenure, Defendant Craddock possessed and exercised command and control over subordinates at the Guantánamo Bay detention facility.  Defendant Craddock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

19.    Defendant Marine Maj. Gen. Michael Lehnert is a U.S. citizen and resident of Florida.  From January 11, 2002 until March 28, 2002, Defendant Lehnert was Commander of Joint Task Force-160.  In this role, Defendant Lehnert was responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantánamo and responsible for the care, custody and control of detainees.  During his tenure, he possessed command and control over U.S. military stationed at the detention facility at Guantánamo.  Defendant Lehnert is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

20.    Defendant Army Maj. Gen. Michael Dunlavey is a U.S. citizen and resident of Pennsylvania.  Defendant Dunlavey was initially Commander of Joint Task Forces-170, responsible for the coordination and implementation of interrogation efforts at Guantánamo, and

later Commander of its successor Joint Task Force-GTMO, formed from the merger of JTF-160 and JTF-170 in October 2002, and responsible for operating the detention facility and conducting operations at Guantánamo. From February until November 2002, Defendant Dunlavey possessed and exercised command and control over subordinates at the detention facility at Guantánamo Bay. Defendant Dunlavey is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

21.    Defendant Army Maj. Gen. Geoffrey Miller is a U.S. citizen and resident of Texas. From October 2002 until March 2004, Defendant Miller was Commander of Joint Task Force-GTMO, responsible for operating the detention facility and conducting operations at Guantánamo. During his tenure, he possessed and exercised command and control over U.S. troops stationed at Guantánamo. Defendant Miller is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

22.    Defendant Army Brig. Gen. Jay Hood is a U.S. citizen and resident of South Carolina. From March 2004 until March 31, 2006, Defendant Hood was Commander of Joint Task Force-GTMO, responsible for operating the detention facility and conducting operations at Guantánamo. During his tenure, he possessed and exercised command and control over subordinates at the U.S. detention facility at Guantánamo Bay. Defendant Hood is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for,

exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

23.    Defendant Navy Rear Adm. Harry Harris is a U.S. citizen and a resident of Texas. From March 31, 2006 until the present, Defendant Harris has been the Commander of Joint Task Force-GTMO, responsible for operating the detention facility and conducting operations at Guantánamo.  Defendant Harris is responsible for the conduct of all interrogations at Guantánamo.  During the relevant time period of March 31, 2006 until November 16, 2006, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay.  Defendant Harris is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

24.    Defendant Army Col. Carrico is a U.S. citizen and resident of Texas.  From January 11, 2002 to April 28, 2002, Defendant Carrico was Commander of Camp X-Ray, the initial temporary detention facility at Guantánamo Bay.  During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay. Defendant Carrico is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

25.    Defendant Army Col. Adolph McQueen is a U.S. citizen.  From November 2002 until August 2003, Defendant McQueen was the Commander of Joint Detention Operations Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security.

During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay. Defendant McQueen is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

26.    Defendant Army Brig. Gen. Nelson Cannon is a U.S. citizen and resident of Michigan. From August 2003 to September 2004, Defendant Cannon was the Commander of Joint Detention Operations Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security. During his tenure, he possessed and exercised command and control over U.S. military at the detention facility at Camp Delta, Guantánamo. Defendant Cannon is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

27.    Defendant Army Col. Mike Bumgarner is a U.S. citizen and a resident of North Carolina. From April 2005 until March 2006, Defendant Bumgarner was the Commander of the Joint Detention Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security. During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay. Defendant Bumgarner is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

28.    Defendant Army Col. Dennis Wade is a U.S. citizen.  From March 2006 until the present, Defendant Wade was the Commander of the Joint Detention Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security.  During the relevant time period of March 2006 until November 16, 2006, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay.  Defendant Wade is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

29.    Defendant Esteban Rodriguez is a U.S. citizen.  From July 2003 until 2006, Defendant Rodriguez was the civilian Director of the Joint Intelligence Group responsible for managing intelligence-gathering operations at Guantánamo and reporting to the Commander of JTF-GTMO.  During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay.  Defendant Rodriguez is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs as hereinafter alleged.

30.    Plaintiffs do not know the true names and capacities of defendants sued herein as Does 1-100 and therefore sue these defendants by fictitious names.  Does 1-100 were the military and civilian personnel who ordered, authorized, condoned, created methods and procedures for, exercised command responsibility over,  conspired with, aided or abetted subordinates and/or directly or indirectly participated in the abuses of Plaintiffs as hereinafter alleged.

**STATEMENT OF FACTS**

**Prolonged Arbitrary Detention, Torture and Cruel, Inhuman or Degrading Treatment by the U.S. Government in Bagram and Kandahar, Afghanistan and Guantánamo**

31.     Since January 11, 2002, the U.S. government has detained well over 700 men on the U.S. military base in Guantánamo Bay, an area which the U.S. controls by virtue of an indefinite lease established in 1903 with the government of Cuba.  Detainees have been transported to Guantánamo from around the world, including from the detention facilities operated by the U.S. government at a U.S. military base in Kandahar, Afghanistan and at the Bagram airbase north of Kabul, Afghanistan.

32.     Before 2004, the U.S. government prohibited detainees at Guantánamo from having any communication with anyone aside from their guards and interrogators, and, occasionally, representatives of the International Committee of the Red Cross.  Since 2004, lawyers have been permitted to interact with some detainees with limitations on their communication, as mandated by a protective order.

33.     Since 2002, numerous credible accounts of serious physical and mental abuse of detainees held under U.S. control at the U.S. military bases in Bagram, Kandahar and Guantánamo have been reported.  These accounts belie a systematic pattern and practice of abuses that reflect policy made at the highest levels of the U.S. government.

34.     In addition to the generally abusive conditions and the specific instances of abusive treatment, all of the detainees held in these facilities have been subjected to prolonged arbitrary detention without trial.  As of November 2006, when the last Plaintiff was released from Guantánamo, none of the detainees who had been held at Guantánamo since the prison opened in January 2002 had been charged, tried or convicted of any offense.

**Afghanistan**

*Bagram*

35.    Plaintiff Hasam was detained at Bagram for two weeks during the months of April and May 2002.  Plaintiff Muhammad was detained at Bagram airbase for two months between June and August 2002.  Plaintiffs Hasam and Muhammad were held for weeks or months in Bagram without being subjected to any legal process to justify their continued detention.

36.    The conditions and treatment of detainees at Bagram were harsh.  Plaintiffs Hasam and Muhammad slept on the ground with only one or two blankets to cover them.  Up to twenty to thirty men lived in a cell, which was little more than a large wire cage inside a former factory building.  The men were deprived of natural light and allowed outside for only very brief periods twice a week.  They were forced to urinate and defecate in a bucket in the back of the cell with no privacy despite cultural and religious norms prohibiting such immodesty.  The container was cleaned approximately once every two days and created a foul odor in the cells.  Fresh water also was severely limited in the cells, and detainees were told that the water could only be used for drinking.  During their limited bathing opportunities, Plaintiffs Hasam and Muhammad were permitted only several minutes to undress, shower and dress.

37.    While in Bagram, Plaintiffs Hasam and Muhammad and other detainees were deprived of their ability to freely exercise their religion.  They were not allowed to pray together or even to converse in their cells.  The Koran was desecrated.  Plaintiff Muhammad's Koran was thrown in the toilet and the shower.  They were forbidden from using their limited water ration to wash to prepare for prayer, as required by Islam.  The detainees, including Plaintiff Muhammad, were subjected to forced shaving of their beards.

38.    Detainees at Bagram in 2002 have reported many instances of physical abuse, including continuous shackling, sleep deprivation, forced stress positions for extended periods of time and beatings. Detainees at Bagram in 2002 were subjected to punishment for any alleged disciplinary infraction, including communicating with each other or praying aloud. Punishment consisted of forced standing in stress positions, such as being chained to the wall, having to stand with their arms above their heads, or being suspended in isolation cells, for extended periods. Detainees were kicked, beaten, shoved, and slammed into walls and tables. During an interrogation, Plaintif Hasam was punched and hit. Plaintiffs Hasam and Muhammad and other detainees were subjected to constant, severe sleep deprivation during their detention at Bagram. Their cells were exposed to twenty-four hour bright artificial floodlighting and loud disruptive noises, including the guards banging on the cell walls with batons and playing music on a loud radio. The guards occasionally conducted cell searches at night.

### Kandahar

39.    Plaintiffs Celikgogus and Sen were detained at the U.S. airbase in Kandahar, Afghanistan for one month between December and January 2002. Plaintiff Mert was detained in Kandahar for approximately three days in January 2002. Plaintiff Hasam was detained in Kandahar for approximately one month between May and June 2002. Plaintiffs were held for days or weeks or months in Kandahar without being subjected to any process to justify their continued detention.

40.    Plaintiffs Celikgogus, Sen, Mert and Hasam, and other detainees at Kandahar in 2002, were regularly sleep-deprived as their cells were floodlit twenty-four hours a day, guards made disruptive noises during the night, and detainees were regularly called for nighttime

interrogations at which time all detainees were forced to wake up and kneel at the back of the cell. Detainees urinated and defecated in buckets in the cell, with insufficient privacy. During cell searches, guards forced detainees to kneel for several hours surrounded by soldiers in riot gear and with vicious dogs.

41. Plaintiffs Celikgogus, Sen, Mert and Hasam, and other detainees at Kandahar in 2002, were prohibited from freely practicing their religion while detained. In the early period at Kandahar, guards prohibited detainees from praying together or aloud. Later, guards permitted prayers, but often intimidated detainees by standing over them armed during their prayers. Detainees were prohibited from using the limited water in the cell to perform ablutions and guards did not provide any additional water for this purpose.

42. Plaintiffs Celikgogus, Sen, Mert and Hasam, and other detainees at Kandahar in 2002, were prohibited from communicating with one another or gathering in groups – small or large. Minor disciplinary infractions led to physical abuse and punishment. Detainees who were alleged to have violated a camp rule, including by communicating with another detainee or praying aloud or communally, were forced into stress positions or into solitary confinement. These positions included kneeling down on gravelly asphalt with hands raised and behind the head for prolonged periods of time.

