**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| YUKSEL CELIKGOGUS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 06-CV-1996 (HHK) |
| | ) | |
| DONALD RUMSFELD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**DEFENDANTS' UNOPPOSED MOTION FOR EXTENSION
OF TIME TO RESPOND TO THE AMENDED COMPLAINT**

Defendants, Donald Rumsfeld, Richard Myers, James T. Hill, Bantz J. Craddock,

Michael Lehnert, Michael E. Dunlavey, Geoffrey Miller, Jay Hood, Harry B. Harris, Jr., Terry

Carrico, Adolph McQueen, Nelson J. Cannon, Michael I. Bumgarner, Wade F. Dennis

(incorrectly named as "Dennis Wade"), and Esteban Rodriguez, respectfully request thirty days

additional time to respond to Plaintiffs' Amended Complaint.  This is Defendants' second

motion for an extension of time to respond to the complaint, the first being denied by the Court

as moot upon granting a stay of the proceedings.  See Docket No. 19.  Plaintiffs' counsel has

informed defense counsel that Plaintiffs consent to the proposed additional thirty-day extension,

but may seek a further stay, contingent upon any further appellate proceedings that may be

undertaken in Rasul v. Rumsfeld, No. 06-5209 (D.C. Cir.).

On May 22, 2007, the Court ordered a stay in the proceedings of this case pending the

outcome of the consolidated appeals in Rasul v. Rumsfeld, Nos. 06-5209, 06-5222 (D.C. Cir.).

See Docket No. 19.  The Court's Order instructed Defendants to respond to the Amended

Complaint "within thirty days of the date upon which the Court of Appeals renders its decision in <u>Rasul</u>."  <u>Id</u>.

On January 11, 2008, the United States Court of Appeals for the District of Columbia Circuit decided the consolidated appeals in <u>Rasul</u>.  A true copy of that slip opinion is attached as Exhibit A.  The Court of Appeals also ordered the issuance of the mandate withheld until seven days after disposition of any timely petition for rehearing or rehearing *en banc*.  At this time it is unknown whether the <u>Rasul</u> plaintiffs intend to seek further appellate review.

Because <u>Celikgogus</u> and <u>Rasul</u> allege nearly identical causes of action on behalf of former non-resident alien detainees at the United States Naval Base at Guantánamo Bay Naval Station, Cuba, against many of the same defendants, the decision by the D.C. Circuit in <u>Rasul</u> is dispositive of most, if not all, of the Plaintiffs' claims in this case.  As the Court of Appeals noted in <u>Rasul</u>, "we must follow Circuit precedent until and unless it is altered by our own *en banc* review or by the High Court."  <u>See</u> <u>Rasul</u>, slip op. at 32 n.15 (citations omitted).

Analysis of the newly-issued <u>Rasul</u> decision therefore must be included in any meaningful response to the Amended Complaint.  The additional time requested is necessary for defense counsel to properly analyze and present the <u>Rasul</u> decision to the Court as it pertains to Plaintiffs' causes of action, as well as to raise other defenses which particular defendants may have that are either not addressed in <u>Rasul</u> or are unique to individual defendants such as personal jurisdiction, personal involvement for qualified immunity purposes, or other available defenses.

Accordingly, Defendants respectfully request thirty days in addition to the time already provided by the Court in order to fully respond to the Amended Complaint.  As detailed in our

prior motion to stay, any delays in this case (and its predecessor) up to this point have been occasioned by plaintiffs' own inaction and the imposition of the stay.  <u>See</u> Docket Nos. 13 & 19. Any additional delay caused by this motion, therefore, would be minimal and would not prejudice plaintiffs.

For all of the reasons stated above, we respectfully request that the Court enter an order extending the time by thirty days by which Defendants are currently required to answer or otherwise respond to Plaintiffs' Amended Complaint.  A proposed order is attached as Exhibit B.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General, Civil Division

C. FREDERICK BECKNER, III
Deputy Assistant Attorney General, Civil Division

TIMOTHY P. GARREN
Director, Torts Branch, Civil Division

 /s/ James R. Whitman
JAMES R. WHITMAN
Wis. Bar Member No. 1036757
JAMES G. BARTOLOTTO
DC Bar Member No. 441314
Trial Attorneys
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, D.C. 20044-7146
Tel:  (202) 616-4169, 4174
Fax:  (202) 616-4314
*Attorneys for the Defendants*

Dated: January 22, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I certify under penalty of perjury that on January 22, 2008, I electronically filed with the

Clerk of the Court, by using the Court's CM/ECF system, the foregoing "DEFENDANTS'

UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO THE AMENDED

COMPLAINT."

       /s/ James R. Whitman
JAMES R. WHITMAN
JAMES G. BARTOLOTTO
Trial Attorneys
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Ben Franklin Station
Washington, D.C. 20044-7146
*Attorneys for the Defendants*

# EXHIBIT A

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2007      Decided January 11, 2008

No. 06-5209

SHAFIQ RASUL *ET AL.*,
APPELLANTS/CROSS-APPELLEES

v.

RICHARD MYERS, AIR FORCE GENERAL ET AL.,
APPELLEES/CROSS-APPELLANTS

———

Consolidated with
06-5222

———

Appeals from the United States District Court
for the District of Columbia
(No. 04cv01864)

———

*Eric L. Lewis* argued the cause for the appellants/cross-appellees. *A. Katherine Toomey*, *Sarah L. Knapp*, *Elizabeth A. Wilson*, *Michael Ratner*, *Jennifer M. Green* and *Shayana Kadidal* were on brief.

*Sidney S. Rosdeitcher* was on brief for *amici curiae* National Institute of Military Justice et al. in support of the appellants.

*William J. Aceves* and *Paul Hoffman* were on brief for *amici curiae* International Law Scholars and Human Rights

2

Organization in support of the appellants.

*Stephen M. Truitt* and *Michael Rapkin* were on brief for *amici curiam* Counsel for Guantanamo Detainees et al. in support of the appellants.

*Jerome A. Hoffman* and *Christopher C. Lund* were on the brief for *amici curiae* National Association of Evangelicals et al. in support of the cross-appellees.

*Jonathan F. Cohn*, Deputy Assistant Attorney General, United States Department of Justice, argued the cause for the appellees/cross-appellants. *Peter D. Keisler*, Assistant Attorney General, *Gregory D. Katsas* and *Jeffrey S. Bucholtz*, Principal Deputy Associate Attorneys General, and *Robert M. Loeb* and *Matthew M. Collette*, Attorneys, United States Department of Justice, were on brief. *R. Craig Lawrence*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON, RANDOLPH and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Separate concurring opinion filed by *Circuit Judge* BROWN.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Appellants Shafiq Rasul, Asif Iqbal, Rhuhel Ahmed and Jamal Al-Harith (plaintiffs or detainees) sued former Secretary of Defense Donald Rumsfeld (Rumsfeld) and defendant military officers[1] (defendants) under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, the Geneva Conventions, 6 U.S.T. 3316 and 6 U.S.T.

---

[1]The other appellees include Air Force General Richard Myers, Army Major General Geoffrey Miller, Army General James T. Hill, Army Major General Michael E. Dunlavey, Army Brigadier General Michael Lehnet, Army Colonel Nelson J. Cannon, Army Colonel Terry Carrico, Army Lieutenant Colonel William Cline and Army Lieutenant Colonel Diane Beaver.

3

3516, the Fifth and Eighth Amendments to the United States Constitution and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq*., seeking damages for their alleged illegal detention and torture at the United States Naval Base at Guantanamo Bay, Cuba (Guantanamo). The defendants argued in district court that the ATS and Geneva Conventions claims were barred by the Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), Pub. L. No. 100-694, 102 Stat. 4563 (1988) (*amending* 28 U.S.C. §§ 2671, 2674, 2679) and that they were entitled to qualified immunity on the constitutional and RFRA claims. The district court agreed that the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2679 *et seq.*, provided the exclusive remedy for the defendants' allegedly tortious conduct and thus granted the defendants' motion to dismiss the ATS and Geneva Conventions claims. *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 30-36 (D.D.C. 2006). The district court also dismissed the constitutional claims, holding that the defendants were entitled to qualified immunity from suit. *Id.* at 41-44. It denied, however, the defendants' motion to dismiss the RFRA claim. *Rasul v. Rumsfeld*, 433 F. Supp. 2d 58 (D.D.C. 2006). The plaintiffs now appeal the dismissal of the ATS, Geneva Conventions and constitutional claims and the defendants appeal the denial of their motion to dismiss the RFRA claim. For the reasons set forth below, we affirm the district court's dismissal of the ATS, Geneva Conventions and constitutional claims and reverse its denial of the motion to dismiss the RFRA claim.

**I.**

The complaint alleges the following facts. Shafiq Rasul (Rasul), Asif Iqbal (Iqbal), Rhuhel Ahmed (Ahmed) and Jamal Al-Harith (Al-Harith) are citizens and residents of the United Kingdom. Compl. ¶ 1. Rasul, Iqbal and Ahmed allege that in October 2001 they traveled to Afghanistan from Pakistan to provide humanitarian relief. *Id.* ¶ 35. They claim that General

4

Rashid Dostum, an Uzbek warlord allied with the United States as part of the Northern Alliance, captured them in northern Afghanistan on November 28, 2001 and transferred them to United States custody in Afghanistan one month later. *Id.* ¶¶ 2, 42-44. In early 2002, they were transported to Guantanamo, where they remained as detainees until their repatriation to the United Kingdom in 2004. *Id.* ¶¶ 5, 58-65.

Al-Harith asserts that he traveled to Pakistan on October 2, 2001 to attend a religious retreat. *Id.* ¶ 3. Upon being advised to leave the country because of reported animosity towards British citizens, Al-Harith alleges that he tried to return to Europe overland via Iran and Turkey. *Id.* According to Al-Harith, while still in Pakistan, the truck in which Al-Harith was traveling was hijacked at gunpoint by Afghans. *Id.* He claims he was then forced into another vehicle which crossed the border into Afghanistan where he was subsequently turned over to the Taliban. *Id.* Al-Harith asserts that the Taliban accused him of being a British spy and imprisoned him. *Id.* He claims he was released in 2001 when the Taliban fell and he contacted British embassy officials to secure his evacuation. *Id.* United States forces, in coordination with British officials, detained Al-Harith and transported him to Guantanamo in February 2002. *Id.* ¶¶ 3-4, 63.