43. Plaintiffs Celikgogus, Sen, Mert and Hasam, and other detainees at Kandahar in 2002, were forced to undergo a painful, intimidating and degrading ritual whenever they or anyone else in their cell was called to be interrogated. When the detainee number of the person to be interrogated was called by soldiers, all other detainees were forced to retreat to the back of the fenced-in area and kneel on the asphalt with soldiers pointing guns at them. The detainee whose number was called was forced to lie down in the middle of the cell face-down on asphalt

with his hands behind his back.  Soldiers then rushed into the cell, violently tied the arms and legs of the one to be interrogated, hooded him and dragged him to the interrogator, often abusing him as they transported him by kicking, punching or hitting him.  The other detainees in the cell were not permitted to move from their position at the rear of the cell until well after the person to be interrogated was removed from the cell.

44.    The flight from Kandahar to Guantánamo lasted approximately twenty-eight hours, with a stopover at an unknown location several hours after departure.  During some flights, detainees were transferred to another plane at the stopover, often abused during the transition between planes.  During other flights, the plane stopped, but detainees were not removed from the plane.  Detainees were not told anything about where or why the plane was stopped, or the location of their eventual destination.  They remained sensory deprived during the entire journey, with extremely limited or no food and water, and limited access to toilet facilities.

**Guantánamo**

45.    Plaintiffs Celikgogus, Sen and Mert were among the first detainees to be transferred to Guantánamo Bay in mid-January 2002.  Plaintiffs Celikgogus and Sen were transferred out of Guantánamo on or about November 22, 2003 while Plaintiff Mert was transferred out of Guantánamo on or about April 1, 2004.  Plaintiff Hasam was detained in Guantánamo from on or about June 14, 2002 until on or about November 16, 2006.  Plaintiff Muhammad was detained in Guantánamo from on or about August 5, 2002 until on or about November 16, 2006.  Plaintiffs Celikgogus, Sen and Mert were detained in Camp X-Ray, Camp Delta and Camp Four prior to their release.  Plaintiffs Hasam and Muhammad were detained in

Camp Delta, Camp Four and Camp Iguana. None were told prior to 2004 the reason for their detention. No charges were ever laid against any of the Plaintiffs.

46. The U.S. government detained Plaintiffs Celikgogus, Sen, Mert and others in Camp X-Ray between January and April 2002. Camp X-Ray resembled animal cages—open-air cells surrounded by chain-link fencing, without water, toilets, sinks or privacy. The cells were entirely exposed to the elements—the extreme heat of Guantánamo Bay during the day and the cold during the night, with mice, rats, snakes, lizards and scorpions roaming freely into the cells. Detainees were rarely permitted out of their cells for recreation. They were prohibited from communicating with one another or even looking at the guards. Detainees had a bucket in which they could defecate and a bucket from which they could drink, with water heated by the sun. They had no alternative but to defecate publicly despite cultural and religious norms prohibiting this. Detainees were subjected to the taunting of guards when they defecated because of their lack of privacy. In Camp X-Ray, detainees were only permitted a mattress, blanket, slippers and Koran. Plaintiffs Celikgogus, Sen and Mert were deprived of sleep during their confinement in Camp X-Ray because of strong and continuous artificial lighting and disruptive noise. They were forced to keep their hands and feet visible and outside of the blanket as they slept. If one hand or foot was under the blanket at night, guards forcibly woke plaintiffs to order them to remove their hands and feet from under the blanket.

47. The U.S. government detained Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad in Camp Delta, the detention facility which succeeded Camp X-Ray and was completed in April 2002. Cells in Camp Delta contained toilets and sinks, yet the sinks produced yellow water not suitable for drinking. The detainees, including Plaintiffs, were subjected to regular sleep deprivation through some combination of bright external and internal lighting

twenty-four hours a day, disruptive noise at night, and nighttime interrogations, transfers and cell

searches. Detainees were moved between cells and cell blocks regularly and for no cognizable

purpose except to disorient the detainees. Officials permitted detainees in Camp Delta "comfort

items" – toothbrush, toothpaste, soap, washcloth, prayer cap, two blankets, one sheet and a

Koran – but these were regularly confiscated by guards for alleged disciplinary infractions.

There was no air conditioning in the cells and they were extremely hot. Camp Delta included

five different facilities, numbering One through Five, with Camp Four housing detainees prior to

their repatriation or after a non-enemy combatant determination prior to Camp Iguana being used

to house classified non-enemy combatants. Camp Iguana, surrounded by wire fencing and with

constant surveillance through guards and video cameras, held non-enemy combatants from

August 18, 2005 until November 16, 2006.

    48.    Within Camp Delta were blocks for solitary confinement and, later, a

psychiatric block. Those held within the solitary confinement blocks were often subjected to

strong air conditioning, and sometimes deprived of their comfort items, including blankets and

religious items. Within Delta block, the psychiatric block also contained cells in which detainees

were subjected to solitary confinement. In these cells, guards sometimes punished detainees by

leaving them naked, strapped to the bed and with extreme air conditioning for hours.

    49.    Alleged disciplinary violations at Guantánamo subjected detainees to extreme

cruelty, often at the hands of the Extreme or Immediate Reaction Force ("ERF" or "IRF" teams).

When ERF teams invaded a detainee's cell, the detainee was instructed to turn around in the cell

so that he was not facing the guards, kneel on the ground and place his hands on the back of his

head. Four or more guards subsequently entered the cell with rubber sticks, and frequently tear

gas or pepper spray, and chained the detainee's hands and feet. ERF teams were very rough and

sometimes kicked and beat the detainee. Subsequently, the teams forced the detainee to remain restrained and tied in a painful position or brought the detainee to solitary confinement.

50.    Plaintiffs were subjected to various forms of religious and cultural abuse, including forced grooming, mocking or disruption of prayer or the call to prayer, the removal of religious items and the desecration of their Koran or the Koran of other detainees through intentional touching, dropping, stepping on or throwing it.

51.    Plaintiffs at Guantánamo were subjected to a variety of physical, mental and verbal torture or cruel, inhuman or degrading treatment during interrogation. These included prolonged solitary confinement, sleep deprivation, exposure to temperature extremes, light and sound manipulation, beatings, threats of transfer to a foreign country for torture, sexual harassment, forced nudity, exploitation of individual phobias, forced stress positions, the removal of "comfort items", including religious items, deprivation of medical treatment or the provision of medical treatment on the condition of cooperation with interrogators and prolonged "short-shackling" with wrists and ankles bound together and to the floor.

52.    Detainees transferred out of Guantánamo prior to late 2004 did not undergo any sort of administrative, judicial or military hearing. However, in July 2004, Deputy Defense Secretary Paul Wolfowitz ordered the establishment of Combatant Status Review Tribunals ("CSRTs") which purported to provide an administrative process for determining whether a prisoner is an "enemy combatant." CSRTs never took place for Plaintiffs Celikgogus, Sen or Mert. The CSRTs for Plaintiffs Hasam and Muhammad did not occur until they had been detained in Guantánamo for approximately two and a half years. The CSRTs lack the most basic elements of due process, including the right to present evidence, to know the evidence in the accusation, to have independent counsel, and to have the case heard by an independent body.

Even given this utterly imbalanced procedure, their CSRTs nevertheless classified Plaintiffs

Hasam and Muhammad as non-enemy combatants.  Nonetheless, Plaintiffs Hasam and

Muhammad were held for many more months before being informed of the outcome of the

CSRT.  Thereafter, they continued to be arbitrarily detained for seventeen more months.

### Yuksel Celikgogus

### Plaintiff Celikgogus' Abduction in Pakistan

53.     With Turkey suffering a severe recession in early 2001, Mr. Celikgogus left in

search of viable employment.  Mr. Celikgogus had been residing in Kabul, Afghanistan when the

United States began bombing Afghanistan in October 2001.  After the commencement of the

war, Mr. Celikgogus knew he must return to Turkey for his safety.  Yet, after crossing the

Pakistani border with crowds of others fleeing the war, Mr. Celikgogus was surrendered by

villagers to Pakistani police.

### Plaintiff Celikgogus' Detention in U.S. Custody in Afghanistan

54.     After approximately five weeks in Pakistani custody, U.S. officials visited the

Pakistani prison and transferred Mr. Celikgogus and a group of other detainees by airplane to the

U.S. military base in Kandahar, Afghanistan.  Mr. Celikgogus was given no information about

why he was taken or detained.

55.     During the transfer, Mr. Celikgogus was placed on the floor of an airplane hooded

and shackled.  U.S. soldiers threatened Mr. Celikgogus and the other bound and hooded

detainees during the flight.

56.     After the plane arrived in Kandahar, U.S. soldiers forced Mr. Celikgogus to lay motionless on the cold ground. While lying on the ground, Mr. Celikgogus was beaten and kicked in the genitals and elsewhere on his body, repeatedly, by those guarding them.

57.     U.S. soldiers forcibly removed all Mr. Celikgogus' clothing and photographed him naked. He was held naked and freezing during his initial interrogation. This was particularly humiliating for him because his Muslim faith prohibited such immodesty, especially in the presence of women. A soldier subjected Mr. Celikgogus to a forced body cavity search. Another forcibly took blood samples, fingerprints and hair samples from his head and beard.

58.     Mr. Celikgogus was detained in Kandahar for approximately one month. During this time, Mr. Celikgogus was deprived of the most basic forms of sustenance – adequate food, water and sleep. U.S. soldiers systematically woke him at regular intervals during the nights. For much of the time of his detention, guards forced Mr. Celikgogus to sit or lie face-down and motionless on the ground.

59.     Soldiers interfered with Mr. Celikgogus' ability to practice his Muslim faith. Islam requires believers to wash their bodies before prayer; yet soldiers did not provide sufficient water for cleansing. Further, when Mr. Celikgogus attempted to pray, U.S. soldiers beat or threatened him. He was thus forced to pray in secret, sitting or lying down in positions inconsistent with his prayer ritual but which he hoped would not provoke the attention of the guards.

60.     Mr. Celikgogus was subjected to repeated coercive interrogations in his final days in Kandahar. Guards dragged Mr. Celikgogus to be interrogated and regularly beat him. Soldiers banged Mr. Celikgogus' head against a wall as they transported him to and from an interrogation.

61.    Mr. Celikgogus was not allowed to communicate with his family.  He was never permitted to communicate with anyone other than guards, interrogators, fellow detainees and, once, a representative of the International Committee of the Red Cross.