On December 2, 2002, defendant Rumsfeld approved for use at Guantanamo interrogation techniques such as the use of stress positions, intimidation by the use of dogs, twenty-hour interrogation sessions, shaving of detainees' facial hair, isolation in darkness and silence and the use of "mild non-injurious physical contact." *Id.* ¶ 9. Rumsfeld subsequently withdrew approval of these tactics in April 2003. *Id.* ¶ 11. The detainees, however, allege that they were systematically and repeatedly tortured throughout their two-year detention at Guantanamo. *Id.* ¶ 4. For example, they claim they were beaten, shackled in painful stress positions, threatened by dogs, subjected to extreme

5

temperatures and deprived of adequate sleep, food, sanitation, medical care and communication. *Id.* ¶ 6. They also allege that they were harassed while practicing their religion, *id.*, including forced shaving of their beards, banning or interrupting their prayers, denying them copies of the Koran and prayer mats and throwing a copy of the Koran in a toilet bucket. *Id.* ¶¶ 58, 78, 92, 97, 206.

In addition to Rumsfeld's approval of these interrogation techniques, the detainees assert that the other defendants implemented, supervised and condoned their torture and detention. *See id.* ¶ 154 ("[A]ll [d]efendants were aware that [p]laintiffs were tortured . . . ."); *id.* ¶ 155 ("[A]ll [d]efendants took no steps to prevent the infliction of torture . . . ."); *id* ¶ 156 ("[A]ll [d]efendants authorized and encouraged the infliction of torture . . . ."). For example, plaintiffs allege that defendant Myers, a United States Air Force General and Chairman of the Joint Chiefs of Staff, was informed of the torture and mistreatment of Guantanamo detainees and, as the senior military officer charged with maintaining the custody of the detainees, condoned their torture. *Id.* ¶ 20. They assert that defendant Miller, a Major General in the United States Army, implemented and condoned the torture and mistreatment of Guantanamo detainees as the Commander of Joint Task Force-GTMO. *Id.* ¶ 21. They claim that defendant Hill, a General in the United States Army and Commander of the United States Southern Command, sought approval for several abusive interrogation techniques used on them. *Id.* ¶ 22. They allege that defendant Dunlavey, a Major General in the United States Army, implemented and condoned torture and cruel, inhuman and degrading acts as the Commander of Joint Task Force 160/170, which succeeded Joint Task Force-GTMO at Guantanamo. *Id.* ¶ 23. They assert that defendant Hood, a Brigadier General in the United States Army, operated the detention facilities at Guantanamo and had supervisory responsibility for the detainees as the Commander of Joint Task

6

Force-GTMO. *Id.* ¶ 24. They claim that defendant Lehnert, a Brigadier General in the United States Marine Corps, was responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantanamo and had supervisory responsibility for detainees. *Id.* ¶ 25. They allege that defendant Cannon, a Colonel in the United States Army, had supervisory responsibility for the detainees as Commander of Camp Delta at Guantanamo. *Id.* ¶ 26. They assert that defendant Carrico, also a Colonel in the United States Army, had supervisory responsibility for the detainees as Commander of Camp Delta and Camp X-Ray at Guantanamo. *Id.* ¶ 27. Finally, they claim that defendant Beaver, a Lieutenant Colonel in the United States Army and Chief Legal Adviser to defendant Dunlavey, provided an opinion purporting to justify the torture and mistreatment of detainees. *Id.* ¶ 28.

The plaintiffs were released in March 2004 and returned to the United Kingdom. *Id.* ¶ 5. On October 27, 2004, they filed a complaint alleging seven causes of action against defendant Rumsfeld and the defendant military officers: (1) prolonged arbitrary detention under the ATS, (2) torture under the ATS, (3) cruel, inhuman or degrading treatment under the ATS, (4) violations of the Geneva Conventions, (5) violations of the Eighth Amendment, (6) violations of the Fifth Amendment and (7) violations of RFRA. Compl. ¶¶ 159-210. They claim they suffered physical and psychological trauma as a result of their detention at Guantanamo. *Id.* ¶¶ 138-140. On March 16, 2005, all of the defendants moved to dismiss for lack of subject matter jurisdiction and failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). *Rasul*, 414 F. Supp. 2d at 29.

The district court dismissed the ATS, Geneva Conventions and constitutional claims, concluding, as discussed *infra* pp. 11-27 that pursuant to the Westfall Act, the FTCA provides the exclusive remedy for torts by a federal official or employee

7

committed within the scope of his employment. *Rasul*, 414 F. Supp. 2d at 31 (citing 28 U.S.C. § 2679(b)(1)). The court held that the ATS and Geneva Conventions claims were covered by the Westfall Act because the defendants' authorization, implementation and supervision of the alleged torture and detention of the detainees was within the scope of their employment. *Id*. at 32-36. Relying on the Restatement (Second) of Agency § 228(1) (1957), the court concluded that the defendants' conduct was incidental to the conduct authorized, *id*. at 33-34, took place within the time and place limitations sanctioned by the United States, *id.* at 34, was done to further the interests of the United States, *id.* at 35-36, and was foreseeable, *id.* at 36. It further ruled that neither the ATS claims nor the Geneva Conventions claim fit within one of the statutory exceptions to the Westfall Act. *Id.* at 36-38. Accordingly, because the plaintiffs had failed to exhaust their administrative remedies as required by the FTCA, *see McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."), the court dismissed the claims under Federal Rule of Civil Procedure 12(b)(1). *Rasul*, 414 F. Supp. 2d at 39.

Regarding the two constitutional claims brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),[2] the defendants argued, first, that the plaintiffs had failed to allege the violation of any right protected by the Constitution because the plaintiffs, as Guantanamo detainees, were aliens located outside sovereign

---

[2]The holding in *Bivens* permits a plaintiff to bring an action in federal court against a federal officer/employee for the violation of his constitutional rights. 403 U.S. at 389. A *Bivens* suit is the federal counterpart of a claim brought pursuant to 42 U.S.C. § 1983 against a state or local officer/employee for the violation of the claimant's constitutional rights.

8

United States territory at the time of the alleged violations and therefore did not possess any constitutional right. *Rasul*, 414 F. Supp. 2d at 39. Even assuming the plaintiffs had alleged the violation of such a right, the defendants continued, such a right was not clearly established at the time of the violations.[3] *Id.* at 41-44.

The district court reserved judgment regarding the defendants' first argument because, at the time, the decision in *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), holding that Guantanamo detainees were not entitled to constitutional protection, was on appeal. *Rasul*, 414 F. Supp. 2d at 40-41. It then concluded that the defendants were entitled to qualified immunity from suit under *Bivens* because any constitutional right the detainees possessed was not clearly established at the time it was allegedly violated. *Id.* at 41. Relying on the United States Supreme Court's holdings in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the district court concluded that "the Constitution applies only once aliens were within the territory of the United States and developed substantial contacts in this

---

[3]In *Saucier v. Katz*, 533 U.S. 194, 201 (2001) the Supreme Court affirmed that under the doctrine of qualified immunity, a federal official alleged to have violated a plaintiff's constitutional right is shielded from liability if the right was not clearly established at the time of the violation. *See also Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985) ("'[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). Although *Saucier* involved a section 1983 claim, "the law of immunity in a *Bivens* claim against a federal official mirrors that in a section 1983 claim against a state official." *Moore v. Valder*, 65 F.3d 189, 192 (D.C. Cir. 1995).

9

country." *Id.* at 44.[4]  The court noted that "plaintiffs have provided no case law, and the court finds none, supporting a conclusion that military officials would have been aware, in light of the state of the law at the time, that detainees should be afforded the rights they now claim." *Id.*

The court reached the opposite conclusion regarding the plaintiffs' RFRA claim. *Rasul*, 433 F. Supp. 2d at 71.  As discussed *infra* pp. 35-43, RFRA provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)-(b).  The district court first considered whether RFRA applied to Guantanamo. *Rasul*, 433 F. Supp. 2d at 62-67.  It rejected the defendants' argument that RFRA does not apply extraterritorially based on its interpretation of 42 U.S.C. § 2000bb-2(2), which  defines "Government" to include "the District of Columbia, the Commonwealth of Puerto Rico, and each *territory and possession* of the United States."  42 U.S.C. § 2000bb-2(1), (2) (emphasis added).  It reasoned that if

---

[4]In *Johnson v. Eisentrager*, the Supreme Court held that German nationals who were convicted of war crimes committed during World War II and were imprisoned at a United States army base in Germany had no constitutional right to test the legality of their detention by way of habeas corpus.  In *United States v. Verdugo-Urquidez*, the Court held that the Fourth Amendment did not apply to a search by DEA agents of a Mexican citizen's residence in Mexico.  It summarized *Eisentrager* as "reject[ing] the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States" and described other cases involving aliens as "establish[ing] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."  494 U.S. at 269, 271.

10

"territory and possession" "is to have any meaning, it must include lands such as [Guantanamo]," over which the United States exercises "perhaps as much control as it possibly could short of 'ultimate sovereignty.'" *Id.* at 65 (quoting *Rasul v. Bush*, 542 U.S. 466, 475 (2004)). Next, it rejected the defendants' assertion that RFRA does not apply to non-resident aliens. *Id.* at 67. It noted that "RFRA expressly protects the religious exercise of 'persons,' a broadly applicable term, commonly including aliens." *Id.* at 66. It reasoned that "because RFRA explicitly applies to 'persons,' the defendants, at a bare minimum, must demonstrate that Congress specifically intended to vest the term 'persons' with a definition . . . at odds with its plain meaning" and noted that "the defendants cite no authority to support their construction of RFRA." *Id.* at 67. Accordingly, the district court concluded that "RFRA applies to U.S. government action at the Naval Base in Guantanamo Bay." *Id.*

The district court then rejected the defendants' assertion of qualified immunity from RFRA liability. Applying the first step of *Saucier v. Katz*, 533 U.S. 194, 201 (2001), it held that the facts alleged constituted a violation of RFRA. 433 F. Supp. 2d at 68-69. Specifically, it found that the defendants' alleged harassment of the plaintiffs in the practice of their religion, including "[f]lushing the Koran down the toilet and forcing Muslims to shave their beards," "falls comfortably within the conduct prohibited from government action by RFRA." *Id.* at 69. Applying step two of *Saucier*, the district court found that the plaintiffs' rights under RFRA were clearly established at the time of the alleged violations, declaring that "[t]he statute's unambiguous application to U.S. territories and possessions should have placed the defendants on notice that they were prohibited from the alleged conduct in Guantanamo." *Id.* at 71 (footnote omitted). While "recogniz[ing] that the defendants are not constitutional law scholars well versed on the jurisdictional reach of RFRA," it concluded that "given the abhorrent nature

11

of the allegations and given our Nation's fundamental commitment to religious liberty, it seems to this court that in this case a reasonable official would understand that what he is doing violates that right." *Id.* at 71 (internal quotations and citations omitted).