62.    While in Kandahar, Mr. Celikgogus developed a severe internal infection of unknown origin and diagnosis but which gave him great discomfort and caused further medical problems that persisted well into his detention in Guantánamo.

63.    In or around January 2002, U.S. soldiers stripped Mr. Celikgogus and, once again, photographed him naked.  He then was clothed in orange overalls, hooded, chained, shackled and forced to wear black goggles, ear coverings, thermal gloves and a face mask.  Mr. Sen may have been provided a sedative against his will and without his knowledge prior to the departure of the flight.  In this condition, Mr. Celikgogus was flown to Guantánamo chained to the floor of a cargo plane, immobile in painful positions for the nearly thirty hour flight.


**Plaintiff Celikgogus' Detention in Guantánamo Bay**

64.    Upon arrival in Guantánamo, U.S. soldiers unloaded Mr. Celikgogus from the cargo plane.  Despite the inability of Mr. Celikgogus to see, hear, speak or move because of restraints, soldiers abused him repeatedly on his arrival.  Dogs were audible when Mr. Celikgogus was unloaded from the plane.  Soldiers then forced Mr. Celikgogus onto a truck in a stress position and punched the back of his neck repeatedly during the journey.

65.    In the initial processing at Guantánamo, soldiers forced Mr. Celikgogus to undergo further public nudity.  He was forced to strip, bathe publicly and undergo another body cavity search.  Soldiers, including female soldiers, poured water on Mr. Celikgogus while he was

naked. Soldiers again took blood samples, fingerprints and hair samples. They again photographed him naked.

66.    After processing, U.S. soldiers brought Mr. Celikgogus to Camp X-Ray. In Camp X-Ray, Mr. Celikgogus was forbidden from communicating with other detainees or looking at the guards. He was forced to sit in total silence and isolation for extended periods of time. After three and a half months in Camp X-Ray, Mr. Celikgogus was hooded, shackled and transferred to Camp Delta.

67.    Sometimes the guards exacted a severe punishment for minor infractions, such as looking at or talking to guards or another detainee, or even when he had done nothing. Sometimes as punishment, Mr. Celikgogus' mattress was removed, and he was forced to sleep on the cement. Sometimes, soldiers sprayed him with a chemical spray which burned his eyes and body and made it difficult to breathe. The agony was prolonged because guards would turn off the water in the cell. At other times, guards assaulted him with an industrial strength hose for an extended period of time. The strength of the water from the hose knocked him to the wall and soaked the contents of his cell, including his few personal items such as his Koran.

68.    Having been deprived of all remnants of a normal human life, Mr. Celikgogus was left with only his religion, prayer and religious study. However, U.S. soldiers consistently placed substantial burdens on his ability to practice his religion and pray. On numerous occasions, his efforts to pray were banned or interrupted. He witnessed U.S. soldiers desecrate Korans. Soldiers prevented detainees from chanting the call to prayer, with guards either silencing the person who was issuing the prayer call, or disrupting the call by playing loud music, imitating the call, screaming or hitting the bars of the cells to drown out the call. All detainees, then, would be prohibited from their normal prayer ritual without the communal call to

prayer. During interrogations, interrogators prohibited Mr. Celikgogus from praying, despite his explicit requests to pray. Guards desecrated Korans and insulted Islam.

69.     While being transferred to and from interrogations, Mr. Celikgogus was sometimes treated roughly. During interrogations, Mr. Celikgogus was threatened and verbally abused. Interrogators sometimes threatened to beat him if he did not confess and made motions as if they would attack him. Mr. Celikgogus was subjected to numerous coercive interrogations. Mr. Celikgogus was, at different times, forced into painful positions with his hands and feet shackled to the floor for extended periods of time during or in connection with interrogations. Interrogations sometimes lasted several hours or multiple times a day. The interrogation rooms were sometimes extremely cold from manipulation of the air conditioner.

70.     In Camp Delta, Mr. Celikgogus was often deprived of sleep because of the continuous artificial lighting within the cells and projectors shining light from outside the cells. In addition, in order to disrupt his sleep patterns, Mr. Celikgogus was sometimes brought to interrogation at night. On one occasion, an Extreme Reaction Force ("ERF") team entered Mr. Celikgogus' cell while he was sleeping, forced him awake at night and accused him of trying to escape. They brought him from the mat in his cell where he had been sleeping to solitary confinement, treating him roughly, only to return him to his cell soon after. Mr. Celikgogus found these manipulations of light and dark, and the insecurity of his sleep, extremely disorienting.

71.     In Guantánamo, Mr. Celikgogus was repeatedly forced to take unspecified pills and injections. Mr. Celikgogus asked what type of medicine he was receiving, but the guards would neither let him refuse the medication nor tell him what they were giving him. In addition, Mr. Celikgogus was still sick from the internal infection he developed in Kandahar. He regularly

asked for a doctor, but was not provided one for many months after his initial requests. When finally brought to the hospital, Mr. Celikgogus was given anesthesia and underwent an operation without an understanding of the purpose of the operation.

72.     Mr. Celikgogus was denied access to family, legal counsel and visitors throughout his detention in Guantánamo.

**Plaintiff Celikgogus' Transfer to Turkish Custody**

73.     Mr. Celikgogus never received any administrative, judicial or military hearing of any kind. After approximately twenty-three months in U.S. custody, he was transferred to Turkey.

74.     After guards told Mr. Celikgogus that he would be released conditional on his signing an "Agreement," Mr. Celikgogus signed this false confession stating the conditions upon which he would be transferred. Relying on statements of the guards, Mr. Celikgogus believed that if he refused to sign, he would be forced to remain in Guantánamo indefinitely.

75.     Mr. Celikgogus was released from custody in Guantánamo and flown to Turkey on November 22, 2003. The Turkish police interrogated Mr. Celikgogus for two days and then released him.

76.     Mr. Celikgogus has ongoing physical, psychological and social problems resulting from his detention in U.S. custody. He has continuing medical problems stemming from his detention and for which he has been unable to receive treatment. He remains traumatized by his experiences in Kandahar and Guantánamo. Further, Mr. Celikgogus has had trouble securing and maintaining employment and his detention by U.S. forces altered his relationships with his family and community.

**Ibrahim Sen**

**Plaintiff Sen's Abduction in Pakistan**

77.    Mr. Sen left Turkey in early 2001 to see if he could find better economic prospects elsewhere.  Mr. Sen had been residing in Kabul, Afghanistan when the United States began bombing Afghanistan in October 2001.   After the commencement of the war, Mr. Sen attempted to return to Turkey for his safety.  However, after Mr. Sen crossed the Pakistani border with crowds of people fleeing the war, Mr. Sen and others were surrendered by villagers to the Pakistani police.

**Plaintiff Sen's Detention in U.S. Custody in Afghanistan**

78.    After approximately five weeks in Pakistani custody, U.S. officials visited the Pakistani prison, took custody of Mr. Sen, and transferred him by airplane to the U.S. military base in Kandahar, Afghanistan.  During the transfer, Mr. Sen was hooded, shackled and placed on the floor of an airplane.  U.S. soldiers hit and abused him and some of the other bound and hooded detainees during the flight.

79.    After the plane arrived in Kandahar, U.S. soldiers forced Mr. Sen to lay motionless on the cold ground.  While lying on the ground, the guards repeatedly kicked Mr. Sen in the genitals and elsewhere on his body and hit him with sticks.  U.S. soldiers forcibly removed all Mr. Sen's clothing and photographed him naked.  His initial interrogation was held while he was naked, freezing and in painful positions.  A soldier subjected Mr. Sen to a forced body cavity search.  Another forcibly took blood samples, fingerprints and hair samples from his head and beard.

80.     Mr. Sen was detained in Kandahar for approximately one month.  During this time, Mr. Sen was deprived of the most basic forms of sustenance -- adequate food, water and sleep.  U.S. soldiers systematically woke him at regular intervals during the nights, and for much of the time, guards forced Mr. Sen to sit or lie face-down and motionless on the ground.

81.     Soldiers interfered with Mr. Sen's ability to practice his religion.  Islam requires believers to wash their bodies before prayer; yet soldiers did not provide sufficient water for cleansing.  Further, on some occasions when Mr. Sen attempted to pray, he was punished.  Guards forced him into stress positions, such as kneeling down or standing with his arms outstretched.  He was thus forced to pray in secret, sitting or lying down, in violation of Islamic tenets of communal prayer and position of prayer as he feared provoking the attention of the guards.

82.     Mr. Sen was subjected to repeated coercive interrogations in his final days in Kandahar.  During some of the interrogations, he was subjected to electric shocks from a generator.  He was promised food, drink or sleep if he confessed and he was threatened with physical abuse if he did not.  On some occasions while guards dragged Mr. Sen to be interrogated, they beat and kicked him, threw him on the ground, banged his head against the will, tried to trip him and scared him with dogs.

83.     Mr. Sen made repeated requests to meet with representatives of the Turkish government.  He also asked to communicate with his family.  Both requests were refused.  In fact, Mr. Sen was never permitted to communicate with anyone other than guards, interrogators, fellow detainees, and, rarely, representatives of the International Committee of the Red Cross.

84.     In or around January 2002, U.S. soldiers stripped Mr. Sen and, once again, photographed him naked.  He was dressed in orange overalls and was hooded, chained, shackled

and forced to wear black goggles, ear coverings, thermal gloves and a face mask. Mr. Sen may

have been provided a sedative against his will and without his knowledge prior to the departure

of the flight. In this condition, Mr. Sen was flown to Guantánamo chained to the floor of a cargo

plane, immobile and in painful positions for the nearly thirty hour flight.

**Plaintiff Sen's Detention in Guantánamo Bay**

85.    Upon arrival in Guantánamo, U.S. soldiers unloaded Mr. Sen from the cargo

plane. Despite the inability of Mr. Sen to see, hear, speak or move because of restraints, soldiers

abused him repeatedly on his arrival. Soldiers forced Mr. Sen onto a truck in a stress position,

and punched the back of his neck repeatedly during the journey.

86.    In the initial processing at Guantánamo, soldiers forced Mr. Sen to undergo

further public nudity. He was forced to strip, bathe publicly, undergo another body cavity search

and be photographed. Soldiers, including female soldiers, poured water on Mr. Sen while he was

naked. Soldiers again took blood samples, fingerprints and hair samples.