The plaintiffs appeal the dismissal of the ATS, Geneva Conventions and *Bivens* claims pursuant to 28 U.S.C. § 1291. The defendants' interlocutory appeal of the denial of qualified immunity on the RFRA claim is pursuant to the collateral order doctrine "'to the extent that [the denial] turns on an issue of law.'" *Int'l Action Ctr. v. United States*, 365 F.3d 20, 23 (D.C. Cir. 2004) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

## II.

We review the district court's legal conclusions *de novo*. *Cummings v. Dep't of the Navy*, 279 F.3d 1051, 1053 (D.C. Cir. 2002) ("'[W]e apply the *de novo* standard of review to the district court's application of law to undisputed fact[s].'" (quoting *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998)) (alterations in *Cummings*)). We "accept as true the facts that [the plaintiffs] allege[] in [their] complaint" in reviewing the district court's disposition of the defendants' motion to dismiss. *Id.* at 1053.

### A. *The ATS Claims*

The plaintiffs brought three claims for violations of the law of nations pursuant to the Alien Tort Statute (ATS) based on the defendants' alleged infliction of "prolonged arbitrary detention," Compl. ¶¶ 159-66, "torture," *id.* ¶¶ 167-72, and "cruel, inhuman or degrading treatment." *Id.* ¶¶ 173-79. As noted earlier, the plaintiffs claim that they were beaten, shackled in painful stress positions, threatened by dogs, subjected to extreme temperatures, deprived of adequate sleep, food, sanitation, medical care and communication and harassed while practicing

12

their religion. *Id.* ¶ 6. They assert that, in December 2002, defendant Rumsfeld approved the use of these interrogation techniques and others, including shaving of detainees' facial hair, isolation in darkness and silence and the use of "mild non-injurious physical contact." *Id.* ¶ 9. According to the plaintiffs, the other defendants authorized, implemented, supervised and condoned their torture and detention, *id.* ¶¶ 20-28, 154-56, and thereby violated customary international law. *Id.* ¶¶ 163, 169, 176.

The Alien Tort Statute provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The district court concluded, however, that pursuant to the Westfall Act, the plaintiffs' claims were cognizable only under the FTCA because the defendants' alleged conduct occurred within the scope of their office/employment. *Rasul*, 414 F. Supp. 2d at 36. It then held that it lacked subject matter jurisdiction because the plaintiffs failed to exhaust their administrative remedies as required by the FTCA. *Id.* at 39 (citing *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997) ("This court and the other courts of appeals have treated the FTCA's requirement of filing an administrative complaint with the appropriate agency prior to instituting an action as jurisdictional.")).[5]

In pertinent part, the Westfall Act provides:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States

---

[5]*See* discussion *infra* pp. 23-25.

13

under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). By this provision, the Westfall Act makes the FTCA remedy "exclusive of any other civil action or proceeding for money damages" for any tort committed by a federal official or employee "while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1).

While the Attorney General's certification "'does not conclusively establish as correct the substitution of the United States as defendant in place of the employee,'" it constitutes "prima facie evidence that the employee was acting within the scope of his employment." *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006) (per curiam) (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995)). The plaintiffs bear the burden of challenging the certification by "'coming forward with specific facts rebutting the certification.'" *Ballenger*, 444 F.3d at 662 (quoting *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003)). The court then determines whether the conduct falls within the scope of employment, conducting an evidentiary hearing if necessary. *Kimbro v. Velten*, 30 F.3d 1501, 1508 (D.C. Cir. 1994), *cert. denied*, 515 U.S. 1145 (citing *Wang v. United States*, 947 F.2d 1400, 1402 (9th Cir. 1991); *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994)). If the court determines that the employee acted within the scope of his employment, "the case is, *inter alia*, restyled as an action against the United States that is governed by the [FTCA]." *Ballenger*, 444 F.3d at 662.

"Scope of employment questions are governed by the law of the place where the employment relationship exists." *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006). We look, then, "to the decisions of the Court of Appeals for the District of Columbia for our guidance on the local law." *Id.* "'As its framework for determining whether an employee acted within

14

the scope of employment, the Court of Appeals for the District of Columbia looks to the Restatement (Second) of Agency (1957).'" *Id.* (quoting *Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995), *overruled on other grounds*, *Osborn v. Haley*, 127 S. Ct. 881 (2007)). According to the Restatement, the "'[c]onduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.'" *Ballenger*, 444 F.3d at 663 (quoting Restatement (Second) of Agency § 228(1) (1958)). "'Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" *Id.* (quoting Restatement (Second) of Agency § 228(2)).

On March 10, 2005, the Attorney General duly certified that "[o]n the basis of the information now available," all of the defendants were acting within the scope of their employment "at the time of the conduct alleged in the complaint." Certification of Scope of Employment (App. 60.) Applying the four Restatement factors, the district court concluded that "the alleged actions of the defendants were within the scope of their employment." 414 F. Supp. 2d at 36. First, it agreed with the defendants that their alleged authorization, implementation and supervision of torture was "'incidental to the conduct authorized.'" *Id.* at 33 (quoting Restatement (Second) of Agency § 229). It noted that the United States authorized military personnel in Guantanamo "to exercise control over the detainees and question the detainees while in the custody of the United States," *id.* at 34 (citing Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)), and that "torture is a foreseeable consequence of the military's detention of suspected enemy combatants." *Id.* It also

15

emphasized that the "complaint alleges torture and abuse tied exclusively to the plaintiffs' detention in a military prison and to the interrogations conducted therein." *Id.* Examining the second factor, the district court observed that "the parties do not dispute that the defendants' actions took place within the time and place limitations sanctions [sic] by the United States." *Id.* Regarding the third factor, the district court ruled that the defendants "were acting, at least in part, to further the interests of their employer, the United States." *Id.* at 35-36. It noted that the plaintiffs did "not allege that the tortious actions arose purely from personal motives, but claim[ed] that the defendants' actions are inextricably intertwined with their respective roles in the military." *Id.* at 35. It also observed that "[t]he plaintiffs have not proffered any evidence that would lead this court to believe that the defendants had any motive divorced from the policy of the United States to quash terrorism around the world." *Id.* And regarding the fourth factor, the district court concluded that while the alleged "aggressive techniques may be sanctionable within the military command, . . . the fact that abuse would occur is foreseeable." *Id.* at 36. It emphasized that "the heightened climate of anxiety, due to the stresses of war and pressures after September 11 to uncover information leading to the capture of terrorists, would naturally lead to a greater desire to procure information and, therefore, more aggressive techniques for interrogations." *Id.*

The plaintiffs do not contest that the second, third and fourth factors listed in section 228(1) of the Restatement support the conclusion that the defendants acted within the scope of their employment in authorizing, implementing, supervising and condoning the plaintiffs' alleged torture and detention. They do challenge the district court's conclusion that the defendants' alleged authorization, supervision and implementation of torture was incidental to the conduct authorized, claiming that the defendants' conduct "was never authorized," was "seriously criminal," "has long [been] condemned" by the United States

16

and was a "substantial departure from the government's 'normal method' of detaining and interrogating persons of interest." Appellant's Br. 22, 25. Alternatively, the plaintiffs assert that even if the defendants' conduct falls within the scope of their employment, their claims come within the exception included in the Westfall Act for "a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Finally, the plaintiffs argue that the district court erred in dismissing their claims without allowing them to conduct discovery.

### 1. *Scope of Employment*

According to the detainees, we cannot conclude that the formulation, approval and implementation of a policy of torture is "of the kind" of conduct the defendants were employed to perform. To be "of the kind" of conduct an individual is employed to perform, the Restatement explains that the "conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." Restatement (Second) of Agency § 229(1). The defendants respond that "[w]here high-level military officials are charged with winning the war on terror, and specifically with detaining and obtaining information from suspected terrorists, the officials' policies on detention and interrogation, and their supervision of the implementation of those policies, is at least 'incidental' to those duties." Appellees' Br. 18.[6]

In *Haddon*, we held that whether conduct is incidental depends on whether the conduct is a "direct outgrowth" of an employment assignment:

---

[6]Although the plaintiffs also assert that the defendants' alleged conduct was not "the same general nature as was authorized," Restatement (Second) of Agency § 229(1), we need not reach this issue because of our conclusion that the alleged conduct was "incidental to the conduct authorized."

17

> According to the D.C. Court of Appeals, conduct is "incidental" to an employee's legitimate duties if it is "foreseeable." "Foreseeable" in this context does not carry the same meaning as it does in negligence cases; rather, it requires the court to determine whether it is fair to charge employers with responsibility for the intentional torts of their employees. To be foreseeable, the torts must be "'a direct outgrowth of the employee's instructions or job assignment.'"

68 F.3d at 1424 (quoting *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984) (quoting *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979))).

More recently, in *Ballenger*, although we did not explicitly use *Boykin*'s "direct outgrowth language," we nonetheless emphasized that whether conduct is incidental depends "on the underlying dispute or controversy, not on the nature of the tort." 444 F.3d at 664 (internal quotation omitted). We explained that the "incidental" prong "is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Id.* (internal quotation omitted). In *Ballenger*, we examined whether a congressman's allegedly defamatory comments made during a telephone conversation fell within the scope of his office. We explained that "[t]he appropriate question, then, is whether that telephone conversation—not the allegedly defamatory sentence—was the kind of conduct Ballenger was employed to perform." *Id.* Because "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties,'" we held that the allegedly defamatory statement was incidental to his office. *Id.* at 664-65.

Similarly, in *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976), this Court upheld a jury verdict holding a deliveryman's employer liable because the employee acted within the scope of his employment when he assaulted and raped a customer. The

18

Court reasoned that the assault "arose naturally and immediately between [the deliveryman] and the plaintiff about two items of great significance in connection with his job[:] the request of the plaintiff . . . to inspect the mattress and springs before payment . . . and [the deliveryman's] insistence on getting cash rather than a check." *Id.* at 652. The Court also noted that "[t]he dispute arose out of the very transaction which had brought [the deliveryman] to the premises." *Id; see also Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (upholding jury verdict that laundromat employee acted within scope of his employment when he shot customer during dispute over removal of clothes from washing machine because "[t]he assault arose out of the transaction which initially brought [the customer] to the premises . . . and was triggered by a dispute over the conduct of the employer's business"); *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984) (holding that jury could reasonably find that university dean acted within scope of employment when he sexually harassed faculty member during faculty, administrative and other professional meetings).