87.    After processing, U.S. soldiers brought Mr. Sen to Camp X-Ray. In Camp X-

Ray, Mr. Sen was forbidden from communicating with other detainees or looking at the guards.

He was forced to sit in total silence and isolation for extended periods of time. After three and a

half months in Camp X-Ray, Mr. Sen was hooded, shackled and transferred to Camp Delta.

88.    Sometimes, Mr. Sen was subjected to extreme cruelty for minor disciplinary

infractions. On one occasion in Camp X-Ray, Mr. Sen was beaten and forcibly restrained by

multiple guards for allegedly having a small piece of wood in his cell. Numerous times when

Mr. Sen resisted any of the abuses of the guards, and often when he did nothing, soldiers sprayed

him with a chemical. The chemical spray burned his eyes and body and made it difficult to

breathe. The agony was prolonged because guards turned off the water in the cell. At other times, guards assaulted him with an industrial strength hose for an extended period of time. The strength of the water from the hose knocked him to the wall and soaked the contents of his cell, including his Koran.

89.     U.S. soldiers consistently placed substantial burdens on Mr. Sen's ability to practice his religion and pray. On numerous occasions, his efforts to pray were banned or interrupted. He witnessed U.S. soldiers desecrate Korans. Soldiers prevented detainees from making the call to prayer, with guards either silencing the person who was issuing the prayer call or disrupting the call by playing loud music, imitating the call, screaming or hitting the bars of the cells to drown out the call. During interrogations, interrogators prohibited Mr. Sen from praying despite his explicit requests to pray. During one interrogation, an interrogator told Mr. Sen that he was in Guantánamo because he was Muslim and that he would remain there as long as he stayed Muslim. The same interrogator desecrated the Koran by throwing it on the ground under his foot. During another interrogation, Mr. Sen was forced to watch pornographic videos. When Mr. Sen was in solitary confinement, guards occasionally forced pornographic magazines on him. These videos and magazines were particularly loathsome to his religious beliefs.

90.     While being transferred to and from interrogations, Mr. Sen was sometimes treated roughly. During interrogations, Mr. Sen was threatened and verbally abused. For example, during Mr. Sen's first interrogation in Guantánamo, his interrogator threatened to shoot Mr. Sen in the head and to bring Mr. Sen's brothers to be imprisoned in Guantánamo. Mr. Sen was, at different times, forced into painful positions for extended periods of time during or in connection with interrogations. Interrogations sometimes lasted hours. Mr. Sen was sometimes forced to sit in an iron chair for hours with his hands and feet shackled in painful positions, often

while being subjected to extreme temperature conditions of heat and cold.  At least once, when Mr. Sen was suffering from the cold, guards entered the interrogation room for the sole purpose of pouring cold water on him.  Other times, the temperature was raised to such a high degree that Mr. Sen would scream.  The detainees nicknamed the interrogation rooms in Camp Delta "rooms that make men crazy."

91.     In Camp Delta, Mr. Sen was often deprived of sleep because of the continuous artificial lighting within the cells and projectors shining light from outside the cells, nighttime transfers and nighttime cell searches.

92.     Mr. Sen was forcibly given unspecified pills and injections.  The guards would neither let him resist the medication nor respond to his inquiries as to its substance.

93.     Mr. Sen requested to see a Turkish government official while he was in Camp Delta.  A U.S. soldier denied this request.  Further, Mr. Sen was denied access to family, legal counsel and visitors throughout his detention in Guantánamo.


**Plaintiff Sen's Transfer to Turkish Custody**

94.     Mr. Sen never received any administrative, judicial or military hearing of any kind.  After approximately twenty-three months in U.S. custody, he was transferred to Turkey.

95.     After guards told Mr. Sen that he would be released conditional on his signing an "Agreement", Mr. Sen signed this false confession stating the conditions upon which he would be transferred.   Relying on statements of the guards, Mr. Sen believed that if he refused to sign, he would be forced to remain in Guantánamo indefinitely.

96.    Mr. Sen was released from custody in Guantánamo and flown to Turkey on November 22, 2003. The Turkish police interrogated Mr. Sen for two days and then released him.

97.    Mr. Sen has ongoing physical, psychological and social problems resulting from his detention in U.S. custody. He has continuing medical problems stemming from his detention and he remains traumatized by his experiences in Kandahar and Guantánamo. His physical problems include eye and wrist problems. Further, Mr. Sen has had trouble securing and maintaining employment and his detention by U.S. forces altered his relationships with his family and community.

## Nuri Mert

### Plaintiff Mert's Abduction in Afghanistan

98.    Greatly indebted and suffering from the severe economic crisis that gripped Turkey beginning in early 2001, Mr. Mert left Turkey in late 2001. Soon after crossing the Afghan border, Mr. Mert was abducted by armed Afghanis. Mr. Mert did not speak the same language as his captors and did not understand why he was being detained. Late one night, a different group of armed Afghan men entered the house in which Mr. Mert was detained and captured and imprisoned him in another location.

### Plaintiff Mert's Detention in U.S. Custody in Kandahar

99.    After several days in one Afghan prison and approximately eight to ten weeks in a second Afghan prison, U.S. soldiers came to the prison, bound and hooded Mr. Mert and other detainees there and transported them in a container to the U.S. military base in Kandahar. When

detainees tried to communicate, guards kicked and beat them. Mr. Mert was given no information about why he was taken or detained.

100.    Upon arrival in Kandahar, U.S. soldiers forced Mr. Mert to the ground, removed his clothing with scissors until he was naked, and marched him to a large tent. There, U.S. soldiers forcibly shaved Mr. Mert's head and body. A female soldier subjected Mr. Mert to a body cavity search while guards took photographs.

101.    While standing hooded and tied at the door to a cell, Mr. Mert was kicked from behind by a soldier and tumbled to the ground. Guards continued to beat Mr. Mert while he lay on the ground, forcing Mr. Mert's lip to burst open and three of his teeth to fall out. As a result of this beating, a fourth tooth had to be removed while Mr. Mert was in Guantánamo.

102.    Mr. Mert was interrogated several times in Kandahar. As four guards transported Mr. Mert to his first interrogation, one asked whether Mr. Mert was Muslim. Mr. Mert did not understand the question, but answered affirmatively. The soldiers then beat him violently, punching him in the stomach and banging his head repeatedly against the wall.

103.    During Mr. Mert's first interrogation, Mr. Mert requested to meet with a Turkish government official. He further requested that the U.S. government access his criminal record in Turkey to clear his name. Both requests were denied.

104.    During the nights in Kandahar, Mr. Mert was deprived of sleep due to the screaming and disruption of guards.

105.    Mr. Mert attempted to perform prayers in Kandahar, but soldiers screamed at those trying to pray. Mr. Mert and other detainees were forced to abandon communal prayer and, instead, pray silently and alone, due to intimidation from soldiers.

106.    Soldiers punished Mr. Mert by forcing him into stress positions for extended periods—kneeling or standing on one leg with his hands behind his head.

107.    In or around January 2002, after approximately three days in Kandahar, U.S. soldiers stripped Mr. Mert and photographed him naked again.  He was dressed in orange overalls and was hooded, chained, shackled and forced to wear black goggles, ear coverings, thermal gloves and a face mask.  Mr. Mert may have been provided a sedative against his will and without his knowledge prior to the departure of the flight.  In this condition, Mr. Mert was flown to Guantánamo chained to the floor of a cargo plane, immobile and in painful positions for the nearly thirty hour flight.

**Plaintiff Mert's Detention in Guantánamo Bay**

108.    Upon arrival in Guantánamo, U.S. soldiers unloaded Mr. Mert from the cargo plane.  Despite the inability of Mr. Mert to see, hear, speak or move because of restraints, soldiers abused him repeatedly on his arrival.  Mr. Mert felt threatened by barking dogs that he heard as he was removed from the plane.  Soldiers forced Mr. Mert onto a truck in a stress position, and punched the back of his neck and head repeatedly during the journey, causing long-term back problems.

109.    In the initial processing at Guantánamo, soldiers forced Mr. Mert to undergo further public nudity.  He was forced to strip, bathe publicly, undergo another body cavity search and be photographed naked.  Soldiers again took blood samples, fingerprints and hair samples.

110.    After processing, U.S. soldiers brought Mr. Mert to Camp X-Ray.  In Camp X-Ray, Mr. Mert was forbidden from communicating with other detainees or looking at the guards.  He was forced to sit in total silence and isolation for extended periods of time.  After three and a

half months in Camp X-Ray, Mr. Mert was hooded, shackled and transferred to Camp Delta. During the transfer, he was forced into a stress position and beaten on the back of the head, as he had been immediately after his arrival in Guantánamo.

111.    Numerous times Mr. Mert was subjected to punishments, regardless of whether or not he was responsible for alleged disciplinary violations or resistance. For example, he was sprayed with a chemical that burned his eyes and body and made it difficult to breathe. The agony was prolonged because guards turned off the water in the cell. At other times, guards assaulted him with an industrial strength hose for an extended period of time. The strength of the water from the hose knocked him to the wall and soaked the contents of his cell.

112.    On one occasion, a woman guard knocked Mr. Mert's Koran to the ground. When he spit at the guard who desecrated his Koran, an ERF team, in full riot gear, burst into his cell, knocked Mr. Mert to the ground and beat him. After shackling him and forcibly removing him from the cell, the soldiers applied a chemical spray and then water at high pressure to Mr. Mert. He was then taken to solitary confinement for approximately three weeks. While in solitary confinement, Mr. Mert was exposed to constant bright light and cold temperatures. He was only wearing shorts and was not given any blankets. During this time, he was prohibited from having a Koran. When Mr. Mert was removed from solitary confinement, a soldier mocked his religion by suggesting that Allah did not exist and that God is America. When Mr. Mert spit, he was again attacked by an ERF team and again returned to solitary confinement for approximately one month. Mr. Mert experienced another term of solitary confinement when he protested the abuse of another detainee.

113.    Guards desecrated Korans and insulted Islam. Guards often prevented Mr. Mert and other detainees from having water required to perform ablutions. Soldiers disrupted the call

to prayer by making sounds, imitating the call, screaming, hitting the bars of the cells and playing loud music both in the interrogation rooms and in the cells. Mr. Mert witnessed a soldier throw a Koran into the toilet. During room searches, guards sometimes knocked the Koran on the ground or stepped on it.