In contrast, the District of Columbia courts have held that tortious conduct is not "incidental" to the performance of authorized duties if the conduct underlying the tort is unrelated to the employee's instructions or job assignment. For example, in *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. 1979), the court held that a railroad employee was not acting within the scope of his employment when he kicked a taxicab driver while traveling between work sites. It concluded that the employee's action "was neither a direct outgrowth of [his] instructions or job assignment, nor an integral part of the employer's business activity," noting that "nothing in the business of running a railroad . . . makes it likely that an assault will occur between a railroad brakeman and a taxicab driver over the celerity with which the latter will provide a taxicab ride to the former." *Id.* at 32; *see also Boykin*, 484 A.2d at 564 (teacher was not acting within scope of employment when he

19

sexually assaulted student because teacher was not then performing teaching responsibilities). And our court, in *Haddon*, held that a White House electrician was not acting within the scope of his employment when he threatened the White House chef with physical harm. 68 F.3d at 1425. We noted that the electrician's "alleged tort did not arise directly out of his instructions or job assignment as a White House electrician" because "[u]nlike the rape in *Lyon* and the shooting in *Johnson*, the electrician's threat did not stem from a dispute over the performance of *his* work." *Id.* (emphasis in original). We also observed that "[u]nlike the sexual harassment in *Howard University*, the electrician was not performing his assigned duties at the time of the incident." Instead, we concluded that his conduct was "closer to the kick in *Penn Central* and the assault in *Boykin*" because "[a]s in those cases, the electrician's conduct was completely unrelated to his official responsibilities." *Id.*

The plaintiffs concede that the "torture, threats, physical and psychological abuse inflicted" on them, which were allegedly approved, implemented, supervised and condoned by the defendants, were "intended as interrogation techniques to be used on detainees." Compl. ¶ 141. In fact, as the district court correctly noted, "the complaint alleges torture and abuse tied exclusively to the plaintiffs' detention in a military prison and to the interrogations conducted therein." 414 F. Supp. 2d at 34. Under *Ballenger*, then, the underlying conduct—here, the detention and interrogation of suspected enemy combatants—is the type of conduct the defendants were employed to engage in. Just as the telephone conversation in *Ballenger*, the mattress delivery in *Lyon* and the removal of clothes from the washing machine in *Thompson* was each part of the employee's job description or assignment, the detention and interrogation of suspected enemy combatants is a central part of the defendants' duties as military officers charged with winning the war on terror. *See Ballenger*, 444 F.3d at 664; *Lyon*, 533 F.2d at 652;

20

*Johnson*, 434 A.2d at 409. While the plaintiffs challenge the methods the defendants used to perform their duties, the plaintiffs do not allege that the defendants acted as rogue officials or employees who implemented a policy of torture for reasons unrelated to the gathering of intelligence. *Cf. Penn Cent.*, 398 A.2d at 32; *Boykin*, 489 A.2d at 564. Therefore, the alleged tortious conduct was incidental to the defendants' legitimate employment duties.

Section 229(2)(j) of the Restatement (Second) of Agency provides, in pertinent part, that "[i]n determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: . . . whether or not the act is seriously criminal."[7] In alleging that the defendants formulated, approved and implemented a policy of torture, the plaintiffs have plainly alleged "seriously criminal" conduct. But criminal conduct is not *per se* outside the scope of employment. *See* Restatement (Second) of Agency § 231 ("An act may be within the scope of employment although consciously criminal or tortious."); *Johnson*, 434 A.2d at 409 (laundromat employee shot customer over laundry dispute); *Lyon*, 533 F.2d at 652 (deliveryman assaulted and raped customer following delivery dispute); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001) (rule that sexual assaults are automatically outside scope of employment "too broad").

Citing § 229(2)(j) of the Restatement, the plaintiffs argue nonetheless that the serious criminality of the defendants' alleged conduct precluded the district court from holding—as a matter of law—that their conduct was within the scope of their employment. Here, however, the district court apparently

---

[7]Comment f to section 229(2) states that "[t]he fact that the act done is a serious crime is a factor indicating that it is not in the scope of employment."

21

assumed the truth of the plaintiffs' allegation that the defendants' conduct was seriously criminal. 414 F. Supp. 2d at 34 (concluding that "torture and inhumane treatment wrought upon captives by their captors" was "'direct outgrowth of the employees' instructions and job assignment'") (quoting *Haddon*, 68 F.3d at 1424) (alteration omitted). Accordingly, regardless whether the court or a jury resolves factual disputes in a Westfall Act action,[8] nothing would be gained by an evidentiary

---

[8]Unlike the determination of scope of employment in a respondeat superior case in the District of Columbia, where under local law the issue *is* a jury question, *see e.g., Johnson*, 434 A.2d at 407-09; *Lyon*, 533 F.2d at 652, our precedent holds that the court determines whether conduct falls within the scope of employment under the Westfall Act, conducting an evidentiary hearing only if necessary to resolve factual disputes. *See Kimbro*, 30 F.3d at 1509 ("If there is a material dispute as to the scope [of employment] issue the district court must resolve it at an evidentiary hearing."); *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (same); *cf. Jamison v. Wiley*, 14 F.3d 222, 236 (4th Cir. 1994) ("The federal courts of appeals have consistently recognized that a district court has the power to hold a limited evidentiary hearing to resolve factual disputes that bear on a scope-of-employment issue properly before it in a Westfall Act case."). In a more recent case, we reversed the district court's grant of summary judgment based on its conclusion as a matter of law that the defendant Smithsonian employee acted within the scope of her employment under the Westfall Act. *Majano v. United States*, 469 F.3d 138 (D.C. Cir. 2006). In *Majano*, we remanded to the district court in light of a factual dispute and included the comment that "scope of employment questions are generally viewed as questions of fact best resolved by a jury." *Id.* at 140. At oral argument here, the plaintiffs' counsel maintained that the *Majano* comment makes the scope of employment under the Westfall Act a jury question. *See* Recording of 9/14/2007 Oral Argument at 7:45-8:32 ("Under *Majano*, [scope of employment] would be a jury [question]. Under *Kimbro v. Velten*, the initial suggestion was that it would be an evidentiary hearing before a court after discovery. . . . *Majano* seemed to move from *Kimbro v. Velten* and suggest that it was a jury issue."). But the

22

hearing because the plaintiffs could, at most, simply re-establish that the defendants' conduct was seriously criminal. Where, as here, there are no material facts in dispute, the court may decide a Rule 12(b) motion as a matter of law. *See, e.g.*, *Ballenger*, 444 F.3d at 663 (affirming district's court dismissal of tort claim based on determination that defendant acted within scope of employment).

If conduct *is* seriously criminal, the Restatement explains that it is generally less likely that the conduct comes within the scope of employment:

> The fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result. The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do.

Restatement (Second) of Agency § 231 cmt. a.

While it may generally be unexpected that seriously criminal conduct will arise "in the prosecution of the business," here it *was* foreseeable that conduct that would ordinarily be

---

*Majano* holding does not retreat from *Kimbro*, which case had earlier made clear that the court is to decide any factual dispute in a Westfall Act action. *Kimbro*, 30 F.3d at 1509. Both *Kimbro* and *Majano* disposed of Westfall Act actions as a matter of law, *Kimbro* by granting a motion to dismiss, *Majano* by granting summary judgment; *Kimbro* expressly instructed the district court to resolve any factual dispute while *Majano* simply noted the existence of a factual dispute and remanded without mentioning *Kimbro*.

23

indisputably "seriously criminal" would be implemented by military officials responsible for detaining and interrogating suspected enemy combatants. As in *Lyon*, the tortious conduct "was triggered . . . or motivated or occasioned by . . . the conduct then and there of the employer's business" even though it was seriously criminal. *Lyon*, 533 F.2d at 655; *see also Johnson*, 434 A.2d at 409 (laundromat employee acted within scope of employment because "[the employee] had no previous relations with [the victim] which would indicate that the tort was personal" and "[n]o subject unrelated to the [laundry] was ever made a part of the conversation between the men"). Therefore, the allegations of serious criminality do not alter our conclusion that the defendants' conduct was incidental to authorized conduct.[9]

Because the defendants' alleged conduct came within the scope of their office/employment, the three ATS claims were properly "restyled as [claims] against the United States that [are] governed by the [FTCA]." *Ballenger*, 444 F.3d at 662; *see Rasul*, 414 F. Supp. 2d at 38-39. Although the district court did not elaborate—and the parties similarly do not discuss it—we must examine whether the restyled claims against the United States were properly dismissed for lack of jurisdiction. The district court stated only that "[b]ecause the plaintiffs in this case did not proceed against the United States, they did not first present their claim to the appropriate Federal agency" and therefore "the plaintiffs have not exhausted their administrative remedies." 414 F. Supp. 2d at 39.

The FTCA provides that "[a]n action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the

---

[9]While the plaintiffs do not rely on the other nine factors listed in section 229, they do contend that the district court erroneously determined the scope of employment without allowing discovery thereto. *See infra* pp. 25-27.

24

appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a). As noted earlier, *supra* p. 12, we view the failure to exhaust administrative remedies as jurisdictional. *See Simpkins*, 108 F.3d at 371. Accordingly, section 2675(a) required the plaintiffs to file an administrative claim with either the Department of Defense (DoD) or the appropriate military department before bringing suit. *See* 28 C.F.R. § 14.1 (under FTCA, "terms Federal agency and agency . . . include the executive departments [and] the military departments"). Since their release in 2004 at least, the plaintiffs have presumably been able to comply with the exhaustion requirements of FTCA—indeed, they do not argue otherwise. The record is devoid, however, of any suggestion that they complied with any of the procedures governing the filing of an administrative claim with DoD or one of the military departments.[10]  Accordingly, the district court

---

[10]*See* 28 C.F.R. § 14.2(a) ("[A] claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident; and the title or legal capacity of the person signing . . . ."); 32 C.F.R. § 750.6(b) (claim against Department of the Navy submitted to "Tort Claims Unit Norfolk," "Office of the Judge Advocate General," "commanding officer of the Navy or Marine Corps activity involved if known, the commanding officer of any Navy or Marine activity, preferably the one nearest to where the accident occurred, or the local Naval Legal Service Command activity"); *id.* § 842.4 (claim against Department of the Air Force filed "at the base legal office of the unit or installation at or nearest to where the accident or incident occurred"); *id.* §§ 536.3, 536.25 (claim against Department of the Army handled by "area claims office" or "claims processing office").

25

properly dismissed the three ATS claims for lack of subject matter jurisdiction.[11]

### 2. *Discovery*

The plaintiffs assert that the district court erred by dismissing their claims without allowing discovery on the scope

---

[11]The detainees argue in the alternative that even if an employee's conduct is within the scope of his employment, the Westfall Act "does not extend or apply to a civil action" brought (1) "for a violation of the Constitution of the United States" or (2) "for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(A)-(B). The plaintiffs maintain that the first exception applies because they allege Eighth and Fifth Amendment claims (Counts V-VI) in addition to their ATS claims (Counts I-III) and that "civil action" refers to the entire action rather than an individual claim. Yet, as the First Circuit has observed, "[w]here a single case involves multiple claims, certification is properly done at least down to the level of individual claims and not for the entire case viewed as a whole." *Lyons v. Brown*, 158 F.3d 605, 607 (1st Cir. 1998). This court—as have a number of other circuits—has permitted the substitution of the United States if a claim within the Westfall Act exception is joined with unexcepted claims. *See, e.g.*, *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 368, 370-71 (D.C. Cir. 1997) (substituting United States for defendant on common law tort claims notwithstanding defendant also charged with constitutional claims); *see also RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1132, 1142-44 (6th Cir. 1996) (substituting United States for defendant on common law tort claims notwithstanding additional Sherman Act and Lanham Act claims); *Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 867 (9th Cir. 1992) (substituting United States for defendant on common law tort claims notwithstanding additional *Bivens* claims); *Duffy v. United States*, 966 F.2d 307, 309, 314 (7th Cir. 1992) (substituting United States for defendant on common law tort claims notwithstanding additional *Bivens* and 42 U.S.C. § 1985 claims). Accordingly, the plaintiffs' claims do not fall within the first exception to the Westfall Act and they do not rely on the second exception thereto.