114.    During transport to and from interrogations, recreation or the medical clinic, Mr. Mert was sometimes physically abused. During these walks, soldiers sometimes tripped him by stepping on the shackles tightly chained around his feet. Because his ankles were chained, he fell on his face, causing injuries. Soldiers sometimes tightened his shackles and forced him to walk quickly, exacerbating the scars on his ankles and leaving them bloody. He suffered wounds and scars from the shackles, kicks and beatings. Because of the abuse that Mr. Mert received when he left the cell, he was often afraid to leave the cell.

115.    During Mr. Mert's first interrogation in Guantánamo, Mr. Mert's interrogator threatened him by telling him that the Chinese broke the feet and hands of women they wanted to prevent from running away, and hung the women from the ceiling. For Mr. Mert, this constituted a threat that he could be similarly tortured and that his interrogator could do anything to him with impunity.

116.    While in the interrogation rooms, Mr. Mert was sometimes subjected to extreme temperature conditions while tied to a chair or restrained in painful positions. Sometimes, Mr. Mert was brought to the interrogation room and made to wait in artificially cold rooms for several hours, even when an interrogator never arrived. For example, once, he was brought to the room early in the morning, and was left chained in the room until night with his arms and legs attached to his waist and a hook on the floor. On another occasion, Mr. Mert was only

wearing shorts and was left in an extremely cold interrogation room for several hours.  In neither instance did an interrogator come to interview him.

117.    Myriad factors contributed to the extreme sleep deprivation that Mr. Mert experienced.  For example, continuous artificial lighting within the cells and projectors shining light from outside the cells flooded the cells.  Guards often transferred Mr. Mert and other detainees between cells or blocks, sometimes at night.  In addition, guards several times entered the rooms in the middle of the night purportedly to search the rooms; Mr. Mert and others were left outside the cells for hours as the guards examined the rooms.  Mr. Mert suffered disorientation from the sleep deprivation.

118.    Throughout his detention at Guantánamo, Mr. Mert was forcibly given unspecified pills and injections.  The guards would neither let him resist the medication nor respond to his inquiries as to its substance.  In multiple instances, when Mr. Mert refused the medication, he was forcibly medicated by an Extreme Reaction Force ("ERF") team.  As is typical in such instances, a group of soldiers in riot gear burst into his cell, threw him to the ground and restrained him, carried him out of the cell, and forced him to either take pills or an injection.  During his time in Camp Delta, Mr. Mert became extremely ill; he experienced severe stomach and chest pains and regular vomiting.  When Mr. Mert wanted medical care, he was often deprived of such care despite frequent requests.  Mr. Mert developed a lump on his head during his detention in Guantánamo.  While at Guantánamo, Mr. Mert underwent surgery several times to remove the lump although he was never advised as to the nature of the lump or why he had to undergo multiple surgeries.

119.    Mr. Mert frequently made requests to see Turkish officials during his interrogations. Further, Mr. Mert was denied access to family, legal counsel and visitors throughout his detention in Guantánamo.

**Plaintiff Mert's Transfer to Turkish Custody**

120.    Mr. Mert never received any administrative, judicial or military hearing of any kind. After nearly twenty-seven months in U.S. custody, he was transferred to Turkey.

121.    On his flight back to Turkey, Mr. Mert was hooded and chained at the feet, hands and waist, with the chains tied to hooks in the plane. He was forced to wear black goggles and sit on the floor of the plane. Soldiers forcibly medicated Mr. Mert prior to departure.

122.    On or about April 1, 2004, Mr. Mert was transferred to the custody of the Turkish police. After several days, he was released from Turkish custody.

123.    Mr. Mert has ongoing physical, psychological and social problems resulting from his detention in U.S. custody. He has continuing medical problems stemming from his detention and he remains traumatized by his experiences in Kandahar and Guantánamo. His physical problems include severe back, dental and fertility problems. Because his lip burst open in Kandahar, it is now disfigured. Mr. Mert is unable to work because of persistent medical problems and the stigma associated with his having been detained at Guantánamo. His detention by U.S. forces drastically altered his relationships with his family and community.

**Zakirjan Hasam**

**Plaintiff Hasam's Abduction in Afghanistan**

124.    Mr. Hasam is an Uzbek refugee who fled religious persecution in his native country. Mr. Hasam initially fled Uzbekistan for Tajikistan in early 2001. Soon after arriving in Tajikistan, Mr. Hasam was forcibly removed to Afghanistan. When the U.S. bombing campaign began, Mr. Hasam was initially taken in by an Afghan group who later transferred him to U.S. custody.

**Plaintiff Hasam's Detention in U.S. Custody in Afghanistan**

125.    U.S. soldiers transferred Mr. Hasam by airplane to the military base in Bagram, Afghanistan in or around April or May 2002. In Bagram, soldiers prohibited Mr. Hasam from reading the Koran aloud, communicating with other detainees or praying communally.

126.    Mr. Hasam was subjected to lengthy and brutal interrogations in Bagram. Because of a fear that he or his family would be persecuted in Uzbekistan if he disclosed details about his personal or family history, Mr. Hasam refused to disclose to his interrogators details about his life in Uzbekistan. On the third day of interrogations, U.S. soldiers subjected Mr. Hasam to physical abuse by forcing him to do strenuous exercises, hitting him in the chest and repeatedly punching him in the stomach.

127.    Subsequent to this beating, U.S. soldiers forced Mr. Hasam to undergo an operation against his wishes. He was never provided any accurate information about the purpose and type of operation being performed. In fact, he was admittedly given inaccurate information about the type of operation performed and, to this day, still does not know what operation was performed or why. Further, the operation did not improve the pain that he felt as a consequence of the beating.

128.    After approximately two weeks in Bagram, Mr. Hasam was transferred to Kandahar. During the flight, Mr. Hasam was tied tightly though he had just undergone an operation. Soldiers pressed down on his back with their knees during the flight, causing immense pain.

129.    Upon arrival in Kandahar, Mr. Hasam was stripped of his clothing with scissors and forced to undergo a body cavity search. Guards placed Mr. Hasam naked on a table and took photographs of him, mocked him and sat on him.

130.    On information and belief, Mr. Hasam was prohibited from meeting with the representative from the International Committee of the Red Cross (ICRC) who visited Kandahar and met with other detainees while Mr. Hasam was incarcerated there.

131.    Mr. Hasam and the other detainees were subjected to forced silence in Kandahar. As punishment for the infraction of allegedly speaking to other detainees, Mr. Hasam was forced into stress positions on two occasions. The guards forced Mr. Hasam onto his knees on gravelly asphalt with his hands raised behind his head for prolonged periods.

132.    After approximately one month in Kandahar, U.S. officials transported Mr. Hasam to Guantánamo on or about June 13, 2002. Prior to Mr. Hasam's transfer, Mr. Hasam was forced to undergo another body cavity search. He was hooded, shackled and forced to wear blackened goggles, ear coverings, padded gloves and a face mask. Mr. Hasam was tied in the plane so that he could not freely move. Soldiers beat him if he moved at all.

**Plaintiff Hasam's Detention in Guantánamo Bay**

133.    Upon arrival in Guantánamo, Mr. Hasam was forced into a truck where he was pushed into a stress position, with his head between his legs. During the trip from the airport, soldiers beat, pushed and applied physical pressure on Mr. Hasam.

134.    Soon after Mr. Hasam was removed from the truck, he was stripped naked. A soldier took a photograph of him completely naked. A soldier subsequently conducted another body cavity search. Immediately after processing, Mr. Hasam was brought to an interrogation block. However, he was not interrogated, but was forced to sit in the interrogation room for six hours, with his hands and legs chained to the floor in a painful position. He was not provided food or water and the room was extremely cold due to high levels of air conditioning. A guard regularly came into the room and ordered him, through hand motions, to stare straight ahead.

135.    Mr. Hasam was subjected repeatedly to lengthy terms of solitary confinement. After Mr. Hasam's first interrogation, he was placed in solitary confinement for approximately three weeks. During this time, he was released only once, and his release was for the purpose of undergoing a second interrogation. While in solitary confinement, Mr. Hasam was denied the most basic items, including toilet paper and a mattress. Mr. Hasam was released from isolation for only two weeks when he was placed again in isolation for nearly one week.

136.    Mr. Hasam was subjected to coercive interrogations that included physical abuse and threats to send him and his family to Uzbekistan to be tortured. Mr. Hasam's fourth interrogation lasted more than seven hours. During this prolonged interrogation, he was not permitted to eat, drink or relieve himself. An interrogator physically abused Mr. Hasam by pressing hard on his throat, pushing him backwards while he was shackled, and grabbing Mr. Hasam's jaw. Towards the end of this interrogation and while Mr. Hasam was chained to the floor, a female interrogator entered the room and came very close to Mr. Hasam. She touched

his shoulder and held his waist, a taboo in his Islamic faith. After leaving Mr. Hasam alone and shackled to the floor for four hours, the male interrogator returned to the interrogation and accused Mr. Hasam of being a member of an Uzbek terrorist organization and threatened to send Mr. Hasam to Uzbekistan, implying that he knew that Mr. Hasam would be subjected to torture in Uzbek jails.

137.    The day after this interrogation, U.S. officials gave three interrogators whom Mr. Hasam believes to be from Uzbekistan access to Mr. Hasam. U.S. soldiers brought Mr. Hasam to the interrogation room and attached Mr. Hasam's shackles to the floor. During this interrogation, Mr. Hasam's Uzbek interrogators threatened to take Mr. Hasam to Uzbekistan and torture him and his family.

138.    Fearing for his own life and that of his family, Mr. Hasam took these threats seriously, especially since they were occurring in a U.S. military prison. In response, Mr. Hasam attempted suicide in his cell block by hanging himself with a bedsheet the morning after the interrogation.

139.    Mr. Hasam survived the suicide attempt and was resuscitated in the medical clinic. While he was in the clinic, he was visited by a high-ranking military officer. However, on that very same day, he was returned by U.S. soldiers to be interrogated again by the same Uzbek officials in the same interrogation room. They again verbally abused him and threatened to take Mr. Hasam to Uzbekistan the following day. The subsequent day, Mr. Hasam was brought to another interrogation with the three Uzbeks and an American who identified himself as a U.S. government official. The American reiterated the threats of the Uzbeks that Mr. Hasam would be returned to Uzbekistan.