26

of employment question.  But discovery is not warranted if "the plaintiff 'did not allege any facts in his complaint or in any subsequent filing . . . that, if true, would demonstrate that [the defendant] had been acting outside the scope of his employment.'"  *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) (alteration in *Stokes*) (quoting *Singleton v. United States*, 277 F.3d 864, 871 (6th Cir. 2002)).  For example, in *Stokes*, a federal employee (Stokes) sued coworkers for defamation arising from their statements that Stokes had failed to perform his duties as a law enforcement officer of the United States Government Printing Office.  *Id.* at 1212.  Stokes alleged that coworkers "destroy[ed] critical evidence, prepar[ed] and submit[ted] false affidavits by use of threat and coercion, and engag[ed] in other criminal acts."  *Id*. at 1216.  While noting that "[i]t is unclear whether evidence of such conduct alone would be sufficient under District of Columbia law," we recognized that evidence of such conduct might reveal the coworkers' "intent to prevent the best candidate, namely Stokes, from getting [a] promotion . . . [and] indicate that they had maliciously acted contrary to their employer's interest and, therefore, outside the scope of their employment."  *Id.* Accordingly, we decided that Stokes was entitled to "at least limited discovery on the scope-of-employment issue."  *Id.*  In contrast, even if the detainees were to establish that the defendants authorized, implemented, supervised and condoned torture and detention based on evidence obtained through discovery, the defendants' conduct would nonetheless fall within the scope of their employment because the defendants were employed to detain and interrogate suspected enemy combatants and the plaintiffs concede that the alleged torture and detention were "intended as interrogation techniques to be used on detainees." Compl. ¶ 141.  The plaintiffs thus failed to allege any facts that, if proven, would establish that the defendants were acting outside the scope of their employment and the district court did not abuse its discretion in denying the plaintiffs

27

discovery. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 737 (D.C. Cir. 2007) ("'The district court has broad discretion in its handling of discovery, and its decision to allow or deny discovery is reviewable only for abuse of discretion.'" (quoting *Brune v. IRS*, 861 F.2d 1284, 1288 (D.C. Cir. 1988))).

B. *The Geneva Conventions Claim*

Similar to Counts I-III, Count IV of the plaintiffs' complaint alleges that they were "held arbitrarily, tortured and otherwise mistreated during their detention" in violation of the Geneva Conventions.[12] Compl. ¶ 181. As already noted, the Westfall Act provides that "'[t]he remedy against the Government under the FTCA 'is exclusive of any other civil action or proceeding for money damages . . . against the employee' and then reemphasizes that '[a]ny other civil action or proceeding for money damages . . . against the employee . . . is precluded.'" *United States v. Smith*, 499 U.S. 160, 165-66 (1991) (quoting 28 U.S.C. § 2679(b)(1)). The plaintiffs' claim based on the Geneva Conventions is for money damages and the alleged conduct falls within the defendant's scope of employment for the reasons discussed *supra* pp. 16-23. Similarly, the plaintiffs' argument that the first exception to the Westfall Act applies because they alleged Eighth and Fifth Amendment claims (Counts V-VI) in addition to their Geneva Conventions claim is rejected for the reasons discussed *supra* note 11. The Geneva Conventions claim is therefore precluded by the Westfall Act and the district court properly dismissed the claim for failure to exhaust administrative remedies. *See Simpkins*, 108 F.3d at 371.

---

[12]Neither the plaintiffs' complaint nor their briefs identify those portions of the Geneva Convention Relative to the Protection of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, or the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287, the defendants allegedly violated.

28

## C.  *The Bivens Claims*

The plaintiffs assert two *Bivens* claims for violations of their Fifth and Eighth Amendment rights.  They allege that the defendants' challenged conduct constituted cruel and unusual punishment in violation of the Eighth Amendment.  Compl. ¶ 186.  Additionally, they claim that the "cruel, inhuman or degrading" conditions at Guantanamo violated their substantive due process rights and their "arbitrary and baseless detention" violated their procedural due process rights, both in violation of the Fifth Amendment.  Compl. ¶¶ 194-95.  The defendants first respond that the detainees, as aliens located outside sovereign United States territory at the time of the alleged violations, had no rights protected by the Constitution.  Even assuming the plaintiffs were protected by the Constitution, the defendants submit that any rights they possessed thereunder were not clearly established at the time of the alleged violations and the defendants are therefore entitled to qualified immunity from suit pursuant to *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), *Mitchell v. Forsyth*, 472 U.S. 511 (1985), and their progeny.

We recently held that Guantanamo detainees lack constitutional rights because they are aliens without property or presence in the United States, *Boumediene v. Bush*, 476 F.3d 981, 984 (D.C. Cir. 2007), *cert. granted*, 127 S. Ct. 3078 (2007).  *Boumediene* involved a Suspension Clause[13] challenge to the Detainee Treatment Act of 2005, Pub. L. No. 109-148, § 1005, 119 Stat. 2680, 2740-44 (2005) (DTA) (amending 28 U.S.C. § 2241), and the Military Commissions Act of 2006, Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2635-36 (2006) (MCA) (amending 28 U.S.C. § 2241).  The DTA was enacted in response to the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466, 483-84 (2004), *see Boumediene*, 476 F.3d at 985, which held that

---

[13]"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.

29

federal courts have subject matter jurisdiction over petitions
filed by Guantanamo detainees seeking a writ of habeas corpus
pursuant to 28 U.S.C. § 2241. The DTA stripped federal courts
of subject matter jurisdiction over detainees' habeas petitions
except as provided therein. DTA § 1005(e), 119 Stat. at 2742
("Except as provided in section 1005 [creating Combatant Status
Review Tribunal], no court, justice, or judge shall have
jurisdiction to hear or consider . . . (1) an application for a writ
of habeas corpus filed by or on behalf of an alien detained by the
Department of Defense at Guantanamo Bay, Cuba; or (2) any
other action against the United States or its agents relating to
any aspect of the detention by the Department of Defense of an
alien at Guantanamo Bay, Cuba . . . ."). The next year, the
Supreme Court held that the DTA did not apply to habeas
petitions pending at the time the DTA was enacted. *Hamdan v.
Rumsfeld*, 126 S. Ct. 2749, 2769 n.15 (2006) ("[W]e conclude
that [the DTA] does not strip federal courts' jurisdiction over
[habeas] cases pending on the date of the DTA's enactment.").
In response to *Hamdan*, the Congress passed the MCA, making
the DTA retroactive. MCA § 7(b), 120 Stat. at 2636 ("The
amendment [ousting the courts of subject matter jurisdiction
over detainees' habeas petitions] shall take effect on the date of
the enactment of this Act, and *shall apply to all cases, without
exception*, pending on or after the date of the enactment of this
Act which relate to any aspect of the detention, transfer,
treatment, trial, or conditions of detention of an alien detained
by the United States since September 11, 2001." (emphasis
added)).

We held in *Boumediene* that neither the DTA nor the MCA
violates the Suspension Clause based in part on our
determination that "[p]recedent in this court and the Supreme
Court holds that the Constitution does not confer rights on aliens
without property or presence within the United States." 476
F.3d at 991. First, we explained that the "controlling case" was
*Johnson v. Eisentrager*, 339 U.S. 763 (1950), which involved

30

German nationals convicted of war crimes who were held at a United States army base in Germany and who filed habeas petitions to challenge their convictions and imprisonment. The Supreme Court rejected the proposition "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses," holding that the German nationals had no constitutional right to petition for habeas corpus relief under the Fifth Amendment. *Id.* at 783. We concluded in *Boumediene* that any difference between Guantanamo and the United States army prison in Germany was "immaterial" because "[t]he text of the lease and decisions of circuit courts and the Supreme Court all make clear that Cuba—not the United States—has sovereignty over Guantanamo Bay." *Boumediene*, 476 F.3d at 992. We noted that the Supreme Court decision following *Eisentrager* held that the Fourth Amendment did not protect a nonresident alien from a DEA agent's allegedly unreasonable search and seizure carried out in Mexico. *Id.* at 991 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990)). We observed that the Supreme Court "found it 'well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders.'" *Id.* at 991-92 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). We rejected the detainees' reliance on the *Insular Cases*,[14] distinguishing those cases on the ground that the Congress had exercised its power to regulate those territories, whereas "[h]ere Congress and the President have specifically disclaimed the sort of territorial jurisdiction they

---

[14]In the *Insular Cases*, the Supreme Court extended "fundamental personal rights" to United States territories. *See Balzac v. Porto* [sic] *Rico*, 258 U.S. 298, 312-13 (1922); *Dorr v. United States*, 195 U.S. 138, 148 (1904). As noted in *Boumediene*, "in each of those cases, Congress had exercised its power under Article IV, Section 3 of the Constitution to regulate 'Territory or other Property belonging to the United States,' U.S. Const., art. IV, § 3, cl. 2." 476 F.3d at 992.

31

asserted in Puerto Rico, the Philippines, and Guam." *Id.* at 992. Finally, we explained that "[p]recedent in this circuit also forecloses the detainees' claims to constitutional rights," noting that we had previously held that "'non-resident aliens . . . plainly cannot appeal to the protection of the Constitution or laws of the United States'" and that a "'foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise.'" *Id.* (quoting *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).