140.    Guards repeatedly subjected Mr. Hasam to forced grooming, shaving his beard and hair, as punishment for alleged disciplinary infractions. On some occasions in which Mr. Hasam was forcibly groomed, he also was assaulted by being thrown on the asphalt, doused with a hose of pressurized water, and held to the ground. Guards physically abused Mr. Hasam regularly when they removed him from his cell, including by smashing his face to the floor or pressing their knees against his head. As another form of punishment, Mr. Hasam was strapped to the bed in his cell for several hours. On one occasion, when Mr. Hasam refused a blood test, soldiers sprayed chemical gas on him, stripped him naked and tied him to the bed in his cell. They drew blood by force while Mr. Hasam was tied naked to the bed. After this, Mr. Hasam was held in an isolation cell with only his shorts for eight hours as cold air was piped in through the ceiling. In a later incident, Mr. Hasam received seven stitches in his head as a result of abuse that he received when guards attempted to remove his belongings from him while he was in solitary confinement. On this occasion, four guards entered his cell, sprayed him with a chemical and slammed him repeatedly against the wall.

141.    Mr. Hasam participated in a CSRT in December 2004. Not until on or about May 8, 2005 was Mr. Hasam informed that the CSRT had declared him to be a non-enemy combatant. On or about August 18, 2005, Mr. Hasam was transferred to Camp Iguana with other non-enemy combatants, more than three years after he was detained in Guantánamo and eight months after his CSRT.

142.    In Camp Iguana, soldiers continued to disrupt the religious practice of Mr. Hasam and other detainees by making noise during prayers. Mr. Hasam continued to be abused after being transferred to Camp Iguana, including with practices abhorrent to Mr. Hasam's religion, such as forced grooming and deprivation of the Koran.

143.    While he was in Camp Iguana, and after a psychologist informed Mr. Hasam that he should never be held in solitary confinement, Mr. Hasam was subjected to solitary confinement in several instances.  On one occasion, Mr. Hasam was subjected to two weeks of solitary confinement for the alleged disciplinary infractions of another detainee.  Despite having been declared a non-enemy combatant, Mr. Hasam was transported to solitary confinement in shackles and chains, blackened goggles and ear coverings.  He was deprived of sleep during the two weeks because of constant, disruptive noise.  On another occasion, for an alleged disciplinary infraction while Mr. Hasam was detained in Camp Iguana, Mr. Hasam was subjected to a body search and forcibly shaved, treatment highly objectionable to Mr. Hasam's Muslim faith.  In solitary confinement, Mr. Hasam was exposed to extremely low temperatures and constant bright lights, making it difficult to sleep.  Mr. Hasam was provided a blanket for only five hours every night.  For the first two days in solitary confinement, guards prohibited Mr. Hasam from praying with others.

144.    Mr. Hasam was forcibly medicated with pills and injections repeatedly while in Guantánamo.  Mr. Hasam was denied access to family, visitors and, prior to 2005, legal counsel.

**Plaintiff Hasam's Transfer from U.S. Custody**

145.    Though he was classified as a non-enemy combatant almost two years earlier, on November 16, 2006, Mr. Hasam was transferred from Guantánamo as if he was still a prisoner. He was wearing prison clothing, shackles on his feet and straps on his hands.  He was tied to the seat of the airplane.  On the plane, rows of soldiers, some armed, faced Mr. Hasam and the other detainees.

146.    The U.S. soldiers who transported him turned Mr. Hasam over to the custody of Albanian officials.  Mr. Hasam now lives in a refugee center outside of Tirana, Albania.  Mr. Hasam's transfer from Guantanamo Bay to Albania was widely publicized within the country, and he experiences discrimination as a result of his detention in Guantánamo and his transfer to a country of which he is an outsider stigmatized by U.S. government actions.

147.    Mr. Hasam has ongoing physical, psychological and social problems resulting from his detention in U.S. custody.  He has continuing medical problems stemming from his detention and he remains traumatized by his experiences in Bagram, Kandahar and Guantánamo.  His physical problems include dental, knee, head and eye problems.  Transported against his wishes to impoverished and isolated Albania, Mr. Hasam has limited job prospects and great difficulty establishing a community.

### Abu Muhammad

**Plaintiff Muhammad's Abduction in Pakistan**

148.    An Algerian refugee, Mr. Muhammad had been living in Pakistan and had received official recognition as a refugee by the United Nations High Commissioner for Refugees (UNHCR) when he was arrested by Pakistani and U.S. officials on or about May 26, 2002.  A medical doctor by training, Mr. Muhammad had been working as a schoolteacher and living with his pregnant wife and five children.

149.    Pakistani officials came to his house searching for a man of a different nationality.  However, after the Pakistani officials left the house, they returned with U.S. officials and they arrested Mr. Muhammad and confiscated personal belongings and family documents, including

Mr. Muhammad's laptop computer, critical family documents and other personal effects. Mr. Muhammad was detained in a jail in Pakistan for approximately nine days.

**Plaintiff Muhammad's Detention in U.S. Custody in Afghanistan**

150.    On or about June 5, 2002, Mr. Muhammad was shackled, hooded and transferred to the U.S. military base in Bagram, Afghanistan. He was transported on the floor of an airplane and chained at the waist with a rope connected to the wall of the plane that was tightened during the trip. U.S. soldiers lifted Mr. Muhammad by his neck whenever he leaned back.

151.    Upon arrival in Bagram, Mr. Muhammad, connected to the other detainees by a string, suffered cutting on his arm. Soon after arrival, guards forcibly stripped Mr. Muhammad of his clothing. Mr. Muhammad was subjected to full body searches between five and ten times in Bagram with no privacy.

152.    Mr. Muhammad was severely sleep deprived in Bagram. Guards blasted loud music at night and shone constant bright lights at the detainees.

153.    Several days after Mr. Muhammad arrived in Bagram, despite his resistance, guards forcibly shaved his beard, an affront to his Muslim faith. He was forcibly shaved again prior to departure for Guantánamo. Guards sometimes desecrated Mr. Muhammad's Koran, by throwing it in the toilet or the shower. Guards often screamed at Mr. Muhammad and threatened him if he attempted to touch the Koran.

154.    Mr. Muhammad was detained in a tent fenced in with barbed wire. Guards prohibited detainees from speaking to one another. Sometimes, guards forced Mr. Muhammad and other detainees to lie on the ground motionless and threatened to shoot them if they moved. Guards punished Mr. Muhammad and other detainees by forcing them to stand hooded in stress

positions for extended periods of time or in an isolation block. When detainees spoke, stood, or

prayed aloud or collectively, they were often subjected to this punishment. Detainees also were

punished for uttering the call to prayer. Mr. Muhammad was punished nearly every day in

Bagram, sometimes for standing, talking or praying. On one occasion, a guard grabbed Mr.

Muhammad's neck through the door of the fence, put a hood on his head, and left him shackled

there for hours.

155.    Mr. Muhammad was interrogated three times in Bagram. During his last

interrogation, Mr. Muhammad's interrogator informed him that he would likely be sent back to

Pakistan. Mr. Muhammad took this to mean that the U.S. officials had no more interest in

detaining him. Instead, he was sent to Guantánamo where he stayed for four and a half years.

156.    On or about August 4, 2002, after Mr. Muhammad was detained for

approximately two months in Bagram, guards transferred Mr. Muhammad to Guantánamo.

Guards hooded him, covered his ears and eyes, shackled his hands tightly to his waist, did a

forced body cavity search and dressed him in an orange jumpsuit. Guards forcibly medicated

Mr. Muhammad against his wishes prior to the flight. The medication altered his consciousness

and made it difficult for Mr. Muhammad to pray. Mr. Muhammad was transported to

Guantánamo on a cargo plane which made a temporary stopover where the detainees were forced

to change planes. During the transfer, Mr. Muhammad was abused.


**Plaintiff Muhammad's Detention in Guantánamo Bay**

157.    On arrival at Guantánamo, guards transferred Mr. Muhammad to a receiving area

in a vehicle. During the transfer, they forced Mr. Muhammad into a stress position and beat him

repeatedly in the head, neck and back. After arriving, Mr. Muhammad was examined and forced

to strip. A guard took photographs of him naked, wearing only shackles on his hands and feet. Another guard subjected Mr. Muhammad to another forced body cavity search.

158.    After a first long interrogation in Guantánamo, guards brought Mr. Muhammad to an isolation cell where he was prohibited from communicating with others and the room was made extremely cold with strong air conditioning. During his first week in Guantánamo, a guard grabbed Mr. Muhammad's hand painfully when he collected tablets for an illness.

159.    After one week in isolation, Mr. Muhammad was interrogated by a U.S. official who asked Mr. Muhammad to work for the U.S. Central Intelligence Agency (CIA). When Mr. Muhammad refused, the official promised to repeat the proposal the following week. He threatened Mr. Muhammad that he would stay in Guantánamo forever if he rejected the proposal. Mr. Muhammad again refused his offer the following week.

160.    When guards removed Mr. Muhammad from his cell, they conducted searches and exposed him to unique abuses. Mr. Muhammad was also punished for non-cooperation with an interrogator. On one occasion, when Mr. Muhammad refused to speak with an interrogator, he was left chained in an extremely cold room for approximately seven hours. He was denied food during this period. Approximately two days after this interrogation, Mr. Muhammad was put in solitary confinement for several weeks without any personal effects, including his Koran. He was subjected to extremely cold temperatures without a blanket to protect himself.

161.    Guards were intentionally disruptive with sound and light while Mr. Muhammad and others were praying. During Mr. Muhammad's first year at Guantánamo, guards did not provide Mr. Muhammad and other detainees with food at the appropriate time to break the fast during Ramadan.

162.     On several occasions, guards conducted searches of the cells at night, depriving

Mr. Muhammad and other detainees of sleep.  Guards left the detainees shackled outside the

cells for many hours as they conducted the searches accompanied by dog.  The dogs barked

constantly at Mr. Muhammad and the others.