The plaintiffs nonetheless assert that *Boumediene* conflicts with the Supreme Court's holding in *Rasul*. *Rasul* reversed our decision in *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), in which we had held that the federal court's habeas jurisdiction did not extend to aliens detained by United States military forces outside the United States. 321 F.3d at 1144. Although the holding was limited to the jurisdictional question, the *Al Odah* opinion included a discussion of whether basic constitutional protections were available to aliens abroad. Relying on *Eisentrager*, *inter alia*, we concluded that detainees were not entitled to due process, *id.* at 1141, and accordingly, "[w]e cannot see why, or how, the writ may be made available to aliens abroad when basic constitutional protections are not." *Id.* But in *Rasul*, the Supreme Court, significantly, did not reach the issue of whether Guantanamo detainees possess constitutional rights and instead based its holding on 28 U.S.C. § 2241 only. *Rasul*, 542 U.S. at 478-84. For example, the Court explained that "persons detained outside the territorial jurisdiction of any federal district court no longer need rely on the Constitution as the source of their right to federal habeas review." *Id.* at 478. It emphasized that "[w]hat is presently at stake is only whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of

32

wrongdoing." *Id.* at 485. Thus, *Boumediene* does not conflict with *Rasul* and remains the law of this Circuit.[15]

Even assuming *arguendo* the detainees can assert their Fifth and Eighth Amendment claims, those claims are nonetheless subject to the defendants' assertion of qualified immunity. In determining whether qualified immunity applies, as we earlier noted,[16] the court must first determine whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* at 201. "A constitutional right was 'clearly established' at the time of the events in question only if '[t]he contours of the right [were] sufficiently clear that a reasonable officer would understand that what he [was] doing violate[d] that right.'" *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alterations in *Butera*)).[17]

The plaintiffs argue that a reasonable person would have been on notice that the defendants' alleged conduct was

---

[15]*Boumediene* is currently before the Supreme Court on certiorari review. Nevertheless, we must follow Circuit precedent until and unless it is altered by our own *en banc* review or by the High Court. *See United States v. Carson*, 455 F.3d 336, 384 n.43 (D.C. Cir. 2006) ("[W]e are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court." (citing *Brewster v. Comm'r*, 607 F.2d 1369, 1373 (D.C. Cir. 1979))).

[16]*See supra* note 3.

[17]Because *Boumediene* was then pending in our Court, the district court assumed the first step of the *Saucier* inquiry and proceeded to analyze "whether the plaintiffs' alleged constitutional rights were clearly established at the time of the alleged abuse." 414 F. Supp. 2d at 41.

33

unconstitutional because the "prohibition on torture is
universally accepted." Appellants' Br. 38. The issue we must
decide, however, is whether the rights the plaintiffs press *under
the Fifth and Eighth Amendments* were clearly established at the
time of the alleged violations.

   An examination of the law at the time the plaintiffs were
detained reveals that even before *Boumediene*, courts did not
bestow constitutional rights on aliens located outside sovereign
United States territory. Supreme Court and Circuit precedent,
consistent with *Eisentrager*'s rejection of the proposition "that
the Fifth Amendment confers rights upon all persons, whatever
their nationality, wherever they are located and whatever their
offenses," concluded that non-resident aliens enjoy no
constitutional rights. *Eisentrager*, 339 U.S. at 783; *see, e.g.*,
*Verdugo-Urquidez*, 494 U.S. at 269 (Fourth Amendment did not
apply to the search and seizure of an alien's Mexican residence);
*Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004), *cert. denied*,
543 U.S. 1146 (2005) ("The Supreme Court has long held that
non-resident aliens who have insufficient contacts with the
United States are not entitled to Fifth Amendment
protections."); *People's Mojahedin Org. of Iran. v. U.S. Dep't
of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity
without property or presence in this country has no
constitutional rights, under the due process clause or
otherwise."); *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d
1412, 1428 (11th Cir. 1995) (Cuban and Haitian refugees at
Guantanamo Bay lacked First and Fifth Amendment rights). In
light of this precedent, we agree with the district court that "[t]he
plaintiffs have provided no case law, and the court finds none,
supporting a conclusion that military officials would have been
aware, in light of the state of the law at the time, that detainees
should be afforded the rights they now claim." 414 F. Supp. 2d
at 44.

34

Finally, the plaintiffs contend that they were not *non-resident* aliens while they were at Guantanamo because the law recognized Guantanamo as sovereign United States territory at the time of the alleged violations. They are mistaken. The United States entered into an indefinite lease with Cuba in 1903 for the Guantanamo Bay Naval Base. Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418, Art. III. The lease provides that "the United States recognizes the continuance of the *ultimate sovereignty of the Republic of Cuba*" and "the Republic of Cuba consents that during the period of the occupation by the United States . . . the United States shall exercise complete jurisdiction and control over and within said areas." *Id.* (emphasis added). Precedent regarding other leased military bases also supported the conclusion that Guantanamo is not a United States territory. For example, in *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 390 (1948), the Supreme Court stated that a leased military base in Bermuda was "beyond the limits of national sovereignty." Similarly, in *Eisentrager*, the Court held that a United States military prison in Germany was outside the sovereign territory of the United States. 339 U.S. at 778. Based on the plain text of the lease and on case law, it was not clearly established at the time of the alleged violations—nor even today—that a reasonable officer would know that Guantanamo is sovereign United States territory.[18] Accordingly, we affirm the district

---

[18]Since the plaintiffs' release, we have held that Guantanamo is *not* sovereign United States territory. *Boumediene*, 476 F.3d at 992 ("The text of the lease and decisions of circuit courts and the Supreme Court all make clear that Cuba—not the United States–has sovereignty over Guantanamo Bay."); *see also Rasul v. Bush*, 542 U.S. 466, 475 (2004) (characterizing Guantanamo Bay as a "territory over which the United States exercises plenary and exclusive jurisdiction, but not 'ultimate sovereignty'"); Detainee Treatment Act of 2005, Pub. L. No. 109-148, § 1005, 119 Stat. 2680, 2740-44 (2005) (provision detailing status review procedure for detainees entitled "Procedures for Status Review of Detainees *Outside* the United States") (emphasis added).

35

court's dismissal of the plaintiffs' two constitutional claims.

## D. *The RFRA Claim*

The plaintiffs' final claim alleges that the defendants "inhibited and constrained religiously motivated conduct central to Plaintiffs' religious beliefs," "imposed a substantial burden on Plaintiffs' abilities to exercise or express their religious beliefs" and "regularly and systematically engaged in practices specifically aimed at disrupting Plaintiffs' religious practices" in violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* Compl. ¶¶ 204-208. RFRA provides that the "Government shall not substantially burden a person's exercise of religion" unless it can demonstrate that "application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). As noted, the district court determined that RFRA applied to Government action at Guantanamo, rejecting the defendants' assertion that RFRA does not apply to non-resident aliens.[19] 433 F. Supp. 2d at 59, 67. It

_____

*But see Rasul*, 542 U.S. at 487 (Kennedy, J., concurring in the judgment) ("Guantanamo Bay is in every practical respect a United States territory . . . ."). As noted, *Boumediene* is currently before the Supreme Court on certiorari review.

[19]The district court found it necessary to conclude that Guantanamo is a "territory and possession of the United States" in order to allow the plaintiffs' RFRA claim to proceed. *Rasul*, 433 F. Supp. 2d at 62-66. Guantanamo's status, however, is not determinative of RFRA's applicability. Section 2000bb-2(1) defines "government" as "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." Whether or not "covered entity," which includes "each territory and possession of the United States," § 2000bb-2(2), applies to Guantanamo, the defendants are "official[s] of the United States" and therefore RFRA applies to their actions.

36

observed that "RFRA expressly protects the religious exercise of 'persons,' a broadly applicable term, commonly including aliens," *id.* at 66, and reasoned that "because RFRA explicitly applies to 'persons,' the defendants, at a bare minimum, must demonstrate that Congress specifically intended to vest the term 'persons' with a definition . . . at odds with its plain meaning," *id.* at 67.   It concluded that the defendants had not done so and therefore denied their motion to dismiss the RFRA claim.[20]  *Id.*

---

A distinct issue is whether RFRA applies extraterritorially regardless whether the defendants satisfy § 2000bb-2's definition of "government."    While there is a presumption against the extraterritorial application of a statute absent a "clear statement" to the contrary, *see EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 258 (1991) (*superseded by* Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071), the legislative history indicates that RFRA may have extraterritorial scope.  *See* 146 Cong. Rec. S7991 (Sept. 5, 2000) (statement of Sen. Thurmond).  We do not reach this question because we conclude that the plaintiffs are not "person[s]" within the meaning of RFRA.

[20]The district court rejected the defendants' qualified immunity from the RFRA claim, concluding that the plaintiffs' allegations made out a claim under RFRA, 433 F. Supp. 2d at 68, and that the plaintiffs' rights under RFRA were clearly established at the time of the alleged violations, *id.* at 71.  Both the Supreme Court and our court have recognized qualified immunity is available to counter not only constitutional claims but also certain statutory claims.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established *statutory* or constitutional rights of which a reasonable person would have known.") (emphasis added); *Berry v. Funk*, 146 F.3d 1003, 1014 (D.C. Cir. 1998) ("[W]e [have] held that . . . the doctrine of qualified immunity applied to plaintiff's statutory claims [under the Federal Wiretap Act] in the same manner as it applied to plaintiff's constitutional claims."); *Tapley v. Collin*, 211 F.3d 1210, 1214-15 n.9 (11th Cir. 2000) (explaining that qualified immunity is available against statutory claim unless "Congress

37

We must first determine whether the district court correctly treated the plaintiffs as "person[s]" under RFRA. Although we ordinarily "first look to the language of the law itself to determine its meaning," *United Mine Workers v. Fed. Mine Safety & Health Rev. Comm'n*, 671 F.2d 615, 621 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 927 (1982), RFRA's text does not define "person." While the defendants do not dispute that "person" is a broad term that has been interpreted as including aliens, they point out that, under various constitutional provisions, "person" does not include a non-resident alien. *See, e.g.*, *Verdugo-Urquidez*, 494 U.S. at 265 (holding that "people" as used in the Fourth Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" and thus excludes alien located in Mexico); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005) ("person" under Fifth Amendment does not include "non-resident aliens who have insufficient contacts with the United States"); *People's Mojahedin Org.*, 182 F.3d at 22 ("person" under Fifth Amendment does not apply to "foreign entity without property or presence in this country").

Because RFRA prohibits the Government from "substantially burden[ing] a *person's* exercise of religion" instead of simply the exercise of religion, 42 U.S.C. § 2000bb-1(a) (emphasis added), we must construe "person" as qualifying "exercise of religion." The original version of RFRA had defined "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb-2(4) (1994). Indeed, the stated purpose of RFRA was "to restore the compelling interest

---

intended to abrogate the defense of qualified immunity to claims under that act" and listing statutes under which qualified immunity is available as defense). We do not reach the issue of the availability of qualified immunity from a RFRA claim.