163.     Mr. Muhammad requested medical care for an ulcer that developed while at

Guantánamo, but did not receive it.  In addition, Mr. Muhammad developed severe dental

problems while at Guantánamo and did not receive prompt or appropriate treatment despite

serious pain and repeated urgent requests.  Because of this delay, three of Mr. Muhammad's

teeth rotted and fell out.  In a subsequent dental visit in Guantánamo, Mr. Muhammad was

provided with replacement teeth that did not last an hour.  When Mr. Muhammad was transferred

to Albania, a dentist informed him that two bridges had to be replaced because they were rotten.

164.     Mr. Muhammad refused to participate in his December 2004 Combatant Status

Review Tribunal ("CSRT") hearing because the government refused to allow him to present as a

witness employees of the UNHCR who knew of his refugee status.  Even without Mr.

Muhammad's participation, the CSRT recognized Mr. Muhammad to be not an enemy

combatant.  However, Mr. Muhammad was not notified of this finding until five months later, on

or about May 10, 2005.

165.     Mr. Muhammad remained in U.S. custody four and a half years after he was

captured, two years after a Defense Department tribunal recognized him to be not an enemy

combatant, and eighteen months after he was told the results of this hearing.  Mr. Muhammad

continued to be shackled, physically searched and insulted after his non-enemy combatant

designation.

166.    His living conditions did not substantially change.  Even after having been classified as a non-enemy combatant, Mr. Muhammad always was subjected to a search of his body prior to being transported anywhere within Guantánamo.  His wrists and ankles were shackled, and he was sometimes forced to wear blackened goggles and ear coverings.  On or about August 18, 2005, Mr. Muhammad and the remaining non-enemy combatants at Guantánamo were moved to Camp Iguana.  In Camp Iguana, Mr Muhammad and the other detainees were constantly monitored by several video cameras, including one in or near the bathrooms.

167.    Moreover, guards continued to disrupt his religious practice.  On or about June 2005, while Mr. Muhammad was outside of his cell, guards searched the cells of those labeled non-enemy combatants and desecrated some of their Korans.  In Camp Iguana, soldiers disrupted prayer by making noise or mocking the religious practices of the detainees.  On one occasion while Mr. Muhammad was in Camp Iguana, soldiers confiscated the Korans of detainees in Camp Iguana.

168.    While Mr. Muhammad was detained in Camp Iguana, and even though Mr. Muhammad was known to be a refugee from his home country, Guantánamo camp officials allowed Mr. Muhammad to be interrogated by Algerian officials.


**Plaintiff Muhammad's Transfer from U.S. Custody**

169.    Two days before Mr. Muhammad was released, he was informed by an interrogator that he would be transferred to Albania.  Mr. Muhammad resisted and insisted that he would not be able to take his family to Albania or build a life there for himself.

170.     On the day before Mr. Muhammad left Guantánamo, Mr. Muhammad met with several soldiers who aggressively urged Mr. Muhammad to sign an agreement related to his past and future detention.  Mr. Muhammad understood that the document was intended to authorize the U.S. government to detain him for future acts.  Recognizing that he had been detained wrongfully for four and a half years, Mr. Muhammad steadfastly refused to sign any document which would have attempted to justify his detention or authorize future detention.

171.     Though he was classified as a non-enemy combatant almost two years earlier, Mr. Muhammad was transferred from Guantánamo as if he were still a prisoner.  He was wearing prison clothing, shackles on his feet, and straps on his hands.  He was tied to the seat of the airplane.  On the plane, rows of soldiers, some armed, faced Mr. Muhammad and the other detainees.

172.     U.S. officials presented Mr. Muhammad, and the two other non-enemy combatants with whom he traveled, to the Albanian authorities and left.  The Albanian authorities instructed Mr. Muhammad that he had to accept asylum in Albania or be returned to Algeria or Guantánamo.  Mr. Muhammad's transfer from Guantánamo Bay to Albania was widely publicized within the country and he experiences discrimination as a result of his detention in Guantánamo and his transfer to a country of which he is an outsider stigmatized by U.S. government actions.

173.     Mr. Muhammad has ongoing physical, psychological and social problems resulting from his detention in U.S. custody.  He has continuing medical problems stemming from his detention and he remains traumatized by his experiences in Bagram and Guantánamo.  His physical problems include dental, stomach and dermatological problems.  Transported against his wishes to impoverished and isolated Albania, Mr. Muhammad has limited job

prospects, great difficulty establishing a community and significant burdens to reunite with his

family. Mr. Muhammad now lives in a refugee center outside of Tirana. He feels he cannot

bring his family to Albania because he is unable to support them financially and his children

cannot get an education in Albania in their native languages of French or Arabic. A medical

doctor by training, Mr. Muhammad cannot practice medicine in Albania.

## GENERAL ALLEGATIONS

### Defendants' Development and Implementation of a Plan of Prolonged Arbitrary Detention, Torture and Abuse of Detainees

174.    The acts described herein were carried out under the actual or apparent authority

or color of law of the United States.

175.    At all relevant times, the named Defendants possessed and exercised command

and control over subordinates at the detention facilities in which Plaintiffs were housed at

Kandahar and Bagram, Afghanistan and Guantánamo Bay. Defendants also acquiesced in and/or

permitted persons or groups to act in concert with U.S. officials to commit the abuses described

herein.

176.    At all relevant times, the named Defendants had the legal authority and practical

ability to exert control over subordinates that participated in the prolonged arbitrary detention,

torture, cruel, inhuman or degrading treatment, violations of religious rights, denials of consular

access and deprivations of due process of the Plaintiffs. Defendants' command over subordinate

forces included the authority and responsibility to give orders to, set policy for, and manage the

affairs of forces under their control, and to remove and discipline personnel who were violating

the rights of the Plaintiffs.

177.    Defendants were aware, or should have been aware, that Plaintiffs were subject to prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, violations of their religious rights, denials of their rights to consular access and deprivations of due process while imprisoned at Kandahar and Guantánamo. Defendants took no steps to prevent the infliction of torture or these other forms of mistreatment to which Plaintiffs were subject nor did Defendants investigate and punish the perpetrators of these abuses. By so doing, Defendants failed in their legal obligations as commanders, under domestic and international law, to ensure that subordinates never perpetrate abuses against detainees in the custody of the U.S. military.

178.    Instead, Defendants authorized, mandated, implemented, encouraged, condoned, acquiesced in and/or failed in their command obligations to prevent the infliction of abuses, including violations of the religious rights, the right to consular access, and the right to due process, of the Plaintiffs. Defendant Rumsfeld and other defendants in the chain of command intended for the techniques to be practiced on Plaintiffs, or knew, or should have known, of the techniques practiced on Plaintiffs – including beatings, short-shackling, sleep deprivation, injections of unknown substances, subjection to extremes of cold or heat and light and dark, hooding, stress positions, isolation, forced shaving, forced nakedness, forced sexual contact and intimidation with vicious dogs and threats, many in concert with each other. Defendants failed to take all necessary measures to investigate and prevent these abuses, or to punish personnel under their commands for committing these abuses.

179.    Defendants intended, were aware, or should have been aware, that prolonged arbitrary detention violates U.S. law, customary international law and international treaties to which the United States is a party. Defendants authorized, carried out, condoned, and/or directly or indirectly implemented the prolonged arbitrary detention of Plaintiffs and others.

56

180.    Defendants intended, were aware, or should have been aware, that torture and cruel, inhuman or degrading treatment of detainees in Kandahar and Guantánamo Bay was occurring in violation of clearly established domestic and international law. Defendants failed to take all necessary measures to investigate and prevent these abuses, or to punish personnel under their commands for committing these abuses.

181.    Decisions and acts by Defendants ordering, authorizing, implementing, facilitating, encouraging, condoning, turning a blind eye to, acquiescing in and/or committing the alleged acts reached from the highest levels of the United States Government down the military chain of command. On information and belief, approval for alleged acts of torture, cruel, inhuman and degrading treatment, and violations of religious rights emanated under color of law from orders, approvals, and omissions occurring in the Pentagon, numerous government agencies headquartered in the District of Columbia, and the offices of Defendant Rumsfeld.

182.    In October 2002, Defendant Dunlavey requested permission of Defendant Rumsfeld to make interrogations in Guantanamo more aggressive. Defendant Miller, who assumed command from Defendant Dunlavey, also pushed for the use of more aggressive techniques. Defendant Rumsfeld thereafter approved numerous interrogation methods to which Plaintiffs were subjected that are clearly illegal under U.S. law. On or around December 2, 2002, Defendant Rumsfeld signed a then-classified memorandum approving hooding, prolonged forced "stress positions" for up to four hours, forced nudity, intimidation with dogs or other "exploitation of phobias," prolonged interrogations up to twenty hours, deprivation of light, forced grooming, isolation, and "mild, non-injurious physical contact." In January, 2003, he rescinded the blanket approval of these methods which violate domestic and international law, but the methods could be carried out, based on specific approval.

183.    In April 2003, after a "Working Group Report" recommended the continued use of abusive interrogation methods, Defendant Rumsfeld issued a new set of recommended techniques, requiring his explicit approval for four techniques that violated the Geneva Conventions and/or customary international law, including the use of intimidation, removal of religious items, threats and isolation.   The April 2003 report, however, officially withdrew approval for unlawful actions that had been ongoing for months, including hooding, forced nakedness, shaving, stress positions, use of dogs, and "mild, non-injurious physical contact." Nevertheless, these illegal practices continued to be employed in Guantánamo, which Defendants intended, or knew or should have known were occurring.   Defendants failed in their command obligation to prevent these abuses and investigate and punish those responsible.

184.    At all relevant times, co-Defendants Myers, Miller, Hill, Dunlavey, Hood, Lehnert, Cannon and Carrico, at their respective levels in the military chain of command with command responsibility for the practices at Guantánamo, authorized, mandated, implemented, encouraged, condoned, acquiesced in, turned a blind eye to, or failed in their command obligations to prevent the torture and cruel, inhuman or degrading treatment that took place at Guantánamo.

185.    Co-Defendant Does 1-100 implemented the prolonged arbitrary detention, torture and cruel, inhuman or degrading treatment, violations of religious rights, denials of consular access, and deprivations of due process at Kandahar and Bagram, Afghanistan and Guantánamo.