38

test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). In both *Sherbert* and *Yoder*, the Supreme Court had held that the Government must demonstrate a compelling interest to justify a substantial burden on religious exercise. *Sherbert*, 374 U.S. at 406-07 (holding that South Carolina had to demonstrate compelling state interest to justify unemployment compensation statute that denied benefits unless claimant worked on Saturday in contravention of her religious beliefs); *Yoder*, 406 U.S. at 215, 220-21 (holding that Wisconsin had to demonstrate compelling state interest to justify education statute requiring Amish children to attend formal high school in contravention of their religious beliefs). In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), however, the Court subsequently held that a generally applicable law may abridge religious exercise regardless whether the Government demonstrates a compelling interest therefor. *See id.* at 884-85 ("Even if we were inclined to breathe into [*Sherbert's* compelling interest test] some life beyond the unemployment compensation field, we would not apply it to require exemptions from a generally applicable criminal law. . . . To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling—permitting him, by virtue of his beliefs, to become a law unto himself—contradicts both constitutional tradition and common sense." (internal quotation and citation omitted)). RFRA was then enacted to restore the pre-*Smith* compelling interest test.[21] Accordingly, RFRA as

---

[21]The Congress declared that "in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4); by enacting RFRA it thus intended to "restore the compelling interest

39

originally enacted did not expand the scope of the exercise of religion beyond that encompassed by the First Amendment.[22]

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court held that RFRA could not be made applicable to the states under section five of the Fourteenth Amendment. Therefore, the Court determined that RFRA did not preclude municipal authorities

_____

test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)." 42 U.S.C. § 2000bb(b)(1).

[22]The plaintiffs and one group of Amici contend that RFRA was also enacted to extend the First Amendment Rights of prisoners and members of the military. Amicus Curiae The Baptist Joint Committee for Religious Liberty et al. (Amici) Br. 8-11. Before RFRA a prisoner's free exercise claim was reviewed under the rational basis standard, *see O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (upholding prison policy not to excuse inmate from work to attend worship service on rational basis review), and the military was exempt from some of the restrictions of the free exercise clause. *See Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (*superseded by* 10 U.S.C. § 774) (sustaining military's dress regulations that forbade wearing of yarmulke because review of military regulations "is far more deferential" than compelling interest test used for review of "similar laws or regulations designed for civilian society"). Amici contend that RFRA changed the standard of review for the free exercise claims of prisoners and military service members to the compelling interest standard. Amici Br. 8-10 (citing H.R. Rep. No. 103-88 (1993) ("Pursuant to the Religious Freedom Restoration Act, the courts must review claims of prisoners and military personnel under the compelling governmental interest test."); S. Rep. No. 103-111 (1993) ("The intent of the Act is to restore traditional protection afforded to prisoner's claims prior to *O'Lone*."); S. Rep. No. 103-111 (1993) ("Under the unitary standard set forth in the act, courts will review the free exercise claims of military personnel under the compelling governmental interest test.")). Assuming *arguendo* the plaintiffs and the amici are correct—an issue we need not reach—the inclusion of prisoners and members of the military within RFRA's protection does not affect our resolution of the plaintiffs' RFRA claim.

40

from enacting an ordinance governing historic preservation that prevented a Catholic church from expanding. *Id.* at 511. In response, in 2000 the Congress amended RFRA through the Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. 106-274, 114 Stat. 803 (2000) (RLUIPA) (codified at 42 U.S.C. §§ 2000cc *et seq.*). RLUIPA provided that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution" unless the government demonstrates a compelling interest therefor. 42 U.S.C. § 2000cc(a)(1).

RLUIPA also amended RFRA by altering the definition of "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5 (incorporated by reference by 42 U.S.C. § 2000bb-2(4)). Rather than expanding the scope of protected religious exercise under RFRA, however, the change in the definition of "exercise of religion" merely affirmed that the Congress did not intend RFRA to overrule *Smith* in its entirety. Before *Smith*, the Supreme Court had held that the "free exercise inquiry asks whether government has placed a substantial burden on the observation of a *central* religious belief or practice." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) (emphasis added); *see also Yoder*, 406 U.S. at 234 (noting Court's "consistent emphasis on the *central* values underlying Religion Clauses") (emphasis added). The Court similarly considered whether conduct was "*mandated by religious belief*" in deciding whether the Government had unconstitutionally burdened a plaintiff's free expression. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (quoting *Thomas v. Rev. Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) (emphasis in original)).

In *Smith*, the Court also rejected applying the compelling interest standard "only when the conduct prohibited is 'central'

41

to the individual's religion," declaring that "[i]t is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field . . . .  As we reaffirmed only last Term, '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" 494 U.S. at 886-87 (alteration in *Smith*) (quoting *Hernandez*, 490 U.S. at 699).  When the Congress enacted RFRA to overrule *Smith*, some courts interpreted RFRA as having restored not only the compelling interest standard but also the centrality limitation.  *See, e.g.*, *Mack v. O'Leary*, 80 F.3d 1175, 1178-79 (7th Cir. 1996) (collecting cases).  RLUIPA's definition of "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" made clear that centrality was not required.  RFRA, then, both as originally enacted and as amended by RLUIPA in 2000, was not intended to expand the scope of free exercise of religion beyond that protected by the First Amendment pre-*Smith*.

Because RFRA's purpose was thus to restore what, in the Congress's view, is the free exercise of religion guaranteed by the Constitution, "person" as used in RFRA should be interpreted as it is in constitutional provisions.  *Cf. Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-316 (2006) ("[U]nder the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read 'as if they were one law.'" (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972))); *United States v. Ursery*, 518 U.S. 267, 304-05 (1996) ("[T]he Double Jeopardy Clause is part of the same Amendment as the Self-Incrimination Clause, and ought to be interpreted *in pari materia*.").  Construing "person" as used in the Fifth

42

Amendment,[23] the Supreme Court held almost sixty years ago that German nationals who were convicted of war crimes and held at a U.S. army base in Germany were not "persons" under the Fifth Amendment and rejected the notion "that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses." *Johnson v. Eisentrager*, 339 U.S. at 783.[24]  More recently, the Supreme Court held that "people" as used in the Fourth Amendment[25] does not include non-resident aliens.  In *United States v. Verdugo-Urquidez*, the Court held that the Fourth Amendment did not apply to the DEA's search and seizure of an alien's Mexican residence.  494 U.S. 259, 269 (1990).  Citing *Eisentrager*'s "rejection of extraterritorial application of the Fifth Amendment," the Court explained that "[i]f such is true of the Fifth Amendment, which speaks in the relatively universal term of 'person,' it would seem even more true with respect to the Fourth Amendment, which applies only to 'the people.'"  *Id*; s*ee also Boumediene*, 476 F.3d at 991-92

_____

[23]"No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. V.

[24]The Supreme Court reversed this Court's opinion in *Eisentrager v. Forrestal*, 174 F.2d 961 (D.C. Cir. 1949), which had given an expansive interpretation to "person."  *See id*. at 963.  Our concurring colleague believes that "nowhere [in *Eisentrager*] did the Court rely on the definition of 'person.'"  Concurrence at 6.  But the Supreme Court rejected a broad definition of "person" in no uncertain terms.  *See Eisentrager*, 339 U.S. at 783; *see also id.* ("American citizens conscripted into the military service are . . . stripped of their Fifth Amendment rights . . . .  Can there be any doubt that our foes would also have been excepted, but for the assumption 'any person' would never be read to include those in arms against us?").

[25]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.

43

(finding it "'well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders.'" (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

We believe that RFRA's use of "person" should be interpreted consistently with the Supreme Court's interpretation of "person" in the Fifth Amendment and "people" in the Fourth Amendment to exclude non-resident aliens. Because the plaintiffs are aliens and were located outside sovereign United States territory at the time their alleged RFRA claim arose,[26] they do not fall with the definition of "person." Accordingly, the district court erred in denying the defendants' motion to dismiss the plaintiffs' RFRA claim.

For the foregoing reasons, we affirm the district's court's dismissal of counts I, II, III, IV, V and VI of the plaintiffs' complaint and reverse the district court's denial of the defendants' motion to dismiss count VII thereof.

*So ordered.*

---

[26]*See supra* note 18.

BROWN, *Circuit Judge*, concurring:  I join Parts I, II–A and II–B of the opinion.  I write separately because I believe special factors foreclose plaintiffs from bringing a *Bivens* action and because I disagree that the term "person" limits the scope of the Religious Freedom Restoration Act ("RFRA").

I

Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), a federal court can only fashion a damages action for constitutional violations where no "special factors counsel[ ] hesitation" in doing so. *Chappell v. Wallace*, 462 U.S. 296, 298 (1983) (quoting *Bivens*, 403 U.S. at 396).  Those factors do not relate to "the merits of the particular remedy" being sought, but involve "the question of who should decide whether such a remedy should be provided."  *Bush v. Lucas*, 462 U.S. 367, 380 (1983).  In cases where these special factors exist, we do not reach the underlying merits of plaintiffs' claims because we simply decline to usurp Congress's authority to create damages actions.  *See Wilkie v. Robbins*, 127 S. Ct. 2588, 2608 (2007) (because *Bivens* does not give plaintiff a cause of action, "there is no reason to enquire further into the merits of [plaintiff's] claim or the asserted defense of qualified immunity"); *Lucas*, 462 U.S. at 390; *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (because special factors foreclose a *Bivens* action, "[w]e do not reach the question whether the protections of the Constitution extend to noncitizens abroad").  Unfortunately, the majority ignores this important separation-of-powers principle and focuses entirely on whether plaintiffs' constitutional claims are meritorious.  *See* maj. op. 28–35.[1]

---

[1] Nothing in the majority's opinion forecloses the special factors argument.  If the Supreme Court limits or overturns this court's constitutional holding in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. granted*, 127 S. Ct. 3078 (2007), future defendants should not hesitate to raise this argument.

2

While the Supreme Court has created *Bivens* remedies for traditional Fifth and Eighth Amendment claims, it has "consistently refused to extend *Bivens* liability to *any new context or new category of defendants*." *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68–69 (2001) (emphasis added). For example, in *United States v. Stanley*, 483 U.S. 669 (1987), the Court held that a former serviceman could not bring a Fifth Amendment claim against unknown federal officers for secretly giving him LSD. In reaching this conclusion, it explained that Congress's failure to provide adequate alternative remedies is "irrelevant" where "congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." *Id.* at 683.

Applying the special factors inquiry to this case is particularly straightforward because of this court's decision in *Sanchez-Espinoza*. In that case, we refused to create a *Bivens* action for Nicaraguans who brought claims against U.S. government officials for supporting the Contras. As then-Judge Scalia explained:

> [T]he special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. The foreign affairs implications of suits such as this cannot be ignored—their ability to produce what the Supreme Court has called in another context "*embarrassment of our government abroad*" through "*multifarious pronouncements by various departments on one question*." *Baker v. Carr*, 369 U.S. 186, 226 (1962). Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens' using the courts in situations such as this to *obstruct the foreign policy of our government*

3

> is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.