186.    Defendants intended, knew or should have known that the practices that they ordered, authorized, mandated, implemented, encouraged, condoned, acquiesced in, turned a blind eye to, for which they had command responsibility, and/or directly or indirectly implemented violated clearly established international and domestic law.  Further, Defendants

failed in their duties to investigate, prevent and punish violations of international and domestic law committed by members of the U.S. military, and/or persons or groups acting in concert with them. These actions and omissions were outside the scope of their lawful authority. Through Defendants' actions, omission, and failures of command, they created a climate of impunity in which subordinate soldiers were given a green light to terrorize the plaintiffs and carry out atrocious acts of torture and cruel, inhuman or degrading treatment, violations of their religious rights, denials of consular access and deprivations of due process.

187.    At all relevant times, the named Defendants and the Doe defendants did act in concert with the intent to punish and/or disadvantage the plaintiffs because of their religion by subjecting the Plaintiffs to prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, violations of their religious rights, and denials of consular access and due process.

## INJURIES

188.    Because of the wrongful acts of the Defendants, as set forth above and herein, Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad were caused the following injuries, among others:

A.  Physical injuries, including those which are continuing and severe;

B.  Emotional and psychological injuries, including those which are continuing and severe;

C.  Loss of earnings and earning capacity;

D.  Loss of interfamilial relations;

E.  Medical expenses, past and future;

F. Humiliation, embarrassment, degradation and public mortification, disgrace and shame.

## CAUSES OF ACTION

### Count I
### Alien Tort Statute
### Prolonged Arbitrary Detention
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

189.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

190.    The acts described herein constitute prolonged arbitrary detention of Plaintiffs in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

191.    Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers and/or in concert with U.S. officials, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to and/or directly or indirectly participated in bringing about the prolonged arbitrary detention of Plaintiffs Sen, Celikgogus, Mert, Hasam and Muhammad. The defendants intended, knew or should have known, that the prolonged arbitrary detention was being committed by their subordinates and failed to prevent those abuses or punish those responsible.

192.    As a result of Defendants' unlawful conduct, Plaintiffs were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse, and are entitled to monetary damages and other relief to be determined at trial.

**Count II**
**Alien Tort Statute**
**Torture**
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

193.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

194.    The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing, coercing or intimidating Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad.    Torture is not permitted as a legitimate government function under any circumstances.

195.    These acts included *inter alia* repeated severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; forced nudity; lack of basic hygiene; intentional exposure to extremes of heat and cold, and to the elements; continuous isolation for a period of months; forced injections; forced nudity; sexual humiliation; other sexual assault; intimidation with unmuzzled dogs; death threats.    These acts, and others, were frequently carried out in concert with each other.

196.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

197.    Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted and/or conspired together to bring about the

torture of Plaintiffs. The defendants intended, knew or should have known, that the torture was being committed by their subordinates and failed to prevent those abuses or punish those responsible.

198.    Plaintiffs suffered severe immediate physical and mental abuse as a result of the acts alleged herein. Plaintiffs continue to suffer profound physical and mental harm from the acts alleged herein.

199.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count III
### Alien Tort Statute
### Cruel, Inhuman or Degrading Treatment or Punishment
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

200.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

201.    The acts described herein were intended and the effect of grossly humiliating and debasing Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad and forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and moral resistance.

202.    These acts included *inter alia* repeated severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; forced nudity; lack of basic hygiene; intentional exposure to extremes of heat and cold, and to the elements; continuous isolation for a period of months; forced injections; sexual humiliation; other sexual assault; intimidation with unmuzzled dogs; and death threats.

203.    The acts described herein constitute cruel, inhuman or degrading treatment or punishment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in

that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment or punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

204.    Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified had command responsibility for, aided and abetted and/or conspired together in bringing about the cruel, inhuman or degrading treatment or punishment of Plaintiffs. Defendants intended for these abuses to occur, or knew or should have known, that these abuses were occurring and failed to prevent these abuses or punish those responsible.

205.    Plaintiffs suffered severe immediate physical and mental harm as a result of the acts alleged herein. Plaintiffs continue to suffer profound physical and mental trauma from the acts alleged herein.

206.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count IV
### Alien Tort Statute and 28 U.S.C. 1331
### Geneva Conventions
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

207.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

208.    As detailed herein, Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad were held arbitrarily, tortured and otherwise mistreated during their detention in violation of specific protections of the Third and Fourth Geneva Conventions, including but not limited to Article 3 common to all four Geneva Conventions. Common Article 3 prohibits, among other things, "outrages upon personal dignity, in particular, humiliating and degrading treatment."

209.    Violations of the Geneva Conventions are direct treaty violations as well as violations of customary international law.

210.    Defendants are liable for such conduct directly and insofar as they directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted and/or conspired together to commit violations of the Geneva Conventions and customary international law. Defendants intended to violate the Geneva Conventions and customary international law, or knew or should have known that the violations of the Geneva Conventions and customary international law were occurring and failed to prevent these abuses or punish those responsible.

211.    As a result of Defendants' violations of the Geneva Conventions and customary international law, Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count V
### <u>Alien Tort Statute, 28 U.S.C. 1331</u>
### Vienna Convention on Consular Relations
*Plaintiffs Sen and Mert*

212.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

213.    Plaintiffs were not notified by arresting or detaining authorities of their right to communicate with consular officials as required by the Vienna Convention on Consular Relations, April 24, 1963, TIAS 6820, 21 U.S.T. 77, Art. 36, and under customary international law, which includes a definite, universal and obligatory norm of granting consular access.

214.    When Plaintiffs Sen and Mert requested to speak with officials from their consulates, Defendants further violated their Vienna Convention rights by failing to respond to their requests without delay and notify the consular posts of their detention. Vienna Convention, Art. 36(1).

215.    Violations of the right to consular access are direct treaty violations, as specified above, and are also violations of customary international law.

216.    As result of Defendants' unlawful conduct, Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count VI
### U.S. Constitution
### First Amendment: Freedom of Religion
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

217.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

218.    Defendants have adopted, promulgated, and/or implemented policies and practices intended to deny Plaintiffs the ability to practice and observe their religion. These policies and practices have included, among other things, the visitation of verbal and physical abuse upon Plaintiffs, and the deliberate denial of all means by which they could maintain their religious practices, including their daily prayer requirements.

219.    By such mistreatment, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly violated Plaintiffs' right to free exercise of religion guaranteed to them under the First Amendment to the United States Constitution.

220.    Plaintiffs have no effective means of enforcing their First Amendment rights other than by seeking declaratory and other relief from the Court.

221.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered emotional distress, humiliation, embarrassment, and monetary damages.

### Count VII
### U.S. Constitution

**Fifth Amendment:  Due Process**
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

222.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

223.    Defendants' actions alleged herein against Plaintiffs violated the Fifth Amendment of the United States Constitution through depriving Plaintiffs of their liberty and subjecting them to behavior which "shocks the conscience."

224.    The arbitrary and baseless detention of Plaintiffs without charge for more than two years constitutes a deprivation of their liberty without due process, in direct violation of their Fifth Amendment rights.

225.    The cruel, inhuman, and degrading conditions of Plaintiffs' incarceration violated their substantive rights to due process.

226.    Defendants' refusal to permit Plaintiffs to consult with counsel, and to have access to tribunals to challenge the fact and conditions of their confinement, constitute violations of Plaintiffs' procedural rights to due process.

227.    Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

228.    Plaintiffs suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment.  Plaintiffs also suffer present and future economic damage.

229.    The actions of Defendants are actionable under Bivens v. Six Unknown Named Federal Agents, 450 U.S. 388 (1971).

230.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## Count VIII
## Religious Freedom Restoration Act
### Religious Interference
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

231.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

232.    Defendants' actions alleged herein inhibited and constrained religiously motivated conduct central to Plaintiffs' religious beliefs.

233.    Defendants' actions imposed a substantial burden on Plaintiff's abilities to exercise and express their religious beliefs.

234.    Defendants regularly and systematically engaged in practices specifically aimed at disrupting Plaintiffs' religious practices.  These acts included forced nudity; forced grooming; desecration of the Koran; denial of the Koran; prohibitions and intrusions on prayer and the call to prayer; sexual humiliation; and confining Plaintiff under conditions where it was impossible or infeasible for them to exercise their religious rights.

235.    Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

236.    Plaintiffs suffered damages as a direct and proximate result of Defendants' violations of the Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb et seq.

237.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## Count IX
## Federal Civil Rights Act
### 42 U.S.C. § 1985 (3)
*Plaintiffs Celikgogus, Sen, Mert, Hasam and Muhammad*

238.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs of this complaint as if fully set forth herein.

239.    At all times herein the Defendants conspired to injure the plaintiffs, to deny them the equal protection of the laws, and to deprive them of rights secured by the laws, treaties, Constitution, and applicable common law of the United States. This conspiracy was motivated by a class-based invidious animus and antagonism to the religion of the plaintiffs.

240.    As a proximate result of the aforementioned, the defendants and their agents undertook and implemented the adverse actions against the plaintiffs, as described and set forth herein.

241.    As a further proximate result, the plaintiffs were caused the injuries, set forth above.


## REQUEST FOR RELIEF

Wherefore Plaintiffs each demand judgment against Defendants jointly and severally, including:

1.    Declaring that Defendants' actions, practices, customs, and policies, and those of all persons acting on their behalf and/or their agents and/or employees, alleged herein, were illegal and violate the rights of Plaintiffs as to each applicable count;

2.    Declaring that each individual Plaintiff's detention was unjustified, unconstitutional, and unlawful;

3.    Awarding compensatory and punitive damages in an amount that is fair, just and reasonable, including reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper; and

4.    Ordering such further relief as the Court considers just and proper.


A jury trial is demanded on all issues.


Dated: March 21, 2007

*Shayana Kadidal*

Shayana Kadidal (Bar No. 454248)
William Goodman
Patty Blum
Michael Ratner
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel:   (212) 614-6424
Fax:  (212) 614-6499

*Attorneys for Plaintiff*

**VERIFICATION**

Counsel for Plaintiffs declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief.


Dated:        March 21, 2007


*Shayana Kadidal*

Shayana Kadidal (Bar No. 454248)
William Goodman
Patty Blum
Michael Ratner
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel:  (212) 614-6424
Fax:  (212) 614-6499

*Attorneys for Plaintiff*