770 F.2d at 209 (emphasis added).  The present case involves the method of detaining and interrogating alleged enemy combatants during a war—a matter with grave national security implications.  Permitting damages suits by detainees may allow our enemies to "obstruct the foreign policy of our government."  Moreover, dealing with foreign relations is primarily delegated to the executive and legislative branches, *see* U.S. CONST. art. I, § 8, cls. 11–16; *id.* art. II, § 2, and creating a damages action could produce "multifarious pronouncements by various departments."   Nor does our government's unanimous condemnation of torture answer this concern, since where to draw that line is the subject of acrimonious debate between the executive and legislative branches.  Treatment of detainees is inexorably linked to our effort to prevail in the terrorists' war against us, including our ability to work with foreign governments in capturing and detaining known and potential terrorists.  Judicial involvement in this delicate area could undermine these military and diplomatic efforts and lead to "embarrassment of our government abroad."  Accordingly, all of the special factors we identified in *Sanchez-Espinoza* apply to this case and plaintiffs cannot bring their claims under *Bivens*.

4

II

A

The majority holds plaintiffs cannot bring a RFRA claim because they are not "person[s]" within the meaning of that statute. Yet, "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). RFRA does not define "person," so we must look to the word's ordinary meaning. There is little mystery that a "person" is "an individual human being … as distinguished from an animal or a thing." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1686 (1981). Unlike the majority, I believe Congress "[did not] specifically intend[] to vest the term 'persons' with a definition … at odds with its plain meaning." *Rasul v. Rumsfeld*, 433 F. Supp. 2d 58, 67 (D.D.C. 2006).

The majority does not point to a single statute defining "person" so narrowly as to exclude nonresident aliens from its ambit, and nothing in RFRA's history suggests Congress focused on the term's scope here. RFRA originally provided that "[g]overnment shall not substantially burden a *person's exercise of religion*" unless such a burden is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1 (1994) (emphasis added). It defined "exercise of religion" as "the exercise of religion *under the First Amendment* to the Constitution." *Id.* § 2000bb-2(4) (emphasis added). The reference to the "First Amendment" made it clear that persons who did not have First Amendment rights were not protected by RFRA. Given this clear textual basis, the term "person" did no work as a limiting principle—"First Amendment" did the job.

5

In the Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, Pub. L. No. 106-274, 114 Stat. 803, Congress amended RFRA's definition of "exercise of religion" to cover "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and removed the term "First Amendment." *See id.* §§ 7(a), 8(7)(A), 114 Stat. 806, 807. This change was meant to "clarif[ ] issues that had generated litigation under RFRA" by providing that "[r]eligious exercise need not be compulsory or central to the claimant's religious belief system." H.R. REP. NO. 106-219, at 30 (1999); *see also Adkins v. Kaspar*, 393 F.3d 559, 567–68 & n.34 (5th Cir. 2004) (citing pre-RLUIPA cases requiring "the religious exercise burdened to be 'central' to the religion"). Congress wanted to expand RFRA's protections to a broader range of religious practices, *see Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2007); there is no indication it wanted to broaden the universe of persons protected by RFRA. However, by removing the term "First Amendment" from RFRA, Congress inadvertently deleted the textual hook precluding persons who did not have First Amendment rights from asserting RFRA claims.

The panel majority attempts to cure the problem created by Congress's careless amendment by constricting the meaning of the term "person." This boils down to a claim that, by removing the term "First Amendment" from RFRA's definition of "exercise of religion," Congress *sub silentio* changed RFRA's definition of "person." But this transforms statutory interpretation into a game of whack-a-mole: a deleted textual hook does not simply re-appear in another statutory term.

Finding no other support for its constricted definition of "person," the majority turns to decisions interpreting constitutional provisions: *Johnson v. Eisentrager*, 339 U.S. 763 (1950) (Fifth Amendment), and *United States v.*

6

*Verdugo-Urquidez*, 494 U.S. 259 (1990) (Fourth Amendment). *Eisentrager* rejected this circuit's conclusion that the breadth of the term "person" in the Fifth Amendment expanded the coverage of the Due Process Clause beyond its traditional limits. Nevertheless, nowhere in its extensive discussion did the Court rely on the definition of "person."[2] Its holding turned on the conventional understanding of the Fifth Amendment, the "full text" of that Amendment, and the foreign policy complexities of allowing aliens to assert constitutional rights. *Id.* at 782–83.[3] Moreover, *Eisentrager* interpreted the Due Process Clause; RFRA implements the Free Exercise Clause. The term "person" does not appear in the Free Exercise Clause, *see* U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof … ."), and thus the definition of "person" cannot be the reason aliens held abroad do not have free exercise rights, *see Boumediene*, 476 F.3d at 993 (implying Guantanamo detainees do not have First Amendment rights even though "[t]he First Amendment's guarantees of freedom of speech and free exercise of religion do not mention individuals").

---

[2] Similarly, none of the other Fifth Amendment cases the majority cites rely on the definition of "person." *See Jifry v. FAA*, 370 F.3d 1174, 1182–83 (D.C. Cir. 2004) (not mentioning the term "person" in holding nonresident aliens with insufficient contacts do not have Fifth Amendment rights); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (same for foreign entities).

[3] In fact, the *Eisentrager* Court repeatedly used the term "person" in its common meaning. *See id.* at 768 n.1 (citing cases brought on behalf of "persons," referring to "German enemy aliens"); *id.* at 783 ("The Court of Appeals has cited no authority whatever for holding that the Fifth Amendment confers rights upon all persons ….").

7

*Verdugo* is even less helpful to the majority. Unlike *Eisentrager*, *Verdugo* did rely on a definitional analysis, explaining that the Fourth Amendment did not apply to nonresident aliens outside of our borders, in part, because "the people" referred to in the Amendment identifies a "*class of persons* who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265 (emphasis added). While "the people" are merely a "class of persons," the relevant inquiry for RFRA purposes is "who are 'persons'?" The answer is obvious— "persons" are individual human beings, of whom the American people are just one class.

B

While the majority's approach is untenable, the plaintiffs still do not prevail. RFRA's proscription that "[g]overnment shall not substantially burden a person's exercise of religion" and RLUIPA's new definition of "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," leave no textual basis for prohibiting suits brought by non-resident aliens held at Guantanamo, or foreign nationals who work for American officials on NATO military bases, or, arguably, jihadists our soldiers encounter on foreign battlefields.[4] While "statutory language represents the clearest indication of Congressional

---

[4] The term "government" provides no limiting basis since RFRA defines this term as including an "official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1). Defendants, the Secretary of Defense and high-ranking military officers, are unquestionably officials of the United States. Moreover, as the majority points out, since defendants are officials of the United States, it is irrelevant whether Guantanamo Bay Naval Base is a "covered entity." Maj. op. 35 n. 19.

8

intent," we may go beyond the text in those "rare cases" where a party can show that "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 230 (D.C. Cir. 2001) (internal quotation omitted).

The unusual drafting history of RFRA and RLUIPA make this one of those rare cases. RFRA originally only provided for suits for violation of First Amendment rights, which did not include intrusions on the free exercise of those in plaintiffs' position. *See Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1428 (11th Cir. 1995). There is no doubt that RLUIPA's drafters, in changing the definition of "exercise of religion," wanted to broaden the scope of the kinds of practices protected by RFRA, not to increase the universe of individuals protected by RFRA. *See* H.R. REP. NO. 106-219, at 30; *Adkins*, 393 F.3d at 567–68 & n.34; *Navajo Nation*, 479 F.3d at 1033. Literal application of RFRA would force us to hold Congress's careless drafting inadvertently expanded the scope of RFRA plaintiffs. Such a result is "demonstrably at odds with the intentions of [RLUIPA's] drafters." *See Nat'l Pub. Radio*, 254 F.3d at 230.

Even if I believed RLUIPA expanded the scope of persons protected by RFRA, I would have no trouble concluding defendants are protected by qualified immunity.[5] There was strong reason for defendants to believe RFRA originally did not apply to plaintiffs. While RLUIPA changed RFRA, it was far

---

[5] There is some uncertainty about whether qualified immunity is available to federal officials sued under RFRA. *See Kwai Fun Wong v. United States*, 373 F.3d 952, 977 (9th Cir. 2004) ("Neither this court nor any other court of appeals has decided whether qualified immunity is available to a federal government official sued under RFRA."). In this case, however, Plaintiffs have assumed that qualified immunity is available and have thus waived any argument to the contrary.

9

from clearly established that this change expanded the class of persons protected by RFRA.

C

Accepting plaintiffs' argument that RFRA imports the entire Free Exercise Clause edifice into the military detention context would revolutionize the treatment of captured combatants in a way Congress did not contemplate. Yet, the majority's approach is not much better. It leaves us with the unfortunate and quite dubious distinction of being the only court to declare those held at Guantanamo are not "person[s]." This is a most regrettable holding in a case where plaintiffs have alleged high-level U.S. government officials treated them as less than human.

In drafting RFRA, Congress was not focused on how to accommodate the important values of religious toleration in the military detention setting. If Congress had focused specifically on this challenge, it would undoubtably have struck a different balance: somewhere between making government officials' pocketbooks available to every detainee not afforded the full panoply of free exercise rights and declaring those in our custody are not "persons." It would not have created a RFRA-like damage remedy, but it likely would have prohibited, subject to appropriate exceptions, unnecessarily degrading acts of religious humiliation. It would have sought to deter such acts not by compensating the victims, but by punishing the perpetrators or through other administrative measures. *See, e.g.*, Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, §§ 1091 to 1092, 118 Stat. 1811, 2068–71 (2004) (to be codified at 10 U.S.C. § 801 note) (creating an administrative regime to prevent unlawful treatment of detainees); Detainee Treatment Act of 2005, Pub. L. 109-148, § 1003(a), 119 Stat. 2739 (to be codified at 42 U.S.C. § 2000dd)

10

("No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment."). Judicial interpretation without text is at best a stop-gap; at worst, a usurpation. In 2000, when Congress amended RFRA, jihad was not a prominent part of our vocabulary and prolonged military detentions of alleged enemy combatants were not part of our consciousness. They are now. Congress should revisit RFRA with these circumstances in mind.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **YUKSEL CELIKGOGUS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-CV-1996 (HHK)** |
| | ) | |
| **DONALD RUMSFELD, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

### ORDER

This matter having come before the Court on Defendants' Unopposed Motion for

Extension of Time to Respond to the Amended Complaint, the Court having considered the

motion, and for good cause shown, it is hereby

**ORDERED** that Defendants' motion is GRANTED; and it is further

**ORDERED** that Defendants shall file answers or motions in response to the Amended

Complaint within sixty days of the date upon which the Court of Appeals rendered it decision in

Rasul v. Rumsfeld, Nos. 06-5209, 06-5222 (D.C. Cir), which would be March 11, 2008.


DATE: _____        BY: _____

UNITED STATES DISTRICT JUDGE